

**Department of Justice**
United States Marshals Service
Northern District of Illinois

# Memo

F I L E D

**To:**   Clerk's Office

**From:**   Tamar De.Costa

**Date:**   July 16, 2008

**Re:**   Case#08C2242

JUL 17 2008  Y M
Jul 17, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT,

I am returning the attached case#08C2242 GMAC Real Estate, LLC vs. Ruben Coulanges, et al. I have not received the requested USM-285 form with the address of the party to be served and the pre-payment fee for service from the plaintiff's representative. The USM-285 form and letter requesting pre-payment where mailed on May 8, 2008.

Tamar
Civil Process

1

Order Form (01/2005)

# United States District Court, Northern District of Illinois

*MHN*

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 2242 | **DATE** | 4/30/2008 |
| **CASE TITLE** | GMAC Real Estate, LLC vs. Ruben Coulanges, et al | | |

**DOCKET ENTRY TEXT**

Motion hearing held on 4/30/2008 regarding # 5. Plaintiff's Motion [5] directing the U.S. Marshal to serve defendants is granted. ENTER ORDER DIRECTING THE U.S. MARSHAL TO SERVE DEFENDANTS

■ [ For further detail see separate order(s).]

Docketing to mail notices.

```
A TRUE COPY - ATTEST
MICHAEL W. DOBBINS, CLERK
BY _____
        DEPUTY CLERK
U.S. DISTRICT COURT, NORTHERN
        DISTRICT OF ILLINOIS
DATE: ___5/6/08___
```

| | Courtroom Deputy Initials: | PAMF |
|---|---|---|

08C2242 GMAC Real Estate, LLC vs. Ruben Coulanges, et al

Page 1 of 1

*MHN*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GMAC REAL ESTATE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 08 CV 2242 |
| | ) | |
| RUBEN COULANGES, SOUTH SHORE | ) | Judge Coar |
| REALTY GROUP, INC., d/b/a SOUTH | ) | |
| SHORE GMAC REAL ESTATE, | ) | Magistrate Judge Cox |
| | ) | |
| Defendants. | ) | |

## ORDER
## DIRECTING THE UNITED STATES MARSHAL TO SERVE DEFENDANTS

This matter coming to be heard on Plaintiff, GMAC Real Estate, LLC's ("GMAC")

Motion Directing The U.S. Marshal to Serve Defendants pursuant to section 9 of the Federal

Arbitration Act, the Court being fully advised,

IT IS HEREBY ORDERED THE MOTION GRANTED and the Court hereby directs the

United States Marshal to serve Defendants with Plaintiff's Motion For Confirmation of

Arbitration Award and Judgment in the same manner as other process is served and pursuant to

Plaintiff's request for Process Receipt and Return to be submitted to the U.S. Marshal.

Dated: April 30, 2008                    ENTERED:

David H.  Coar, U.S. District Judge

Order Form (01/2005)

## United States District Court, Northern District of Illinois

*MHN*

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 2242 | **DATE** | 4/30/2008 |
| **CASE TITLE** | GMAC Real Estate, LLC vs. Ruben Coulanges, et al | | |

**DOCKET ENTRY TEXT**

Motion hearing held on 4/30/2008 regarding # 5.  Plaintiff's Motion [5] directing the U.S. Marshal to serve defendants is granted.  ENTER ORDER DIRECTING  THE U.S. MARSHAL TO SERVE DEFENDANTS

■ [ For further detail see separate order(s).]

Docketing to mail notices.

A TRUE COPY - ATTEST
MICHAEL W. DOBBINS, CLERK
BY *Marla J Co___*
DEPUTY CLERK
U.S. DISTRICT COURT, NORTHERN
DISTRICT OF ILLINOIS

DATE: 5/6/08

| | Courtroom Deputy Initials: | PAMF |
|---|---|---|

*MHN*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GMAC REAL ESTATE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 08 CV 2242 |
| | ) | |
| RUBEN COULANGES, SOUTH SHORE | ) | Judge Coar |
| REALTY GROUP, INC., d/b/a SOUTH | ) | |
| SHORE GMAC REAL ESTATE, | ) | Magistrate Judge Cox |
| | ) | |
| Defendants. | ) | |

## ORDER
## DIRECTING THE UNITED STATES MARSHAL TO SERVE DEFENDANTS

This matter coming to be heard on Plaintiff, GMAC Real Estate, LLC's ("GMAC")

Motion Directing The U.S. Marshal to Serve Defendants pursuant to section 9 of the Federal

Arbitration Act, the Court being fully advised,

IT IS HEREBY ORDERED THE MOTION GRANTED and the Court hereby directs the

United States Marshal to serve Defendants with Plaintiff's Motion For Confirmation of

Arbitration Award and Judgment in the same manner as other process is served and pursuant to

Plaintiff's request for Process Receipt and Return to be submitted to the U.S. Marshal.

Dated: April 30, 2008                                    ENTERED:

David H. Coar, U.S. District Judge

AO440 (REV. 10/93) Summons in a Civil Action

# United States District Court
Northern District of Illinois

### SUMMONS IN A CIVIL ACTION

GMAC Real Estate, LLC

vs.

Ruben Coulanges, et al

Defendant

**CASE NUMBER**: 08cv2242

**JUDGE:** Coar

**TO:**   Ruben Coulanges

YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and serve upon plaintiff's attorney:

Name  Eric Richard Lifvendahl
Address: 20 North Wacker Drive, Ste. 2100
City: Chicago, IL 60606

an answer to the complaint which is herewith served upon you, within **[20]** days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Michael W. Dobbins, Clerk

By:   M. Cowan
Deputy Clerk

Dated: 5/6/08

## RETURN OF SERVICE

| Service of the Summons and Complaint was made by me:^ | DATE |
|---|---|
| NAME OF SERVER (Print) | TITLE |

*Check one box below to indicate appropriate method of service:*

[ ]   Served personally upon the defendant.  Place where served: _____

_____

[ ]   Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.  Name of person with whom the summons and complaint were left:

_____

[ ]   Returned unexecuted: _____

[ ]   Other (specify): _____

_____

_____

_____

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                        Date                                          Signature of Server

_____
Address of Server

^As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

AO440 (REV. 10/93) Summons in a Civil Action

# United States District Court
Northern District of Illinois

### SUMMONS IN A CIVIL ACTION

GMAC Real Estate, LLC

vs.

Ruben Coulanges, et al

Defendant

**CASE NUMBER**: 08cv2242

**JUDGE:** Coar

**TO:**   Ruben Coulanges

        YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and serve upon plaintiff's attorney:

Name  Eric Richard Lifvendahl
Address: 20 North Wacker Drive, Ste. 2100
City: Chicago, IL 60606

an answer to the complaint which is herewith served upon you, within **[20]** days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Michael W. Dobbins, Clerk

By:  M. Cowan
Deputy Clerk

Dated: 5/6/08

## RETURN OF SERVICE

| Service of the Summons and Complaint was made by me:^ | DATE |
|---|---|
| NAME OF SERVER (Print) | TITLE |

*Check one box below to indicate appropriate method of service:*

[ ]  Served personally upon the defendant.  Place where served:_____

_____

[ ]  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.  Name of person with whom the summons and complaint were left:

_____

[ ]  Returned unexecuted:_____

[ ]  Other (specify): _____

_____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____    _____
                        Date                                   Signature of Server

_____
Address of Server

^As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GMAC REAL ESTATE, LLC, )
)
      Plaintiff, )
) FILED:  APRIL 18, 2008
) 08CV2242      CEM
vs. ) No.  JUDGE COAR
) MAGISTRATE JUDGE COX
RUBEN COULANGES, SOUTH SHORE )
REALTY GROUP, INC., d/b/a SOUTH )
SHORE GMAC REAL ESTATE, )
)
      Defendants. )

## MOTION FOR CONFIRMATION OF ARBITRATION AWARD AND JUDGMENT

      Plaintiff and Claimant in the underlying arbitration GMAC Real Estate, LLC ("GMAC")

by its attorney Eric R. Lifvendahl, moves this Court to confirm the arbitration award entered on

April 9, 2008 by the American Arbitration Association ("AAA") and enter judgment on behalf of

GMAC pursuant to Federal Arbitration Act, §9.  In support of its motion, GMAC states as

follows:

      1.      GMAC and Defendants (also the named Respondents in the arbitration) Ruben

Coulanges ("Coulanges") and South Shore Realty Group, Inc. d/b/a South Shore Realty Group

("South Shore") entered into a Franchise Agreement effective February 1, 2005.  A copy of the

Franchise Agreement is attached hereto as Exhibit A.

      2.      Pursuant to Section 23 of the Franchise Agreement, the parties agreed that any

dispute would be resolved by arbitration before the AAA in Chicago. (Ex. A, §23B, pp. 22-23).

The parties also agreed that the arbitration would be governed by the Federal Arbitration Act and

any judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

3.      Following a dispute over the Franchise Agreement GMAC filed an Arbitration Demand with AAA. (A copy of the Demand is attached as Exhibit B). As stated in the Demand, GMAC's principal place of business is Illinois.

4.      On April 3, 2008, an arbitration hearing in Case No. 51 115 01284 07 was held at AAA's offices in Chicago before the arbitrator Paul Bernstein.

5.      On April 9, 2008, arbitrator Bernstein issued an Award of Arbitrator ("Award"). (A copy of the Award is attached as Exhibit C).

6.      As states in the Award, defendant South Shore is ordered to pay GMAC a total of $167,073.43 excluding arbitration filing costs and fees.

7.      As stated in the Award, defendant Coulanges is ordered to pay GMAC $70,864.43 excluding arbitration costs and fees.

8.      Lastly, the Award found South Shore and Coulanges jointly and severally liable to GMAC for $6,000 for arbitration costs and fees.

9.      GMAC requests this Court enter an Order confirming the arbitration Award and entering judgment on behalf of GMAC. Attached hereto is a draft proposed order confirm the arbitration Award and entering judgment on behalf of GMAC.

WHEREFORE, Plaintiff GMAC Real Estate, LLC respectfully requests the Court enter an Order confirming the arbitration Award entered by arbitrator Paul Bernstein on April 9, 2008 and entering judgment against both Defendants.

Respectfully submitted,

GMAC Real Estate, LLC, Plaintiff


By:___/s/ Eric R. Lifvendahl_____
        One of its Attorneys

Eric R. Lifvendahl
Williams Montgomery & John Ltd.
20 North Wacker Drive
Suite 2100
Chicago, IL 60606
(312) 442-3200

Document #: 771582

08CV2242          CEM
JUDGE COAR
MAGISTRATE JUDGE COX

# EXHIBIT A

# GMAC REAL ESTATE, LLC

## REAL ESTATE FRANCHISE AGREEMENT

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4



# TABLE OF CONTENTS

**Page**

1.  THE FRANCHISE...................................................................................1
2.  RELATIONSHIP OF THE PARTIES...........................................................1
3.  THE MARKS........................................................................................1
4.  MATERIALS.........................................................................................2
5.  TRAINING...........................................................................................4
6.  GRANT OF THE LICENSE......................................................................4
7.  CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE; PROVISION OF OTHER SETTLEMENT SERVICES.................6
8.  NO CONFLICTING LICENSE / INTEREST..................................................7
9.  GROSS COMMISSION INCOME AND FEES / REAL PROPERTY. ...................7
10. FEES.................................................................................................8
11. PAYMENT OF FEES/REPORTING. ..........................................................8
12. LATE PAYMENT..................................................................................9
13. VERIFICATION RIGHTS.......................................................................10
14. ADVERTISING FUND...........................................................................10
15. REFERRALS.......................................................................................10
16. PREMIER SERVICE(SM); PERFORMANCE STANDARDS. .............................12
17. ASSIGNMENT; OWNERSHIP; RIGHT OF FIRST REFUSAL. ........................13
18. TERMINATION; DEFAULT; CROSS-DEFAULT..........................................16
19. OBLIGATIONS UPON TERMINATION.....................................................19
20. REPRESENTATIONS AND WARRANTIES.................................................20
21. ENTIRE AGREEMENT..........................................................................21
22. INDEMNIFICATION AND INSURANCE.....................................................22
23. CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS. .............................................22
24. MODIFICATION OF AGREEMENT...........................................................24
25. SEVERABILITY...................................................................................24
26. NON-WAIVER.....................................................................................24
27. NOTICES; FACSIMILE AND ELECTRONIC MAIL.......................................24
28. TERM AND RENEWAL..........................................................................25

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

i

29.   EFFECTIVE DATE......................................................................................................25
30.   LIMITATION OF DAMAGES. ....................................................................................25
31.   CONFIDENTIALITY OF AGREEMENT......................................................................26

**EXHIBITS**

Endorsement of Principals / Ownership Interest Holders
A       -       Royalty / Advertising Fees

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

ii

# REAL ESTATE FRANCHISE AGREEMENT

The parties, GMAC Real Estate, LLC, a Delaware limited liability company, with its principal offices at 2021 Spring Road, Suite 300, Oak Brook, Illinois 60523 ("GMAC Real Estate"); and

South Shore Realty Group, Inc.
Exact name under which real estate license is held ("Strategic-Partner"), whose principal place of business is located at 136 Main Street, Brockton, MA 02301

dba South Shore
(any change in dba requires prior written approval)

FEDERAL ID#51-0480418

agree as follows:

## 1. THE FRANCHISE.

GMAC Real Estate and its predecessors have developed a franchise system (the "Franchise") which will permit use of the Marks (as defined in Section 3), including the Mark "GMAC Real Estate", in the promotion and sale of Real Property (as defined in Section 9.C.). The Franchise provides those firms selected to be strategic-partners with the opportunity to use the Marks and to participate in the other benefits outlined in this Agreement.

GMAC Real Estate: (a) provides guidelines regarding the use of the GMAC Real Estate name and other Marks, which are intended to maximize the value of the nationally recognized image of GMAC Real Estate and improve the effectiveness of Strategic-Partner's advertising, public relations, personnel recruiting and sales promotion programs; (b) facilitates referrals between strategic-partners (but excluding referrals from GMAC Real Estate's affiliated relocation company, unless Strategic-Partner and/or Strategic-Partner's sales associates have qualified for such referrals, and then, subject to the conditions of such qualification); (c) provides systems and programs to deliver sales training and education, management training and client promotional materials to its strategic-partners; and (d) periodically provides a national business conference for the benefit of its strategic-partners.

GMAC Real Estate will strive to improve the Franchise through development of new programs and review of existing programs and will seek recommendations from its strategic-partners to strengthen the Franchise at local and national levels.

## 2. RELATIONSHIP OF THE PARTIES.

GMAC Real Estate and Strategic-Partner are each independently owned and operated businesses which share similar mutual interests with respect to real estate brokerage. Neither this Real Estate Franchise Agreement (this "Agreement"), nor the use of the term "Strategic-Partner" in this Agreement, is intended to create or shall be construed to create an agency, partnership, joint venture or employer-employee relationship between the parties. The GMAC

Real Estate business operated by Strategic-Partner is an independently owned and operated business and Strategic-Partner is solely responsible for its day-to-day conduct and activities. Strategic-Partner is not an agent (actual, implied or ostensible) of GMAC Real Estate. Neither party shall hold itself out to be an agent, partner, joint venturer or employee of the other party. Neither party shall have the right to bind or obligate the other party.

Strategic-Partner agrees to conduct its real estate brokerage business: (a) in such fashion as to reflect favorably at all times on GMAC Real Estate and the good name, goodwill and reputation of GMAC Real Estate and the Marks, and (b) in compliance with all laws and regulations pertaining to the operation of its real estate brokerage business.

## 3.  THE MARKS.

A.  **Ownership and Modification of the Marks.**  GMAC Real Estate is the owner or licensee of the GMAC Real Estate trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols used to identify the products and services offered by GMAC Real Estate franchises, including the mark "GMAC Real Estate" (collectively the "Marks"). Strategic-Partner's right to use the Marks is derived solely from this Agreement and is limited to the operation of a real estate brokerage business by Strategic-Partner, pursuant to and in compliance with this Agreement and with all applicable standards, specifications and operating procedures prescribed by GMAC Real Estate, from time to time, during the term of this Agreement. Any unauthorized use of the Marks by Strategic-Partner shall constitute a Default (as defined in Section 18.D.) of this Agreement and an infringement of the rights of GMAC Real Estate in and to the Marks. GMAC Real Estate will protect and defend the Marks in the manner that it, in its sole discretion, determines is required. All goodwill resulting from Strategic-Partner's use and promotion of the Marks will accrue to the benefit of GMAC Real Estate.

If it becomes advisable at any time, in the sole discretion of GMAC Real Estate, to modify or discontinue use of any Mark and/or to require Strategic-Partner to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols, Strategic-Partner agrees to comply with the requirements of GMAC Real Estate to modify or otherwise discontinue the use of such Mark and/or to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs or other commercial symbols after notice to do so from GMAC Real Estate. All provisions of this Agreement applicable to the Marks shall apply to any other trademarks, service marks, trade dress, logos, designs, colors and commercial symbols later authorized by GMAC Real Estate, in writing, for use by and licensed to Strategic-Partner. The term "Marks" shall include any marks developed and/or registered in the future.

GMAC Real Estate shall have no obligation to reimburse Strategic-Partner for any expenditures made by Strategic-Partner to modify or discontinue the use of a Mark or to adopt additions to or substitutes for a discontinued Mark, including, without limitation, any expenditures relating to advertising or promotional materials or to compensate Strategic-Partner for any goodwill related to the discontinued or modified Mark. Notwithstanding the foregoing, if GMAC Real Estate changes the primary service mark of the Franchise so that it no longer includes the words "GMAC Real Estate" or some variation of those words, GMAC Real Estate will (a) provide Strategic-Partner 12 months' prior written notice of the change and (b) allow

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

2

Strategic-Partner to terminate this Agreement at the end of the twelve-month notice period. If Strategic-Partner elects to so terminate this Agreement, Strategic-Partner shall notify GMAC Real Estate, in writing, at least 90 days before the expiration of the 12-month notice period and shall comply with all post-termination obligations contained in this Agreement.

B. **Use of Marks.** To maintain the integrity of the Marks and the Franchise, GMAC Real Estate retains the right to control the quality of all materials and programs bearing the Marks and the manner in which the Marks are used.

The Marks shall be used: (1) only in conjunction with permanent real estate sales offices approved by GMAC Real Estate, and (2) only in the form and style authorized by GMAC Real Estate, as outlined from time to time in its manuals and other communications. Any departure from the restrictions set forth in the manuals or any use of the Marks on printed materials not outlined in the manuals must be approved in advance, in writing, by GMAC Real Estate. Use of the Marks on any publication (e.g., homeowner newsletter, decorating magazine, booklets, etc.) is specifically prohibited, unless the publication is approved in advance, in writing, by GMAC Real Estate.

Strategic-Partner will use the Marks in all real estate brokerage activities at or from the Licensed Site (as described in Section 6) during the term of this Agreement.

The Marks shall not be used to identify any property, goods or services provided by Strategic-Partner, other than those specifically approved, in writing, by GMAC Real Estate. Strategic-Partner will not use the Marks in any manner which indicates or implies the endorsement by GMAC Real Estate of any real property listed, sold or advertised by Strategic-Partner, including such real property's design, quality or price.

Strategic-Partner shall not use the GMAC Real Estate name or any other Mark as part of its corporate or entity name or in any other manner not expressly authorized, in writing, by GMAC Real Estate. The Marks shall be used as part of the trade name of Strategic-Partner in connection with all of, and limited to, its real estate brokerage activities. Strategic-Partner may use the GMAC Real Estate name (but not "GMAC" alone or any other Mark) as part of an Internet (or other computer network) domain name, provided that (i) such use complies with the standards set forth in the manuals or other communications supplied by GMAC Real Estate from time to time; (ii) prior written approval of the domain name is obtained from GMAC Real Estate; and (iii) upon termination of this Agreement for any reason, Strategic-Partner will comply with the terms of Section 19.A.(1) with regard to terminating its use of the GMAC Real Estate name as part of its domain name.

GMAC Real Estate reserves the right, in its sole discretion, to vary standards for any strategic-partner based upon the peculiarities or uniqueness of a strategic-partner's particular circumstances, business practices or any other conditions which GMAC Real Estate deems to require such variances. Strategic-Partner shall have no recourse against GMAC Real Estate for any variation from standard specifications and practices granted to any other strategic-partner and shall not be entitled to require GMAC Real Estate to grant Strategic-Partner a like or similar variation.

3/2004 Reg. Fran. Agmt.
CHGO1/30423577.4

3

## 4. MATERIALS.

The use of any GMAC Real Estate materials (including copyrighted materials) is restricted to use by Strategic-Partner in its own business. Strategic-Partner shall not use for its own benefit (except as provided in this Agreement) or license to, or otherwise permit, third-parties to use or reproduce, in any form or manner, GMAC Real Estate materials or programs, or adapt and use, or permit any of its sales associates or employees to adapt and use, any GMAC Real Estate materials or programs on an Internet (or other computer network) site or in any other manner without the prior written approval of GMAC Real Estate.

All building signs, yard signs, promotional items and printed materials shall adhere to the design, size, colors and other specifications (together, the **"Specifications"**) set forth in the manuals or other communications supplied by GMAC Real Estate from time to time. No departure from the Specifications shall be permitted without the prior written approval of GMAC Real Estate which approval shall not be unreasonably withheld, denied or delayed; any such departure shall be considered a Default of this Agreement. Strategic-Partner's Licensed Site shall be required to display building signs in conformance with the Specifications within sixty (60) days of the Effective Date. If a zoning ordinance, regulation, lease or similar restriction precludes Strategic-Partner from using a sign consistent with the Specifications, prior to erection of an alternate sign, the details for such an alternate sign shall be presented for approval to GMAC Real Estate, with a copy of the relevant zoning ordinance, regulation, lease or similar restriction; GMAC Real Estate's approval shall not be unreasonably withheld, delayed or conditioned.

All business records, letterheads, business forms, advertising and other materials (excluding business cards) disseminated to the public and used in Strategic-Partner's business shall indicate Strategic-Partner's independent ownership of the brokerage business with the statement "An Independently Owned and Operated Firm".

GMAC Real Estate will provide the initial development of a new logo treatment for Strategic-Partner, together with a franchise opening/starter kit, including operating and presentation manuals, videotapes, audio tapes, advertising materials, magazines and marketing products, at no cost to Strategic-Partner.

## 5. TRAINING.

A. **Getting Connected Session.** For New Strategic-Partners: GMAC Real Estate shall conduct a Getting Connected Session ("GCS") in the Chicago, Illinois area, or such other location designated by GMAC Real Estate. Strategic-Partner or its designated manager must attend, and satisfactorily complete, the first available GCS after execution of this Agreement. GMAC Real Estate will pay the GCS registration fee for one attendee (either Strategic-Partner or its designated manager) to attend a GCS at the site selected by GMAC Real Estate, provided that such designated person attends the GCS within 12 months after the Effective Date. Strategic-Partner may elect to have additional persons attend a GCS, but it must pay the then-current GCS registration fee for each additional attendee.

For Renewing Strategic-Partners: Within six (6) months after renewal, Strategic-Partner shall send at least one key management representative to a GCS at a site designated by GMAC Real Estate. The representative must complete the GCS to GMAC Real Estate's reasonable satisfaction. Strategic-Partner must pay the GCS registration fee for its designated representative and for each additional attendee.

**B. Accountability in Management.** For both new and renewing Strategic-Partners, following the Effective Date at least one key management representative of Strategic-Partner must satisfactorily complete "Accountability in Management" training. Upon any subsequent changes in key management personnel at the Licensed Site, at least one key management representative must satisfactorily complete Accountability in Management training. Accountability in Management training is a week-long management training class currently provided by a third-party vendor. Strategic-Partner must pay the Accountability in Management training registration fee for each attendee.

**C. Premier Service℠.** Strategic-Partner and each of its managers and sales associates must satisfactorily complete Premier Service training within six (6) months following the later to occur of (i) the Effective Date or (ii) such individual first becoming associated with Strategic-Partner. Strategic-Partner must pay the registration fee for each attendee.

**D. Costs.** Strategic-Partner shall be responsible for all travel, living and other costs its attendees incur in association with attending the training programs described in Sections A, B, and C above and all other training programs.

## 6. GRANT OF THE LICENSE.

**A. Current Office.** Strategic-Partner represents that it presently operates, or will by the Effective Date operate, an office at the following location:

Location        136 Main Street, Brockton, MA 02301

GMAC Real Estate grants to Strategic-Partner a license to establish and/or operate a real estate brokerage office displaying the Marks at its existing office location, as set forth above (the "Licensed Site"). Although the license granted to Strategic-Partner is non-exclusive and similar licenses may be granted to others within Strategic-Partner's market area, GMAC Real Estate shall not grant to another strategic-partner a license to use the Marks at an office located at the Licensed Site.

Simultaneously with the execution of this Agreement, Strategic-Partner shall execute and deliver to GMAC Real Estate a written instrument, conveying to GMAC Real Estate Strategic-Partner's rights to any telephone numbers relating to the Licensed Site. GMAC Real Estate agrees that it will hold the instrument in escrow, and will not release the instrument or exercise its rights thereunder unless and until there exists an Event of Default under this Agreement.

**B. Additional Offices.** If Strategic-Partner desires to expand its real estate brokerage business, by opening an additional office or otherwise, it shall apply to GMAC Real Estate for

approval to do so, by submitting a written application at least ninety (90) days prior to the planned date for opening. Approval of such expansion shall be within GMAC Real Estate's sole discretion and, if granted, shall be in writing. If approved, Strategic-Partner and GMAC Real Estate will enter into a separate agreement, on the form then being offered by GMAC Real Estate, with regard to the new office. Strategic-Partner's application must be accompanied by payment of the applicable Joining Fee for the additional franchise. If the office expansion is not approved by GMAC Real Estate, the Joining Fee will be refunded.

C. **Sublicensing Prohibited.** Strategic-Partner shall not sublicense, or permit a third-party to use, the GMAC Real Estate name or any other Mark.

7. **CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE; PROVISION OF OTHER SETTLEMENT SERVICES.**

A. Nothing in this Agreement shall preclude Strategic-Partner or other strategic-partners from listing, selling or advertising any real estate, wherever it or the owner of the real estate may be located, including in areas serviced by Strategic-Partner or other strategic-partners, as applicable. GMAC Real Estate reserves the right: (i) to license other real estate brokers to use the Marks anywhere, other than at Strategic-Partner's Licensed Site, including areas adjacent to, or in proximity with, the Licensed Site; (ii) for GMAC Real Estate and its parents, subsidiaries, or affiliated entities to conduct activities, including real estate brokerage activities, mortgage, title insurance and relocation operations, in areas adjacent to, or in proximity with, the Licensed Site under the Marks or other marks; and (iii) for GMAC and its parents, subsidiaries, or affiliated entities to establish other franchises or company-owned outlets or other channels of distribution, selling or leasing similar products or services under a different mark. Additionally, GMAC Real Estate reserves the right to establish, and to have its parents, subsidiaries and/or affiliated entities establish, anywhere, franchises or company-owned businesses or other channels of distribution: (x) selling or leasing similar products or services under trademarks, service marks, trade dress, logos, designs, colors or other commercial symbols different from the Marks, or (y) offering dissimilar products or services under the Marks.

B. Simultaneously with the execution of this Agreement, Strategic-Partner will enter into exclusive contractual relationships with GMAC Real Estate or its affiliates or designees pertaining to the delivery of other core real estate settlement services and/or products, including mortgage, title and closing services, home warranty and homeowner's insurance, provided, however, that both Strategic-Partner and GMAC Real Estate agree that the entry into such contractual relationships is beneficial to both parties. If Strategic-Partner does not enter into one or more of these contractual relationships with GMAC Real Estate or its affiliates as of the Effective Date, but subsequently decides during the Term of this Agreement to provide any such core real estate settlement services and/or products, Strategic-Partner agrees that it must do so exclusively through the entry into contractual relationships with GMAC Real Estate or its affiliates or designees, as to those services and/or products. Except for arrangements that Strategic-Partner has in place which pre-date the Effective Date, Strategic-Partner and its Owners and affiliates may not directly or indirectly offer any such core real estate settlement services and products of other vendors, and may not have relationships with other vendors of such services and products, during the Term of this Agreement. Any existing arrangements

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

6

which are to be excluded from this requirement will be noted in writing before this Agreement is signed. The mortgage business, CMC Mortgage, is excluded from this requirement.

## 8.  NO CONFLICTING LICENSE / INTEREST.

During the period beginning on the Effective Date and ending on the last day of the Term, neither Strategic-Partner nor any of its principals or ownership interest holders (together, "Owners"), directly or indirectly, shall become affiliated with, establish or have an interest in: (a) any real estate brokerage franchising or similar system or service, other than one operated by GMAC Real Estate; (b) any real estate brokerage operation or business or real estate information center, which is not licensed by GMAC Real Estate; or (c) any business offering real estate settlement services and/or products including those described in Section 7.B. above, except in accordance with the provisions of Section 7.B. above. The provisions of this Section 8:  (y) shall remain in effect through the last day of the Term, even if Strategic-Partner attempts to voluntarily terminate this Agreement or ceases operations or if this Agreement is terminated as the result of an Event of Default attributable to Strategic-Partner; or (z) shall have no further effect if this Agreement is terminated as the result of a Event of Default attributable to GMAC Real Estate. GMAC Real Estate acknowledges that the Owner's ownership interests in Mass Management Group, LLC, a property management company, will not constitute a violation of this provision and fees earned by Mass Management Group, LLC will not be subject to the provisions of this Agreement, provided Strategic-Partner operates Mass Management Group, LLC in accordance with the Commercial Exclusion Provisions defined below.

## 9.  GROSS COMMISSION INCOME AND FEES / REAL PROPERTY.

A.  Gross Commission Income, as defined below and where applicable, shall be used as the basis for the calculation of fees to be paid by Strategic-Partner to GMAC Real Estate.

B.  "Gross Commission Income" ("GCI") includes (A) all commissions and fees received by Strategic-Partner from the sale, lease, transfer or other disposition (including mergers and similar transactions) (each a "Disposition") of Real Property (as defined below), including any note, obligation, lien or other consideration given to Strategic-Partner in lieu of a commission, less commissions and referral fees paid to cooperating and/or referring brokers in other brokerage entities, but excludes (B) all commissions and fees received by Strategic-Partner from property management, the Disposition of commercial real estate or the non-residential portion of farm properties and any other brokerage or similar activity, provided Strategic-Partner conducts such activities through a separate legal entity (with a Federal I.D. number different from Strategic-Partner's), which entity maintains its own office location and telephone number and does not use the Marks (the "Commercial Exclusion Provisions"). Specifically: (X) GCI includes any selling bonuses, document preparation fees, administration and similar fees received by Strategic-Partner; (Y) GCI does not include referral payments made by GMAC Real Estate to Strategic-Partner nor does it include cooperating brokers fees paid to cooperating brokers in other brokerage entities that Strategic-Partner receives at closing and distributes to the cooperating broker; and (Z) there shall not be deducted from the calculation of GCI Strategic-Partner's expenses, membership or other fees (including multiple listing service fees) or payments made to brokers, sales associates or employees working in association with, or licensed through, Strategic-Partner.

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

7

C. "**Real Property**" includes single and multiple unit residential housing, commercial properties, farm houses, vacant or unimproved land to be used for residential, recreation or commercial purposes, condominiums, cooperatives, townhouses, vacation houses, interests in interval-ownership/ time-share residential units and mobile homes when affixed to the ground.

## 10. FEES.

Strategic-Partner agrees to pay the following fees (in United States dollars) to GMAC Real Estate:

A. **Joining Fee.**  Simultaneously with the execution of this Agreement (if this Agreement is not being executed upon the expiration of a similar contract between Strategic-Partner and GMAC Real Estate or its predecessor), a Joining Fee in an amount equal to $20,000 if the Licensed Site is Strategic-Partner's first GMAC Real Estate office within a particular market area, or $7,500 if the Licensed Site is located within the same market area, as determined by GMAC Real Estate, as another GMAC Real Estate office owned by Strategic-Partner. Notwithstanding the foregoing, if Strategic-Partner qualifies for the Classic Market Program (as described hereinafter), the Joining Fee will be $7,500, regardless of the number of GMAC Real Estate offices Strategic-Partner operates. For purposes of this Agreement, the "Classic Market Program" is a reduced-Joining Fee program open to strategic-partners that (i) earned $499,999 or less of GCI in the twelve (12) calendar months immediately preceding the Effective Date and (ii) are not located within any Metropolitan Statistical Area, as determined in accordance with the then-current standards of the United States Office of Management and Budget.

B. **Royalty Fees.**  In accordance with the provisions of Exhibit A, attached.

C. **Referral Office Fee.**  A Referral Office Fee of $504 per year, billed in monthly installments of $42 per month (or $485 if paid in full, in advance, on the Effective Date and on each subsequent anniversary date thereof). Strategic-Partner acknowledges that payment of the Referral Office Fee is required to help defray the costs of promoting GMAC Real Estate's broker to broker referral network and that payment of the Referral Office Fee does not insure that Strategic-Partner will receive any such broker to broker referrals.

D. **Referral Fee.**  A referral fee, in accordance with Section 15 below, to GMAC Real Estate and, as applicable, any of its strategic-partners, within 10 days of the receipt by Strategic-Partner of a commission or fee generated from a transaction which was referred to Strategic-Partner by GMAC Real Estate or any of its strategic-partners.

E. **Advertising Fee.**  In accordance with the provisions of Exhibit A, attached. Advertising Fees shall be used in connection with the Advertising Fund, described in Section 14 of this Agreement

F. **Business Conference Registration Fee.**  Each attendee each must pay the then-current registration fee.

## 11. PAYMENT OF FEES/REPORTING.

A. Strategic-Partner agrees to pay all fees as set forth above and on the appropriate Exhibit, and to use such forms or computer software as recommended by GMAC Real Estate. Strategic-Partner agrees to furnish reports to GMAC Real Estate as the latter may reasonably require, including, but not limited to, periodic financial reports and statements, as provided in this Agreement and as may be reasonably requested by GMAC Real Estate in the future. In addition, Strategic-Partner shall submit to GMAC Real Estate Receipt a copy of Ruben Coulanges' 2004 federal tax return.

B. GMAC Real Estate shall have the right to set-off any amounts due to Strategic-Partner (including Awards – as defined in Exhibit A, if applicable) against any amounts due from Strategic-Partner to GMAC Real Estate or to any Affiliate of GMAC Real Estate (an "Affiliate" of GMAC Real Estate is defined as an entity, the majority ownership of which is held, directly or through subsidiaries, by General Motors Acceptance Corporation). Within 90 days of receiving a notice, in writing, from GMAC Real Estate to do so, Strategic-Partner shall make all reports through a broker reporting system ("BRS") approved by GMAC Real Estate and shall make all payments to GMAC Real Estate, electronically, through an electronic funds transfer account/system ("EFT") approved by GMAC Real Estate, which may or may not use a BRS. After receipt of such written notice and within the above time period, Strategic-Partner shall install and use a BRS and/or EFT, including all required hardware and software. Acceptable BRS's and EFT's will be those set forth on a document prepared and distributed by GMAC Real Estate to Strategic-Partner, together with (or prior to) the service of the written notice referenced above. As to each BRS and EFT (as applicable), Strategic-Partner shall (A) continuously maintain a software support system through an agreement with a reputable and competent service provider, (B) promptly cause to be rectified all problems which interfere with the proper operation of the BRS, (C) install updated versions as they become available, and (D) enter promptly (within 48 hours of settlement or closing, as to fees based on GCI or transactions) and accurately all information requested, including information related to listings, pendings, offices and agents. In addition, as to each EFT: (Y) Strategic-Partner shall enter into and keep effective whatever agreements with third-parties (including Strategic-Partner's financial institution) are required to permit GMAC Real Estate to withdraw electronically from Strategic-Partner's account amounts to which GMAC Real Estate is entitled and to provide in such agreements that 30-days prior notification will be given to GMAC Real Estate before such agreements are terminated, suspended or materially changed, and (Z) Strategic-Partner shall maintain sufficient monies in its accounts to cover all withdrawals permitted to be made by GMAC Real Estate.

C. Strategic-Partner agrees to furnish to GMAC Real Estate, on an ongoing updated basis and in form as reasonably requested by GMAC Real Estate, a roster of sales agents, brokers and other persons associated with Strategic-Partner who are authorized and/or licensed to conduct real estate sales activities, which roster shall include, as to each such sales agent and broker, the name, address, real estate license number (with a copy of the license), date of association, date of termination, location of office from which each such sales agent and broker is operating and other items that may reasonably be requested by GMAC Real Estate, from time to time.

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

9

## 12. LATE PAYMENT.

If Strategic-Partner fails to make payment of any fee within 15 days of its due date: (a) Strategic-Partner shall pay to GMAC Real Estate interest on the payment due at the annual rate of prime plus 4%, but, in any event, not less than 12% nor more than 15%; "prime" is defined as the interest rate published in The Wall Street Journal (the "WSJ") in its money rate section on the 1st business day of each month, as the prime or base lending rate being offered on that day (if such interest rate is not so published in the WSJ, "prime" shall be the average prime or base lending rate, as of that date, being offered by Citibank, N.A., to its most credit-worthy customers for 90-day loans); (b) GMAC Real Estate shall have the right, at its option, to deduct all such amounts from any payments due to Strategic-Partner pursuant to this Agreement or otherwise; (c) if the delinquent payment is in connection with a deferred payment plan, subject to any contrary provision in any documentation evidencing such a deferred payment plan, all present and future payments shall be automatically accelerated and all amounts due under the plan shall be considered due and payable; and (d) at the option of GMAC Real Estate and after written notice has been served upon Strategic-Partner, GMAC Real Estate may terminate Strategic-Partner's right to receive referrals, change any territorial provisions and/or, if Strategic-Partner's Fee Schedule is based solely on GCI, terminate Strategic-Partner's right to receive Awards (as defined in Exhibit A, if applicable). In the event collection action is necessary to recover monies due to GMAC Real Estate, Strategic-Partner agrees to pay the costs of collection, including agency and attorneys fees and court costs.

## 13. VERIFICATION RIGHTS.

No later than one hundred twenty (120) days following the end of each calendar-year during the Term (including any calendar-year in which the Term expires), Strategic-Partner shall provide to GMAC Real Estate annual financial statements in a form acceptable to GMAC Real Estate. If Strategic-Partner is conducting a business which is not covered by this Agreement, Strategic-Partner shall maintain a separate set of books and records for its real estate brokerage operations. Strategic-Partner shall permit a GMAC Real Estate representative to inspect and audit Strategic-Partner's accounting records and books for each line of business in which Strategic-Partner engages. If it is determined that Strategic-Partner has reported to GMAC Real Estate any fees due under this Agreement which are 3% or more lower than the fees actually due hereunder, Strategic-Partner shall pay to GMAC Real Estate, in addition to the unpaid fees, interest on the unpaid fees as provided in Section 12, plus the actual travel costs and expenses of the auditors and other persons involved in the inspection and/or audit. GMAC Real Estate shall have the right to inspect Strategic-Partner's offices and to confer with Strategic-Partner, its sales associates and employees to assure compliance with the standards GMAC Real Estate prescribes from time to time. GMAC Real Estate also shall have the right, and Strategic-Partner and each of its Owners hereby confirms that each of them so authorizes GMAC Real Estate to complete a credit investigation concerning each or all of them from time to time during the Term, as and in whatever manner GMAC Real Estate deems necessary in its sole discretion.

## 14. ADVERTISING FUND.

A. Within its sole discretion, GMAC Real Estate (or an entity designated by GMAC Real Estate, in which event, such entity shall have all the rights and obligations of GMAC Real

Estate with respect to the Advertising Fund, as provided in this Section) may establish and operate a fund (the "Advertising Fund" or the "Fund") for the purpose of providing marketing and advertising relative to the Marks. The Advertising Fund shall consist of monies paid to GMAC Real Estate by entities using the Marks, including Strategic-Partner. The monies paid to GMAC Real Estate as Advertising Fees (or otherwise designated by GMAC Real Estate as monies to be used by the Advertising Fund) shall be used by GMAC Real Estate, within its sole discretion, to, among other things: (A) create, produce, administer and support (either in-house or outsourced) national, regional and local marketing, advertising, public relations, promotional and other programs (together, "Programs"); and (B) present and promote a national business conference.

B. The amount, type, timing, content, location, cost and all other matters relating to Programs sponsored by the Advertising Fund or to which the Advertising Fund contributes, shall be within the sole discretion of GMAC Real Estate. Monies expended from the Advertising Fund on Programs in areas served by Strategic-Partner are not required to be proportionate to the amount of Advertising Fees paid by Strategic-Partner. Expenditures from the Advertising Fund shall be charged first to earned interest, if any.

C. GMAC Real Estate, in any calendar year, may expend from the Advertising Fund amounts which are greater or lesser than either amounts received by the Advertising Fund in such year or amounts contained in the Advertising Fund during that year (regardless of when they were collected). If a lesser amount is expended, the balance shall be carried over to the next year; if a greater amount is expended, the excess amount shall be repaid to GMAC Real Estate (or to whomever provided such monies, if other than GMAC Real Estate) from fees received by the Advertising Fund in the next year.

D. In the event a strategic-partner is delinquent in the payments required to be made by it to the Advertising Fund, GMAC Real Estate shall have the right (but not the obligation) to undertake collection action against the delinquent strategic-partner and to charge the reasonable costs of collection (including, but not limited to, collection agency fees, attorney's fees and costs) to the Advertising Fund. GMAC Real Estate, within its sole discretion, shall have the right to settle, reduce, compromise or waive payments required to be made by a strategic-partner to the Advertising Fund.

E. Advertising Fees (and all other monies received by the Advertising Fund) shall be accounted for separately, but may be deposited and commingled with any other funds of GMAC Real Estate. On or before April 30 of each year, GMAC Real Estate shall prepare a financial statement of the Advertising Fund for the prior calendar year, which shall be certified by a senior officer of GMAC Real Estate and shall be forwarded to Strategic-Partner, upon Strategic-Partner's written request. Strategic-Partner shall have the right to reasonably review the books and records of the Advertising Fund at GMAC Real Estate's principal place of business, upon reasonable prior notice to GMAC Real Estate.

F. GMAC Real Estate shall have the right, in its sole discretion, to negotiate with any strategic-partner a different arrangement than that set forth in the Section entitled "Advertising Fees", relating to the payment of Advertising Fees, including, but not limited to, payments by such strategic-partner for designated local marketing in lieu of the payment by such strategic-

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

11

partner of Advertising Fees, or payments from the Advertising Fund to a strategic-partner for designated local marketing, where national or regional marketing is determined to be inappropriate or where other situations, peculiar to a local market, are determined by GMAC Real Estate, within its sole discretion, to require such action.

G. GMAC Real Estate, within its sole discretion and upon 30-days notice to Strategic-Partner, may suspend or discontinue (and, thereafter, within its sole discretion, reinstate) the Advertising Fund, provided that, upon a suspension or discontinuance, the Fund shall continue to be operated until all monies in the Fund are expended in accordance with the provisions of this Agreement.

H. GMAC Real Estate's obligations with respect to the Advertising Fund and the collection, maintenance and distribution of Advertising Fees are as set forth in, and limited to, those contained in the provisions of this Agreement. In no event shall GMAC Real Estate be deemed to have fiduciary obligations to Strategic-Partner as to the operations of the Advertising Fund.

## 15. REFERRALS.

A. **Broker to Broker Referrals.** With respect to a broker-to-broker referral to be made by Strategic-Partner, Strategic-Partner shall make each such referral to an eligible GMAC Real Estate strategic-partner or, if no such strategic-partner is located in the applicable area, then to another broker approved by GMAC Real Estate (hereinafter an "Authorized Alternative Broker"). All such referrals shall be made either by contacting GMAC Real Estate to have GMAC Real Estate facilitate the referral or by directly contacting such strategic-partner. The strategic-partner who places the referral must register the transaction with GMAC Real Estate. To register a referral, Strategic-Partner must submit the required referral form to include complete contact information as provided at the time that the referral is accepted by the destination broker. This referral form is required regardless of whether the destination broker is a strategic-partner of GMAC Real Estate or is an Authorized Alternative Broker. Strategic-Partner shall pay referral fees and royalties as set forth below.

If another GMAC Real Estate strategic-partner refers a transaction to Strategic-Partner, Strategic-Partner as the destination company will, within 10 days after it receives any GCI from that referred transaction, pay to the originating strategic-partner a fee equal to 25% of the GCI that Strategic-Partner earned from the referred transaction. Strategic-Partner then will pay Royalty Fees based on the net GCI from the referred transaction.

Likewise, if Strategic-Partner refers an outgoing transaction to another strategic-partner or Authorized Alternative Broker, that other broker will pay to Strategic-Partner a fee equal to 25% of the GCI it earned from the referred transaction. In that instance, Strategic-Partner as the originating broker then will pay GMAC Real Estate a fee equal to 2.5% of the GCI that the other broker earned from the referred transaction (which may also be stated as 10% of the amount that Strategic-Partner received from the other broker).

B. In the event Strategic-Partner fails to comply with the above procedures or with the policies, standards or procedures adopted by GMAC Real Estate, from time to time, regarding

referrals, GMAC Real Estate may, at its option (and in addition to any other remedies available to it for a Default of this Agreement), suspend further referrals to Strategic-Partner, remove Strategic-Partner from the authorized referral directory, require referral training attendance, terminate this Agreement or take other action deemed appropriate.

C. Strategic-Partner acknowledges that it acquires no rights or expectations with respect to referrals, whether from corporate relocation activities or otherwise, beyond those expressly stated in this Section.

## 16. PREMIER SERVICE℠; PERFORMANCE STANDARDS.

A. Strategic-Partner agrees that retention of market coverage, consistent performance, recruitment and training of a full-time, professional sales staff and commitment to the programs of GMAC Real Estate are necessary for retention of the license granted by this Agreement. Of primary importance is Strategic-Partner's full engagement in the process of Premier Service℠, a systematic and measurable way to conduct business. In addition to satisfying the Premier Service training requirements described in Section 5.C. above, Strategic-Partner agrees to participate in the Premier Service survey process by registering the Licensed Site and requesting every buyer and seller represented by Strategic-Partner to complete a Premier Service survey upon completion of a transaction. Strategic-Partner is responsible to pay a one-time registration fee for the Licensed-Site and a fee for each survey sent to a buyer or seller. In addition, Strategic-Partner shall use Strategic-Partner's best efforts, and shall actively encourage its managers and sales agents, to implement third-party and affiliated programs sponsored by GMAC Real Estate, through its Strategic Alliance Group or otherwise.

B. Strategic-Partner's performance shall be reviewed annually on the anniversary of the Effective Date, beginning on the second anniversary of the Effective Date. Strategic-Partner's average GCI shall exceed, for the 1 year period being reviewed, 75% of the higher of (a) GCI attained during the first year after the Effective Date, or (b) GCI attained during the 1-year period prior to the 1-year period being reviewed, or (c) the average of the prior 3 years (if Strategic-Partner has been licensed for such period). Failure by Strategic-Partner to meet this performance standard shall constitute an Event of Default under this Agreement. Notwithstanding the provisions of this subparagraph (b), if the Market Area (as later defined) serviced by Strategic-Partner is negatively impacted as a whole, to the extent that the total sales volume, by dollar, of residential property sold during the year being reviewed is less than 90% of the total sales volume, by dollar, of residential property sold during the prior year, the percentage of GCI to be maintained by Strategic-Partner shall be reduced proportionately (e.g., if the total sales volume of the year being reviewed is 90% of the total sales volume of the prior year, the percentage required to be maintained by Strategic-Partner shall be reduced by 10%, i.e., to 67.5% - 10% of 75%). "Market Area" shall be the area serviced by the following multiple listing service: MLS Property Information Network (the "MLS"); total sales volume shall be as reflected by the records of the MLS.

## 17. ASSIGNMENT; OWNERSHIP; TRANSFERS; RIGHT OF FIRST REFUSAL.

A. **Assignment by GMAC Real Estate.** GMAC Real Estate shall have the right, within its sole discretion, to assign or transfer this Agreement and/or any of its rights or obligations

under this Agreement to a third-party, whether or not such third-party is affiliated with GMAC Real Estate.

**B. Transfer of Agreement, Assets by Strategic-Partner.**    Strategic-Partner acknowledges and agrees that GMAC Real Estate has entered into this Agreement in reliance upon the qualifications and representations of Strategic-Partner and, where Strategic-Partner is an entity, upon the qualifications and representations of both Strategic-Partner and Strategic-Partner's Owners (as defined in Section 8). Therefore, Strategic-Partner agrees that it shall not, without the prior written consent of GMAC Real Estate, Transfer (as defined in Section 17.E. below) this Agreement, any interest in its licensed business, or all or substantially all of its assets. GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement. Additionally, any such consent will be conditioned upon the following: (1) the Transfer of this Agreement may occur only in connection with the Transfer of the entire business conducted pursuant to this Agreement; (2) the transferee has agreed, in writing, to honor Strategic-Partner's obligations under this Agreement; (3) all of Strategic-Partner's obligations to GMAC Real Estate (financial and otherwise) have been satisfied; (4) agreement by the transferee (or a principal of the transferee) to attend required training; (5) a copy of all relevant Transfer documentation is delivered to GMAC Real Estate; (6) at least 30-days prior written notice is given to GMAC Real Estate; and (7) the transferee executes a franchise agreement in the form as contained in the most recently filed offering circular, for the term indicated in that form (but not less than 5 years), commencing with the date of execution of the new agreement. Strategic-Partner shall remain liable to GMAC Real Estate pursuant to this Agreement with respect to all obligations which are based on actions or omissions prior to the effective date of the Transfer.

**C. Ownership.** Strategic-Partner certifies that: (i) Strategic-Partner is an individual or, if one of the entities described below is checked, it is that type of entity; and (ii) if Strategic-Partner is an entity, the Owners listed below are the only principals or persons holding an ownership interest in Strategic-Partner and the percentage of ownership interest held by each is set forth next to the name of each such person (if an ownership interest is held by another entity, Strategic-Partner certifies that there is set forth below each successive ownership interest, until individual ownership interests are reached and disclosed). Strategic-Partner shall notify GMAC Real Estate, in writing, prior to any change in the ownership interests (or the percentages) shown below or any change in the broker of record (the name of whom is set forth below).

    (X)        corporation: organized under the laws of the State or Commonwealth of <u>Massachusetts</u>

    ( )        limited liability company: organized under the laws of the State or Commonwealth of _____

    ( )        partnership (indicate type): organized under the laws of the State or Commonwealth of _____

Owners:

Ruben Coulanges_____          <u>100</u>%

(Ownership interest holders listed)

Idelie Jean Baptiste_____
(Broker of Record)

**D. Transfer of Ownership Interests in Strategic-Partner.**  The written consent of GMAC Real Estate shall be required with respect to any Transfer of an ownership interest equal to or greater than 10% of the total ownership interests in Strategic-Partner (including Transfers which, over a period of 2 years, each individually involve less than 10% of the ownership interests, but cumulatively, equal or exceed a Transfer of 10% or more of the ownership interests). GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement.  Strategic-Partner shall provide at least 60 days prior written notice to GMAC Real Estate of any Transfer of the type described in the first sentence of this Section 17.D. (but, in the case of an Transfer upon the death of an Owner, within 30 days after the date of such death). Within 60 days of its receipt of the notification, GMAC Real Estate shall notify Strategic-Partner or transferee of its consent or refusal to consent to the proposed Transfer.

**E. Definition of a Transfer.**  For purposes of Sections 17.B. and 17.D., the term "Transfer" shall mean any sale, lease, assignment, conveyance or other transfer including: (i) those occurring involuntarily or by operation of law, including those resulting from death, marriage, incompetency or similar events; (ii) those occurring through merger, acquisition, consolidation, dissolution, bankruptcy, execution or foreclosure sale or similar events or those occurring between/among the spouse and/or children of an Owner; and (iii) those occurring through any other voluntary act.

**F. Effect of Unauthorized Transfer.**  In the event of a Transfer for which consent was required pursuant to this Section 17, but such consent was not obtained, both Strategic-Partner and the transferee shall be required to comply with the provisions of this Agreement and shall be obligated to GMAC Real Estate to do so.  A failure to comply with the provisions of this Section 17 shall constitute an Event of Default under this Agreement.

**G. Right of First Refusal.**  As to any Transfer referenced in 17.B. or 17.D. above (except a Transfer of ownership interests between/among the spouse and/or children of an Owner or between/among Owners), GMAC Real Estate shall have the right, at its option, to purchase (or otherwise have transferred to it) the stock and/or assets of Strategic-Partner, under substantially the same conditions as a proposed Transfer to a third-party (the "**Right of First Refusal**"). Prior to an Transfer to a third-party, Strategic-Partner shall serve upon GMAC Real Estate a copy of the term sheet, letter of intent or contract (the "**Offer Document**") whereby Strategic-Partner has agreed with a third-party to an Transfer, together with a certification from the transferor(s) that the Offer Document accurately and fully represents all the terms and conditions of the proposed Transfer and a copy of all due diligence materials furnished by Strategic-Partner to the third-party upon which the third-party based its offer as provided in the Offer Document. If, within 10

days of receipt by GMAC Real Estate of the above documentation (the "10-day Notice Period"), GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected to exercise its Right of First Refusal, GMAC Real Estate and Strategic-Partner shall be deemed to have entered into a contract based on the same terms set forth in the Offer Document and, thereafter, each party shall be bound by its terms, provided the Offer Document provides (and, shall be deemed to so provide, if it does not), that: (i) GMAC Real Estate shall have the right to substitute cash for any other form of payment provided in the Offer Document; and (ii) the date of closing or settlement shall be not less than 60 days from the date of service by GMAC Real Estate upon Strategic-Partner of the notice that it has elected to exercise its Right of First Refusal; and (iii) Strategic-Partner makes the customary warranties and representations given by the seller of the assets of, or ownership interests in, an entity operating a real estate brokerage business, including, but not limited to, those related to title, the operating condition of the assets, the validity of contracts and the extent of liabilities. If, within the 10-day Notice Period, GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected not to exercise its Right of First Refusal or if no notice is so served by GMAC Real Estate, GMAC Real Estate shall be deemed to have waived its Right of First Refusal for a period of 180 days from the beginning of the 10-day Notice Period (the "180-day Waiver Period"). If, within the 180-day Waiver Period, Strategic-Partner effectuates the Transfer in accordance with the terms and conditions of the Offer Document, the Right of First Refusal shall be considered terminated. If, within the 180-day Waiver Period, the Transfer is not effectuated in accordance with the terms and conditions of the Offer Document or any material term or condition of the Offer Document is changed, the Right of First Refusal shall be considered reinstated and the procedures set forth above shall be followed with respect to any proposed Transfer (including a proposed Transfer which was the subject of a Offer Document that was changed during any 180-day Waiver Period).

## 18. TERMINATION; DEFAULT; CROSS-DEFAULT.

This Agreement may be terminated upon any one of the following conditions (in addition to the conditions specifically mentioned elsewhere in this Agreement and unless otherwise provided by the law of the state in which Strategic-Partner is located). Prior to the effective date of termination, Strategic-Partner shall pay all monies due, or to become due pursuant to this Agreement, to GMAC Real Estate and shall furnish GMAC Real Estate with all required reports and records. After termination, GMAC Real Estate shall have no further obligations to Strategic-Partner.

A. **By Strategic-Partner.** If GMAC Real Estate is in Default (as defined in Section D, below) of this Agreement, Strategic-Partner may terminate this Agreement, effective upon service upon GMAC Real Estate of a written notice of termination (the "**Strategic-Partner's Termination Notice**"), provided, prior to the service of Strategic-Partner's Termination Notice, Strategic-Partner had served upon GMAC Real Estate a written notice of such Default (the "**Strategic-Partner's Default Notice**") which specified the nature and extent of the Default, including identification of the specific provision of this Agreement which GMAC Real Estate is in Default of, and GMAC Real Estate failed to cure such Default within 30 days after receipt of Strategic-Partner's Default Notice or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, GMAC Real Estate failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by

GMAC Real Estate within 90 days of the service of the Strategic-Partner's Default Notice, despite the diligent efforts of GMAC Real Estate to do so, Strategic-Partner shall have the right to serve Strategic-Partner's Termination Notice at any time thereafter, until the Default is cured).

The service of Strategic-Partner's Termination Notice by Strategic-Partner shall: (1) be deemed to be an irrevocable waiver by Strategic-Partner of the exclusivity of the Licensed Site and GMAC Real Estate shall be free to license other parties to use the Marks at the Licensed Site, and (2) relieve other strategic-partners of the Franchise of any obligations regarding the placement of referrals with Strategic-Partner.

**B. By GMAC Real Estate (Automatic).** Each of the following shall constitute an Event of Default, which, among other things, shall result in an automatic termination of this Agreement (unless GMAC Real Estate, in its sole discretion, notifies Strategic-Partner, in writing to the contrary), effective immediately, without notice to Strategic-Partner:

(1)    Strategic-Partner becomes insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy (or similar proceeding) is filed by Strategic-Partner or is filed against Strategic-Partner and is not opposed by Strategic-Partner; or if a final judgment in an amount of $25,000 or more is entered against Strategic-Partner and is not covered by a policy of insurance remains unsatisfied for a period of 60 days; or, if Strategic-Partner is an individual and except as otherwise provided in this Agreement, Strategic-Partner dies, or, if Strategic-Partner is an entity, Strategic-Partner ceases to exist; or if execution is levied against Strategic-Partner or Strategic-Partner's business, assets, ownership interest or property.

(2)    Strategic-Partner ceases to operate its real estate brokerage business, which shall include failing to keep its offices open and staffed during all regular business hours, properly equipped for the transaction of real estate brokerage activities; provided, however, that if Strategic-Partner's business premises are damaged or destroyed, Strategic-Partner shall have 30 days after such event in which to apply for approval from GMAC Real Estate to relocate or reconstruct the premises, which approval shall not be unreasonably withheld, delayed or conditioned. Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any cessation of its real estate brokerage business or the closure of any of its offices;

(3)    The real estate brokerage license of Strategic-Partner, of Strategic-Partner's broker of record (or the equivalent) or of any Owner is suspended, revoked or not renewed, or Strategic-Partner's right to do business in the jurisdiction in which any of Strategic-Partner's Licensed Sites is located. Strategic-Partner shall notify GMAC Real Estate, in writing, immediately upon the occurrence of any of the above events;

(4)    Strategic-Partner or any Owner conducts its real estate brokerage operations in such a fashion as to reflect unfavorably on GMAC Real Estate, its name, goodwill or reputation, or on the Marks, including, but not limited to, the employment of or other association with any individuals who have been convicted of a crime; or Strategic-Partner acts or fails to act in such a manner as to be in violation of any law or regulation. Without limiting the generality of the foregoing, any breach of the

representations or warranties set forth in Section 20.C. hereof shall result in automatic termination of this Agreement. Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any of the above events;

(5) Strategic-Partner or any Owner purports to Transfer any rights or obligations under this Agreement or any interest in Strategic-Partner to a third party without GMAC Real Estate's prior written consent, contrary to the provisions of this Agreement;

(6) Strategic-Partner or any Owner makes any material misrepresentation or omission in its application or Business and Financial History Form or Strategic-Partner maintains false books or records or makes any false reports or statements to GMAC Real Estate; or

(7) Strategic-Partner or any Owner is in Default of any provision of this Agreement and was served with a GMAC Real Estate Default Notice (as defined below) in the preceding 12-month period.

C. **By GMAC Real Estate (Right To Cure).** If Strategic-Partner or any Owner is in Default of this Agreement based on acts or omissions not referenced in Section 18.B., above, GMAC Real Estate, in addition to all other remedies available to it, may terminate this Agreement, effective upon service upon Strategic-Partner of a written notice of termination (the **"GMAC Real Estate Termination Notice"**), provided, prior to the service of the GMAC Real Estate Termination Notice, GMAC Real Estate had served upon Strategic-Partner a written notice of such Default (the **"GMAC Real Estate Default Notice"**) which specified the nature and extent of the Default and Strategic-Partner failed to cure such Default within 30 days after receipt of the GMAC Real Estate Default Notice, or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, Strategic-Partner failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by Strategic-Partner within 90 days of the service of the GMAC Real Estate Default Notice, despite the diligent efforts of Strategic-Partner to do so, GMAC Real Estate shall have the right to serve a GMAC Real Estate Termination Notice at any time thereafter, until the Default is cured).

D. **Default and Event of Default.** The term **"Default"**, as used throughout this Agreement, shall mean a material failure to comply with a provision of this Agreement. The term **"Event of Default"**, as used throughout this Agreement, shall mean a Default for which this Agreement provides no period to cure or for which the period to cure has expired.

E. **Additional Remedies upon an Event of Default.** Should Strategic-Partner commit an Event of Default, GMAC Real Estate, without terminating this Agreement, may, at its option, (and in addition to any other remedies available to it under this Agreement), suspend services to Strategic-Partner, remove Strategic-Partner from any GMAC Real Estate websites and other directories, eliminate Strategic-Partner's exclusive territory (if any) under this Agreement, suspend further referrals to Strategic-Partner and remove Strategic-Partner from the authorized referral directory, or take other action deemed appropriate.

F.  **Cross-Default.**  Notwithstanding any contrary provision of this Agreement or any other Franchise Agreement between Strategic-Partner (and/or its Owners or affiliates) and GMAC Real Estate (each such other Franchise Agreement being a "Sister Agreement"), any occurrence of Strategic-Partner's Default and/or Event of Default under this Agreement shall constitute a Default and/or Event of Default under each Sister Agreement, and any occurrence of Strategic-Partner's Default and/or Event of Default under any Sister Agreement shall constitute a Default and/or Event of Default under this Agreement.

## 19. OBLIGATIONS UPON TERMINATION.

A.  Upon termination of this Agreement, for whatever reason, Strategic-Partner shall:

(1)    within 10 days of such termination, discontinue use of all Marks, including the words "GMAC Real Estate", or any derivation of those words, and refrain from holding itself out to the public in a manner that would suggest that it is a licensee or former licensee of GMAC Real Estate.  Strategic-Partner agrees that GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of the Marks.  In addition, if Strategic-Partner has used the words "GMAC Real Estate" as part of its internet domain name and such use has not terminated within 10 days of termination of this Agreement, Strategic-Partner will be deemed to have assigned its rights in such domain name to GMAC Real Estate, and GMAC Real Estate may take whatever actions it deems appropriate to terminate such domain name and Strategic-Partner's right to use the same;

(2)    on the date of such termination, pay to GMAC Real Estate all fees, charges and other amounts due to GMAC Real Estate, together with the following additional fees:

(a)    Royalty Fees and Advertising Fees, computed as set forth on Exhibit A, on GCI attributable to transactions in process on the termination date and to transactions under contract on the date of termination that settle or close within 30 days after termination; and

(b)    Referral Fees, computed as set forth above, on referrals sent or received prior to the termination date;

(3)    Surrender to GMAC Real Estate or, at the option of GMAC Real Estate, destroy all signs and documentation bearing the Marks, including yard signs, letterheads, advertising and marketing materials, business cards, manuals, training materials, client promotion materials and the like.  GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of materials or programs which are part of the Franchise;

(4)    Take immediate steps to cancel all advertising, including advertising in the Yellow Pages of the telephone directory, which carries the Marks; and

(5)    Execute any documents necessary to effectuate its obligations under this Agreement and take such action as GMAC Real Estate deems reasonably necessary to

evidence the fact that Strategic-Partner has ceased using the Marks and has no further right to use the Marks.

B. Upon termination of this Agreement pursuant to Section 18.B. or 18.C. above, in addition to the obligations set forth in Section 19.A. above:

    (1)   Strategic-Partner shall:

        (a)    pay to GMAC Real Estate all financial losses sustained by GMAC Real Estate as the result of the early termination (if the amount of such losses cannot be calculated exactly, they shall be estimated); and

        (b)    remain obligated with respect to the provisions of Section 8 of this Agreement; and

    (2)   Owners shall be personally liable to GMAC Real Estate for all financial obligations of Strategic-Partner to GMAC Real Estate, but limited to those obligations incurred prior to the date of termination and those based on losses attributable to the one-year period after the date of termination.

For purposes of section 19 b.(2), "losses attributable to the one-year period after the date of termination" shall mean the Total Fee Amounts (defined as Royalty Fees, Advertising Fees and Referral Office Fees) which would have been due from Strategic-Partner under the Agreement had Strategic-Partner performed under the Agreement for the one-year period following the termination date.  For purposes of calculating the Total Fee Amounts for such period, the monthly average of the Royalty Fees and Advertising Fees due from Strategic-Partner, as provided in Exhibit A of this Agreement, for the twenty-four (24) month period preceding the date of termination will be multiplied by twelve, and will be added to the actual Referral Office Fees due for the one-year period following the date of termination.  If the date of termination occurs prior to year three of this Agreement, the Royalty and Advertising Fees portion of the Total Fee Amounts will be based on the amount of such fees due to GMAC Real Estate for the twelve-month period preceding the date of termination.

C. If, after termination of this Agreement, Strategic-Partner fails to comply with its obligations under this Section, in addition to any other payments required to be made by Strategic-Partner to GMAC Real Estate, Strategic-Partner shall reimburse GMAC Real Estate for all its costs related to its attempt to enforce its rights, including the payment of reasonable collection agency's fees, attorney's fees and costs.

## 20. REPRESENTATIONS AND WARRANTIES.

A. Strategic-Partner represents that it is either an individual or an entity (properly formed and authorized to do business in the state in which the Licensed Site is located) licensed to sell real estate in the state in which the Licensed Site is located.

B. Strategic-Partner acknowledges that GMAC Real Estate has delivered to Strategic-Partner, not less than 10 business days prior to the signing of this Agreement, a copy of the

Offering Circular concerning this franchise for the state in which the Licensed Site is located and in which Strategic-Partner intends to do business, which Strategic-Partner has had an opportunity to review. Strategic-Partner further acknowledges that GMAC Real Estate has not, either orally or in writing, represented that Strategic-Partner will achieve in the licensed business any specified level of sales or profit, nor represented the sales or profit level of any other licensee, but has referred Strategic-Partner to the Offering Circular which provides Strategic-Partner with the names, addresses and telephone numbers of other licensees of GMAC Real Estate, so that Strategic-Partner can make its own inquiry. Strategic-Partner further acknowledges that any additional inquiry pertaining to the nature of this franchise which Strategic-Partner has made to GMAC Real Estate, in writing, has been answered, in writing, to the satisfaction of Strategic-Partner.

C. Strategic-Partner acknowledges that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the "Anti-Terrorism Measures"). GMAC Real Estate therefore requires certain representations and warranties that the parties with whom it deals are not directly or indirectly involved in terrorism. Therefore, Strategic-Partner hereby represents and warrants that neither it nor any of its employees, agents, representatives or, as applicable, its principals, members, officers or directors, nor any other person or entity associated with Strategic-Partner (each, individually, a "Strategic-Partner Party" and collectively, the "Strategic-Partner Parties") is:

      (i)    a person or entity listed in the Annex to the Executive Order; or

      (ii)    a person or entity otherwise determined pursuant to the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism (such a person or entity and those persons and entities listed in the Annex to the Executive Order are referred to herein as "Terrorists"); or

      (iii)    a person or entity who assists, sponsors or who supports Terrorists or acts of terrorism ("Sponsors of Terrorism"); or

      (iv)    owned or controlled by Terrorists or Sponsors of Terrorism.

Furthermore, Strategic-Partner represents and warrants that neither it nor any Strategic-Partner Party will, during the term of this Agreement, become a person or entity described in clauses (i) – (iv) above.

## 21. ENTIRE AGREEMENT.

This Agreement is the entire agreement of the parties and supersedes any and all prior oral or written agreements or understandings between the parties relating to the subject matter of this Agreement.

## 22. INDEMNIFICATION AND INSURANCE.

Strategic-Partner shall defend, indemnify and hold harmless GMAC Real Estate, its shareholder, agents and employees, from and against any claims for damages, losses and expenses (including attorney's fees) resulting in any way from the conduct of Strategic-Partner's real estate brokerage business. This indemnification obligation shall survive the expiration or earlier termination of this Agreement.

In addition to, and not in substitution for, the above indemnification, Strategic-Partner shall, at its own expense, purchase and maintain: (a) comprehensive general liability insurance, including contractual, products/completed operations and personal injury coverage; (b) comprehensive automobile liability coverage, including owned, non-owned and hired automobiles used in Strategic-Partner's real estate brokerage operations; (c) errors and omissions insurance, with respect to Strategic-Partner's real estate brokerage operations. For the insurance referenced under clauses (a) and (b) above, the minimum limits required shall be $1,000,000 per occurrence for bodily injury and $500,000 per occurrence for property damage, with a maximum deduction of $5,000; for the insurance referenced in clause (c) above, the minimum limits shall be $1,000,000 per annum, with a maximum deduction of $5,000. GMAC Real Estate shall be named as an additional insured on each such policy. Workers Compensation insurance, to the extent required by the law of the state in which the Licensed Site is located, shall be purchased and maintained by Strategic-Partner on each employee and sales associate. All losses resulting from Strategic-Partner's failure to obtain insurance shall be borne by Strategic-Partner, only. In the event of cancellation, non-renewal or material change in Strategic-Partner's required insurance policies, Strategic-Partner shall serve upon GMAC Real Estate a notice of such action at least 30 days prior to the effective date of such action. Strategic-Partner shall deliver to GMAC Real Estate a copy of its insurance binder before the Effective Date and, thereafter, shall serve upon GMAC Real Estate continuous certificates of such coverages (which certificates shall provide that the applicable policies shall not be cancelled without serving upon GMAC Real Estate at least 30-days prior notification of such intended cancellation).

## 23. CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS.

A. **Choice of Law.** Except as expressly provided otherwise, this Agreement shall be construed in accordance with the laws of the state in which the Licensed Site is located. However, no law regulating the offer or sale of franchises, business opportunities or similar interests or governing the relationship between GMAC Real Estate and Strategic-Partner will apply unless its jurisdictional requirements are met independently without reference to this Section. All disputes regarding the validity of the arbitration agreement set forth in Section 23.B shall be governed by the laws of the State of Illinois, without regard for its conflict of laws principles.

B. **Arbitration.** GMAC Real Estate and Strategic-Partner agree that, except for controversies, disputes or claims (together or separately, "Claims") related to the improper use of the Marks, all Claims between GMAC Real Estate and its affiliates (and their respective shareholders, officers, directors, agents, and/or employees)(together, the "GMAC Real Estate

Parties"), and Strategic-Partner (and/or Strategic-Partner's Owners, guarantors, affiliates, and/or employees)(together, the "**Strategic-Partner Parties**") arising out of or related to:

    (1)   this Agreement or any other agreement between Strategic-Partner and GMAC Real Estate;

    (2)   GMAC Real Estate's relationship with Strategic-Partner; or

    (3)   any policy or standard relating to the Franchise or the franchised business;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association ("AAA"). The arbitration proceedings will be conducted by one arbitrator and, except as this section otherwise provides, according to the then current commercial arbitration rules of the American Arbitration Association. All proceedings will be conducted at a suitable location chosen by the arbitrator in the Chicago Metropolitan Area of the State of Illinois and will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

The arbitrator may not declare any Mark generic or otherwise invalid or, except as expressly provided by federal statute, award any punitive or exemplary damages against either party (GMAC Real Estate and Strategic-Partner waive, to the fullest extent permitted by law, except as expressly provided by federal statute, any right to, or claim for, punitive or exemplary damages against the other). The arbitrator shall be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. Each party shall be required to submit all Claims against the other or those Claims shall be forever waived. The arbitrator may not consider any settlement discussions that might have been made by either Strategic-Partner or GMAC Real Estate.

GMAC Real Estate and Strategic-Partner agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between any of the GMAC Real Estate Parties and any of the Strategic-Partner Parties may not be consolidated with any other arbitration proceeding between GMAC Real Estate and any other person or between Strategic-Partner and any other person.

Despite GMAC Real Estate's and Strategic-Partner's agreement to arbitrate, GMAC Real Estate and Strategic-Partner each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that GMAC Real Estate and Strategic-Partner must contemporaneously submit the dispute for arbitration on the merits as provided in this Section.

The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

    C. **Waiver of Jury Trial. To the extent permitted by law, Strategic-Partner and GMAC Real Estate each waives its right to a trial by jury in any litigation or arbitration proceeding arising from this Agreement or from actions taken pursuant to this Agreement or from the relationship between the parties resulting from this Agreement.**

**D. Time Limitations for Claims.** Any claim by Strategic-Partner against GMAC Real Estate shall be barred unless, within one year from the date that Strategic-Partner knew, or should have known, of the facts upon which the claim is based, Strategic-Partner filed a formal request for arbitration against GMAC Real Estate, as set forth above.

## 24. MODIFICATION OF AGREEMENT.

Subject to GMAC Real Estate's right to modify its standards and specifications for use of the Marks and other aspects of the operation of a GMAC Real Estate business, no changes may be made in this Agreement unless in writing and signed by all parties.

## 25. SEVERABILITY.

Each Section and provision of this Agreement is severable and, if one portion is invalid, the remaining portions shall nevertheless remain in full force and effect.

## 26. NON-WAIVER.

No failure by GMAC Real Estate to take action on any Default or Event of Default of Strategic-Partner, whether it is a single instance or a series of instances, shall constitute a waiver of such Default or Event of Default or of the performance required of Strategic-Partner. No express waiver by GMAC Real Estate of any performance or Default or Event of Default of Strategic-Partner shall be construed as a waiver of any other or any future obligation or Default or Event of Default.

## 27. NOTICES; FACSIMILE AND ELECTRONIC MAIL.

A. Any notice provided for in this Agreement shall be in writing, addressed to GMAC Real Estate or Strategic-Partner at the respective addresses set forth at the beginning of this Agreement, and shall be served: (a) by personal delivery (which shall be effective upon such personal delivery) or (b) by certified mail, return receipt requested, properly addressed, postage prepaid (which shall be effective on the earlier of the date of delivery as indicated on the return receipt card or 3 days after deposit into the United States mails, or (c) by a nationally recognized overnight delivery service, properly addressed, delivery charges prepaid (which shall be effective on the earlier of the date of delivery as indicated on the carrier's receipt records or 2 days after delivery to the carrier).

B. Although not effective for purposes of giving notice pursuant to Section 27.A. above, each party consents to the other party forwarding facsimile and electronic mail transmissions to the consenting party as follows:

GMAC Real Estate:

To: Contract Administration @ 908-542-5526 (fax) and susan_daniel@gmachs.com (e-mail)

Strategic Partner:

To: Ruben Coulanges @ 508-583-6901(fax) and r_coulanges@hotmail.com (e-mail)

Such consent will continue in effect until modified or terminated by written notice to the other party sent in accordance with subparagraph 27.a. above.

## 28. TERM AND RENEWAL.

The term of this Agreement shall be seven (7) years from the Effective Date (as later defined) (the "**Term**").

At the expiration of the Term, Strategic-Partner shall have the right to enter into a new, ten-year agreement with GMAC Real Estate, subject to the following conditions: (a) Strategic-Partner has provided GMAC Real Estate with written notice of its intent to execute a new agreement at least 180 days prior to the expiration of the Term, and (b) Strategic-Partner is not then and has not been in Default of this Agreement. The new agreement will be in the form then being offered by GMAC Real Estate. The new agreement may contain materially different terms than this Agreement, including those which relate to fees, payment of fees, performance standards, renewal terms and the Marks.

Subject to any contrary applicable state law, if Strategic-Partner continues to use the Marks after the end of the Term, but fails to execute a new agreement, Strategic-Partner will be deemed to be operating under the terms and conditions of the agreement then being offered by GMAC Real Estate, except that the term shall be deemed to be 180 days from the date that GMAC Real Estate is served with a notice of termination by Strategic-Partner (at its option, GMAC Real Estate shall have the right to shorten the term by the service upon Strategic-Partner of a notice fixing a shorter term) and, at the option of GMAC Real Estate but without notice being required, the Royalty Fees shall be increased to an amount equal to 10% of Strategic-Partner's monthly GCI, payable within 48 hours of the completion of each settlement and closing from which Strategic-Partner is entitled to be paid a commission.

## 29. EFFECTIVE DATE.

The parties intend that this Agreement be effective as of February 1, 2005 (the "**Effective Date**") conditioned upon:

1.) Strategic-Partner having submitted to GMAC Real Estate a copy of the Company's active real estate brokerage license issued by the appropriate regulatory agency of the Commonwealth of Massachusetts; and

2.) Receipt, review and acceptance by GMAC Real Estate of a completed Agent Verification Checklist, including copies of the active real estate brokerage sales agents' licenses for agents associated with Strategic-Partner and verifiable data, acceptable to GMAC Real Estate, documenting the GCI indicated in Strategic-Partner's franchise application; and

3.) Receipt by GMAC Real Estate of the declaration pages for all insurance policies secured by Company as required under Section 22 of the Franchise Agreement. GMAC Real Estate must be named as an additional insured under all of the insurance policies; and

Upon satisfaction of all of the foregoing conditions, or waiver thereof by GMAC Real Estate, GMAC Real Estate will provide Strategic-Partner with written confirmation of the same. If, however, the foregoing conditions are not satisfied by the Effective Date, GMAC Real Estate, at its sole option, may agree to amend the Effective Date to a later date or may terminate this Agreement by sending written notice of termination to Strategic-Partner.

## 30. LIMITATION OF DAMAGES.

Except for Strategic-Partner's obligation to indemnify GMAC Real Estate, as provided by common law or in the Section of this Agreement entitled "Indemnification and Insurance", neither party shall be liable to the other for consequential, punitive or exemplary damages.

## 31. CONFIDENTIALITY OF AGREEMENT.

Except as may be required by law, Strategic-Partner agrees not to publicize or disclose to any third party, without the prior written consent of GMAC Real Estate, the terms of this Agreement.

**[The remainder of this page has been intentionally left blank.]**

**IN WITNESS WHEREOF**, the parties have executed this Agreement.

GMAC REAL ESTATE, LLC

By: _Judith O'Brien_

Print Name: <u>Judith O'Brien</u>

Title: <u>Vice President</u>

Date: <u>1-31-05</u>

SOUTH   SHORE   REALTY   GROUP, INC.

By: _____

Print Name: <u>Ruben Coulanges</u>

Title: <u>President</u>

Date: <u>1-19-05</u>

## ENDORSEMENT OF PRINCIPALS / OWNERSHIP INTEREST HOLDERS

Each of the Owners identified in Section 17.B. is executing this Agreement for the limited purpose of being personally bound by the provisions of Sections 3 (The Marks), 4 (Materials), 7 (Certain Activities Not Precluded; Rights Reserved; Provision of Other Settlement Services), 8 (No Conflicting License/Interest), 13 (Verification Rights), 17 (Assignment; Ownership; Transfers; Right of First Refusal), 18.F. (Cross-Default), 19.B. (Financial Obligations after Default) of this Agreement and 23 (Choice of Law and Forum; Arbitration; Waiver of Jury Trial; Time Limitation for Claims).

_____          Date:  1 - 19 - 05  _____
Ruben Coulanges

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

28

08CV2242          CEM

JUDGE COAR

MAGISTRATE JUDGE COX

<u>Exhibit A to the Franchise Agreement</u>
<u>Royalty and Advertising Fees</u>

a.     **Royalty Fees.**

Strategic-Partner shall pay to GMAC Real Estate, Royalty Fees, in accordance with the following:

(1)     <u>Amount.</u>  Upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid Gross Commission Income ("GCI"), a Royalty Fee, in an amount equal to five percent (5%) of the GCI to which Strategic-Partner is entitled.  In addition, if at the end of each twelve-month period following the Effective Date, the total amount of Royalty Fees paid by Strategic-Partner during such twelve-month period is less than $10,000 (the "Annual Royalty Fee Minimum"), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the Annual Royalty Fee Minimum and the total amount of Royalty Fees actually paid.

If this Agreement is the first contract between GMAC Real Estate and Strategic-Partner, Strategic-Partner shall not be required to pay the Royalty Fees which are based on GCI earned with respect to transactions under contract or in escrow on the Effective Date, provided, however, that such transactions are closed or settled within thirty (30) days after the Effective Date.  As to transactions under contract or in escrow on the date of the termination of this Agreement, Strategic-Partner shall be required to pay those Royalty Fees which are based on GCI earned with respect to such transactions, if such transactions close or are settled within thirty (30) days of the termination date.

(2)     <u>Awards.</u>  Within 105 days of the end of each calendar-year after the Effective Date, GMAC Real Estate shall pay to Strategic-Partner an award amount ("Award") equal to the following percentage of Strategic-Partner's past calendar-year's GCI:

**AWARD CHART**

| Award Level | Gross Commission Income Range From | Gross Commission Income Range To | Maximum Range Amount | Award Multiplier Rate | Maximum Award For Range | Cumulative Maximum Award |
|---|---|---|---|---|---|---|
| 1 | 0 | $1,150,000 | $1,150,000 | N/A | $-0- | $-0- |
| 2 | 1,150,001 | 1,725,000 | 574,999 | N/A | 2,500 | 2,500 |
| 3 | 1,725,001 | 2,300,000 | 574,999 | 1.00 % | 5,750 | 8,250 |
| 4 | 2,300,001 | 4,025,000 | 1,724,999 | 1.25 % | 21,562 | 29,812 |
| 5 | 4,025,001 | 5,750,000 | 1,724,999 | 1.50 % | 25,875 | 55,687 |
| 6 | 5,750,001 | 7,500,000 | 1,749,999 | 1.75 % | 30,625 | 86,312 |
| 7 | 7,500,001 | 9,250,000 | 1,749,999 | 2.00 % | 35,000 | 121,312 |
| 8 | 9,250,001 | 10,950,000 | 1,699,999 | 2.25 % | 38,250 | 159,562 |
| 9 | 10,950,001 | 12,725,000 | 1,774,999 | 2.50 % | 44,375 | 203,937 |
| 10 | 12,725,001 | 15,025,000 | 2,299,999 | 2.75 % | 63,250 | 267,187 |
| 11 | 15,025,001 | 17,350,000 | 2,324,999 | 3.00 % | 69,750 | 336,937 |
| 12 | 17,350,001 | 20,825,000 | 3,474,999 | 3.25 % | 112,937 | 449,874 |
| 13 | 20,825,001 | 24,300,000 | 3,474,999 | 3.50 % | 121,625 | 571,499 |
| 14 | 24,300,001 | 56,600,000 | 32,299,999 | 3.75 % | 1,211,250 | 1,782,749 |
| 15 | 56,600,001 | and higher | as determined | 4.00 % | as calculated | as calculated |

(3)    Conditions of Awards.  (a) Notwithstanding the above, Strategic-Partner shall be entitled to no Award in the event that:  (i) at any time during the calendar-year for which the Award is applicable or on the date that the Award is to be given, an Event of Default existed or exists, as applicable, regarding this Agreement or any other contract with GMAC Real Estate or any Affiliate; or (ii) during the calendar-year for which the Award is applicable, Strategic-Partner had been more than 30 days in arrears of any payments required to be made by Strategic-Partner to GMAC Real Estate under this Agreement or under any other contract with GMAC Real Estate or any Affiliate; or (iii) on the date that Strategic-Partner would otherwise have been entitled to payment of an Award, this Agreement had been terminated and no new franchise agreement had been entered into between Strategic-Partner and GMAC Real Estate; and

(b)    For the purpose of calculating GCI with respect to Awards under this Section, Strategic-Partner's Licensed Sites contributing to the GCI shall include the Licensed Site listed in Section 6 as well as those other licensed sites (the "Sister Sites") subject to a Sister Agreement (as defined in Section 18.F), provided (i) each of those Sister Sites is owned by the same persons listed in Section 17.B. as Owners, in the same percentages listed in Section 17.B., and (ii) each of those Sister Sites is located within the same local market area.  Strategic-Partner and GMAC Real Estate agree that GCI from the following Sister Sites will be considered together with the Licensed Site for purposes of determining any Award due Strategic-Partner:    N/A

(c)    The Gross Commission Income Range figures included in the Award Chart may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the figures in any year be greater than 5%).  The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

b.    **Advertising Fees.**

Upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid GCI, Strategic-Partner shall pay to GMAC Real Estate an Advertising Fee, in an amount equal to 2% of the GCI to which Strategic-Partner is entitled, provided, however, the amount of the Advertising Fee in any calendar-month:  (i) shall not exceed $870 for that calendar-month; and (ii) shall not be lower than $240 for that calendar-month regardless of transaction count (if this minimum amount has not been received by GMAC Real Estate during any month through payments based on a percentage of GCI for that calendar-month, the difference between this minimum amount and the payments actually received by GMAC Real Estate shall be paid by Strategic-Partner on the first business day after the last day of each calendar-month).

GCI generated by a sales agent shall be attributed to the office location (and/or Licensed Site) at which the sales agent's license is held or registered or, if the applicable state's licensing regulations do not provide for the holding or registration of sales agents' licenses at particular office locations, at the office location (and/or Licensed Site) from which the sales agent principally operates.

Minimum and maximum Advertising Fees may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the Advertising Fees in any year be greater than 5%).  The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United

States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

A-3

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

A-1

## RECEIPT OF FRANCHISE-RELATED DOCUMENTS

The undersigned, personally and/or as an officer or ownership interest holder of the proposed franchisee, does hereby acknowledge receipt of the following documents, in form for execution, relating to the franchise of GMAC Real Estate, LLC:

[X]    (1)    Franchise Agreement
[ ]    (2)    State Rider for the State of _____
[ ]    (3)    Franchise Development Costs Note
[ ]    (4)    The Personal Guaranty of Note
[ ]    (5)    The Loan and Security Agreement
[ ]    (6)    The Pledge Agreement
[ ]    (7)    The Subordination Agreement
[ ]    (8)    The Term Loan Note
[ ]    (9)    Other (specify): _____

(Proposed franchisee must initial the box adjacent to the applicable documents)

I further acknowledge my understanding that it is my responsibility, individually and/or as an officer or ownership interest holder of the proposed franchisee, to review all such documents, so that I am fully familiar with the transaction contemplated thereby prior to signing the documents.

DATED: _____1 – 11 – 05_____

A FEDERAL TRADE COMMISSION RULE REQUIRES THAT WE PROVIDE YOU WITH THE FRANCHISE-RELATED DOCUMENTS NOTED ABOVE AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO THE DATE THEY ARE TO BE EXECUTED.   PLEASE DO NOT SIGN OR RETURN THESE DOCUMENTS UNTIL FIVE (5) BUSINESS DAYS HAVE ELAPSED FROM THE DATE OF THIS RECEIPT.

_____

_____ individually

and/or as an officer or ownership interest holder of

_____

(a __Massachusetts_____ corporation)

(a _____ partnership)

(a _____ limited liability company)

# EXHIBIT B

27516.00BUBV/Document #: 751607

IN ARBITRATION

GMAC REAL ESTATE, LLC,

      Complainant,

vs.                                Case No.

RUBEN COULANGES,
SOUTH SHORE REALTY
GROUP, INC., d/b/a SOUTH
SHORE GMAC REAL ESTATE,

      Respondents.

## DEMAND FOR ARBITRATION

      Complainant, GMAC Real Estate, LLC ("GMACRE"), by its attorneys, Williams Montgomery & John Ltd, and for its Complaint and Demand for Arbitration against Respondents, Ruben Coulanges and South Shore Realty Group, Inc d/b/a South Shore GMAC Real Estate, alleges as follows:

### Parties

      1.      GMACRE is a limited liability company organized under the laws of the State of Delaware having its principal place of business in the State of Illinois.  GMACRE is engaged in the business of granting to others ("franchisees") the right to operate residential real estate brokerage offices using various trade and services marks, including the mark "GMAC® Real Estate" (the "GMAC Marks").

      2.      Upon information and belief, Ruben Coulanges ("Coulanges") is a resident and citizen of the State of Massachusetts.  Coulanges is a former franchisee of GMACRE.



3.      Upon information and belief, South Shore Realty Group, Inc. d/b/a South Shore GMAC Real Estate ("South Shore") is a corporation organized and existing under the laws of the State of Massachusetts. South Shore is a former franchisee of GMACRE.

4.      This is an action for breach of contract and an accounting.

5.      For many years prior to the acts complained of herein, Complainant has been continuously engaged in providing commercial and residential real estate brokerage services to the public.

## Facts Common to All Counts

### The Parties' Written Real Estate Service Contract

6.      On or about January 19, 2005, Coulanges and South Shore entered into a written GMAC Real Estate, LLC Real Estate Franchise Agreement (the "Franchise Agreement") with GMACRE pursuant to which GMACRE granted Coulanges and South Shore a franchise to operate residential real estate offices at the following locations:

136 Main Street, Brockton, MA 02301

7.      Under the Franchise Agreement, Coulanges and South Shore received, among other things, a limited license to use the GMAC Marks in connections with the operation of that office. The term of the Franchise Agreement was to be seven (7) years from the effective date of February 1, 2005, or through February 1, 2012. The Franchise Agreement was executed by Coulanges as President of South Shore on January 19, 2005. A true and correct copy of the Franchise Agreement is attached hereto as Exhibit A and incorporated herein by reference.

8.      Under the Franchise Agreement, Coulanges and South Shore agreed, among other things, to pay GMACRE certain fees, including Franchise Fees, Referral Fees, Royalty Fees and Advertising Fees. The Franchise Fees, which were due and payable on a monthly basis, were

2

computed as a percentage of the commission and fees income Coulanges and South Shore

generated from the sale of residential real property.

9.      Under Section 11 of the Franchise Agreement, Respondents agreed to furnish

GMAC with financial reports and statements.

10.     Under Section 18 of the Franchise Agreement, it is an event of default, and

grounds for termination of the Franchise Agreement, if Coulanges and South Shore failed to

comply with their payment obligations and failed to cure that breach within 30 days after their

receipt of notice of breach.

11.     Under Paragraph 23(B) of the Franchise Agreement any dispute with respect to

the Agreement "must be submitted for binding arbitration, on demand of either party, to the

American Arbitration Association ("AAA")." The arbitration proceeding is to be conducted by

one arbitrator according to the commercial arbitration rules of AAA. All proceedings are to be

conducted in the Chicago Metropolitan Area in the State of Illinois.

<u>Coulanges and South Shore's Default and Failure to Pay GMACRE</u>
<u>the Amounts Due Under the Franchise Agreement</u>

12.     By letter dated May 11, 2006, GMACRE advised Coulanges and South Shore that

they were in default of their obligations under the Franchise Agreement.

13.     The Notice of Default letter advised that Coulanges and South Shore owed

GMACRE past due fees of $18,986.22 under the Agreement and that the Respondents failed to

submit reports required under Section 11 of the Agreement for the period between February 2006

to April 2006. The estimated amount of fees due for the months in which reports were not filed

was estimated to be $3,654.22. The letter advised that if the amounts were not paid and the

reports were not filed within 30 days, then GMACRE would have no choice but to consider

termination of the Agreement. Coulanges and South Shore failed to comply with these requests.

3

14.     By letter dated March 26, 2007, GMACRE gave Coulanges and South Shore Notice of Termination of the Franchise Agreement, effective March 26, 2007.  South Shore was advised that it remained liable for $18,045.00 in outstanding transaction and advertising fees (estimated due to non-reporting by the Respondents), and a statement balance of $16,855.43.

15.     In accordance with the terms of the Franchise Agreement, South Shore remains obligated to remit additional fees based on any closings occurring on or prior to the termination date, any closings occurring after the termination date attributable to listings obtained on or prior to the termination date, and any referrals sent or received on or before the termination date.

16.     Under Section 13 of the Franchise Agreement, GMACRE reserved the right to conduct a post-termination audit of the Respondents' transaction documents.

17.     GMACRE has been deprived of the future stream of anticipated revenue for the remaining term of the Franchise Agreement, in an estimated amount of $120,773.00.  The total amount owed to GMACRE is estimated at $155,673.43.

18.     The Notice of Termination letter further advised Coulanges that in accordance with Section 19(B)(2) of the Franchise Agreement, he is personally liable for all fees owed by South Shore as of the date of termination, and for the loss of future revenue attributable to the one-year period following termination.  This liability is estimated at $59,464.43.

19.     Respondents have failed to pay the amounts due and owing as stated in the March 26, 2007 Notice of Termination letter.

20.     Under Section 19(C) of the Franchise Agreement, Coulanges and South Shore agreed to reimburse GMACRE for all of the costs it incurred, including reasonable attorneys' fees, in enforcing its rights under the Agreement.

21.     GMACRE has fully performed its obligations under the Franchise Agreement.

4

22.    Ruben Coulanges executed an Endorsement of Principals agreeing to be personally bound by the provisions of the Franchise Agreement relating to, among others, Section 19(B) (the financial obligations incurred by South Shore prior to the date of termination and those based on losses attributable to the one-year period after the date of termination). (Exhibit A, p. 28).

## COUNT I

### (Breach of Contract – Franchise Agreement)

23.    GMACRE realleges and incorporates by reference paragraphs 1 through 22 of its Demand, inclusive, as and for this paragraph 23, as if fully set forth herein.

24.    Coulanges and South Shore have breached the Franchise Agreement by, among other things, failing and refusing to pay outstanding transaction fees, advertising fees, and statement balances due to GMACRE and to submit financial reports.

25.    As a direct and proximate result of Alchester and Grifferty's breaches of the Franchise Agreement, GMACRE has suffered damages in an amount in excess of $155,673.43.

WHEREFORE, Complainant prays for an entry of a judgment against Respondents in an amount in excess of $155,673.43, plus all attorneys' fees and costs associated with this action, plus all pre and post-judgment interest.

## COUNT II

### (Accounting)

26.    GMACRE realleges and incorporates by reference paragraphs 1 through 25 of its Complaint, inclusive, as and for this paragraph 26, as if fully set forth herein.

27.    GMACRE is entitled to an accounting from Respondents Coulanges and South Shore for all activity conducted by the business for the period prior to termination for which Respondents failed to furnish required reports.

28.    GMACRE cannot make an exact (estimates of fees owed can be estimated in accordance with the Franchise Agreement) determination as to what additional fees are due and owing to it from the Respondents until an accounting is completed and all pertinent reports and/or statements are examined.

WHEREFORE, Complainant prays for entry of a judgment against Respondents for an accounting for all activity conducted by the business for the period prior to termination for which Respondents failed to furnish required reports, and for Complainant's costs in this action, including its reasonable attorneys' fees, plus pre and post-judgment interest.

Respectfully submitted,

By: _Thomas F. Falkenberg_
Thomas F. Falkenberg
One of the Attorneys for the Complainant

Thomas F. Falkenberg
Hanson L. Williams
WILLIAMS MONTGOMERY & JOHN, LTD.
Attorneys for Complainant GMAC Real Estate, LLC
20 North Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 443-3200
(312) 630-8500 (fax)

6

# GMAC REAL ESTATE, LLC

## REAL ESTATE FRANCHISE AGREEMENT

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4


EXHIBIT

*A*

# TABLE OF CONTENTS

**Page**

1.   THE FRANCHISE...................................................................................................1
2.   RELATIONSHIP OF THE PARTIES.....................................................................1
3.   THE MARKS............................................................................................................1
4.   MATERIALS.............................................................................................................2
5.   TRAINING................................................................................................................4
6.   GRANT OF THE LICENSE....................................................................................4
7.   CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC
     REAL ESTATE; PROVISION OF OTHER SETTLEMENT SERVICES.............5
8.   NO CONFLICTING LICENSE / INTEREST..........................................................6
9.   GROSS COMMISSION INCOME AND FEES / REAL PROPERTY....................7
10.  FEES.........................................................................................................................7
11.  PAYMENT OF FEES/REPORTING.......................................................................8
12.  LATE PAYMENT.....................................................................................................9
13.  VERIFICATION RIGHTS......................................................................................10
14.  ADVERTISING FUND...........................................................................................10
15.  REFERRALS...........................................................................................................10
16.  PREMIER SERVICE[SM]; PERFORMANCE STANDARDS................................12
17.  ASSIGNMENT; OWNERSHIP; RIGHT OF FIRST REFUSAL..........................13
18.  TERMINATION; DEFAULT; CROSS-DEFAULT................................................13
19.  OBLIGATIONS UPON TERMINATION..............................................................16
20.  REPRESENTATIONS AND WARRANTIES.........................................................19
21.  ENTIRE AGREEMENT..........................................................................................20
22.  INDEMNIFICATION AND INSURANCE.............................................................21
23.  CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY
     TRIAL; TIME LIMITATION FOR CLAIMS........................................................22
24.  MODIFICATION OF AGREEMENT.....................................................................22
25.  SEVERABILITY......................................................................................................24
26.  NON-WAIVER.........................................................................................................24
27.  NOTICES; FACSIMILE AND ELECTRONIC MAIL...........................................24
28.  TERM AND RENEWAL.........................................................................................25

29.   EFFECTIVE DATE.......................................................................................................

30.   LIMITATION OF DAMAGES. ...........................................................................25

31.   CONFIDENTIALITY OF AGREEMENT.........................................................26

.......................................................................................................................26

## EXHIBITS

Endorsement of Principals / Ownership Interest Holders
A     -          Royalty / Advertising Fees

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

ii

# REAL ESTATE FRANCHISE AGREEMENT

The parties, GMAC Real Estate, LLC, a Delaware limited liability company, with its principal offices at 2021 Spring Road, Suite 300, Oak Brook, Illinois 60523 ("GMAC Real Estate"); and

South Shore Realty Group, Inc.

Exact name under which real estate license is held ("Strategic-Partner"), whose principal place of business is located at 136 Main Street, Brockton, MA 02301

dba South Shore

(any change in dba requires prior written approval)

FEDERAL ID#51-0480418

agree as follows:

## 1. THE FRANCHISE.

GMAC Real Estate and its predecessors have developed a franchise system (the "Franchise") which will permit use of the Marks (as defined in Section 3), including the Mark "GMAC Real Estate", in the promotion and sale of Real Property (as defined in Section 9.C.). The Franchise provides those firms selected to be strategic-partners with the opportunity to use the Marks and to participate in the other benefits outlined in this Agreement.

GMAC Real Estate: (a) provides guidelines regarding the use of the GMAC Real Estate name and other Marks, which are intended to maximize the value of the nationally recognized image of GMAC Real Estate and improve the effectiveness of Strategic-Partner's advertising, public relations, personnel recruiting and sales promotion programs; (b) facilitates referrals between strategic-partners (but excluding referrals from GMAC Real Estate's affiliated relocation company, unless Strategic-Partner and/or Strategic-Partner's sales associates have qualified for such referrals, and then, subject to the conditions of such qualification); (c) provides systems and programs to deliver sales training and education, management training and client promotional materials to its strategic-partners; and (d) periodically provides a national business conference for the benefit of its strategic-partners.

GMAC Real Estate will strive to improve the Franchise through development of new programs and review of existing programs and will seek recommendations from its strategic-partners to strengthen the Franchise at local and national levels.

## 2. RELATIONSHIP OF THE PARTIES.

GMAC Real Estate and Strategic-Partner are each independently owned and operated businesses which share similar mutual interests with respect to real estate brokerage. Neither this Real Estate Franchise Agreement (this "Agreement"), nor the use of the term "Strategic-Partner" in this Agreement, is intended to create or shall be construed to create an agency, partnership, joint venture or employer-employee relationship between the parties. The GMAC

Real Estate business operated by Strategic-Partner is an independently owned and operated business and Strategic-Partner is solely responsible for its day-to-day conduct and activities. Strategic-Partner is not an agent (actual, implied or ostensible) of GMAC Real Estate. Neither party shall hold itself out to be an agent, partner, joint venturer or employee of the other party. Neither party shall have the right to bind or obligate the other party.

Strategic-Partner agrees to conduct its real estate brokerage business: (a) in such fashion as to reflect favorably at all times on GMAC Real Estate and the good name, goodwill and reputation of GMAC Real Estate and the Marks, and (b) in compliance with all laws and regulations pertaining to the operation of its real estate brokerage business.

## 3. THE MARKS.

A. **Ownership and Modification of the Marks.** GMAC Real Estate is the owner or licensee of the GMAC Real Estate trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols used to identify the products and services offered by GMAC Real Estate franchises, including the mark "GMAC Real Estate" (collectively the "Marks"). Strategic-Partner's right to use the Marks is derived solely from this Agreement and is limited to the operation of a real estate brokerage business by Strategic-Partner, pursuant to and in compliance with this Agreement and with all applicable standards, specifications and operating procedures prescribed by GMAC Real Estate, from time to time, during the term of this Agreement. Any unauthorized use of the Marks by Strategic-Partner shall constitute a Default (as defined in Section 18.D.) of this Agreement and an infringement of the rights of GMAC Real Estate in and to the Marks. GMAC Real Estate will protect and defend the Marks in the manner that it, in its sole discretion, determines is required. All goodwill resulting from Strategic-Partner's use and promotion of the Marks will accrue to the benefit of GMAC Real Estate.

If it becomes advisable at any time, in the sole discretion of GMAC Real Estate, to modify or discontinue use of any Mark and/or to require Strategic-Partner to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols, Strategic-Partner agrees to comply with the requirements of GMAC Real Estate to modify or otherwise discontinue the use of such Mark and/or to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs or other commercial symbols after notice to do so from GMAC Real Estate. All provisions of this Agreement applicable to the Marks shall apply to any other trademarks, service marks, trade dress, logos, designs, colors and commercial symbols later authorized by GMAC Real Estate, in writing, for use by and licensed to Strategic-Partner. The term "Marks" shall include any marks developed and/or registered in the future.

GMAC Real Estate shall have no obligation to reimburse Strategic-Partner for any expenditures made by Strategic-Partner to modify or discontinue the use of a Mark or to adopt additions to or substitutes for a discontinued Mark, including, without limitation, any expenditures relating to advertising or promotional materials or to compensate Strategic-Partner for any goodwill related to the discontinued or modified Mark. Notwithstanding the foregoing, if GMAC Real Estate changes the primary service mark of the Franchise so that it no longer includes the words "GMAC Real Estate" or some variation of those words, GMAC Real Estate will (a) provide Strategic-Partner 12 months' prior written notice of the change and (b) allow

Strategic-Partner to terminate this Agreement at the end of the twelve-month notice period. If Strategic-Partner elects to so terminate this Agreement, Strategic-Partner shall notify GMAC Real Estate, in writing, at least 90 days before the expiration of the 12-month notice period and shall comply with all post-termination obligations contained in this Agreement.

   B. **Use of Marks.**  To maintain the integrity of the Marks and the Franchise, GMAC Real Estate retains the right to control the quality of all materials and programs bearing the Marks and the manner in which the Marks are used.

   The Marks shall be used:  (1) only in conjunction with permanent real estate sales offices approved by GMAC Real Estate, and (2) only in the form and style authorized by GMAC Real Estate, as outlined from time to time in its manuals and other communications. Any departure from the restrictions set forth in the manuals or any use of the Marks on printed materials not outlined in the manuals must be approved in advance, in writing, by GMAC Real Estate. Use of the Marks on any publication (e.g., homeowner newsletter, decorating magazine, booklets, etc.) is specifically prohibited, unless the publication is approved in advance, in writing, by GMAC Real Estate.

   Strategic-Partner will use the Marks in all real estate brokerage activities at or from the Licensed Site (as described in Section 6) during the term of this Agreement.

   The Marks shall not be used to identify any property, goods or services provided by Strategic-Partner, other than those specifically approved, in writing, by GMAC Real Estate. Strategic-Partner will not use the Marks in any manner which indicates or implies the endorsement by GMAC Real Estate of any real property listed, sold or advertised by Strategic-Partner, including such real property's design, quality or price.

   Strategic-Partner shall not use the GMAC Real Estate name or any other Mark as part of its corporate or entity name or in any other manner not expressly authorized, in writing, by GMAC Real Estate. The Marks shall be used as part of the trade name of Strategic-Partner in connection with all of, and limited to, its real estate brokerage activities. Strategic-Partner may use the GMAC Real Estate name (but not "GMAC" alone or any other Mark) as part of an Internet (or other computer network) domain name, provided that (i) such use complies with the standards set forth in the manuals or other communications supplied by GMAC Real Estate from time to time; (ii) prior written approval of the domain name is obtained from GMAC Real Estate; and (iii) upon termination of this Agreement for any reason, Strategic-Partner will comply with the terms of Section 19.A.(1) with regard to terminating its use of the GMAC Real Estate name as part of its domain name.

   GMAC Real Estate reserves the right, in its sole discretion, to vary standards for any strategic-partner based upon the peculiarities or uniqueness of a strategic-partner's particular circumstances, business practices or any other conditions which GMAC Real Estate deems to require such variances. Strategic-Partner shall have no recourse against GMAC Real Estate for any variation from standard specifications and practices granted to any other strategic-partner and shall not be entitled to require GMAC Real Estate to grant Strategic-Partner a like or similar variation.

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

3

### 4. MATERIALS.

The use of any GMAC Real Estate materials (including copyrighted materials) is restricted to use by Strategic-Partner in its own business. Strategic-Partner shall not use for its own benefit (except as provided in this Agreement) or license to, or otherwise permit, third-parties to use or reproduce, in any form or manner, GMAC Real Estate materials or programs, or adapt and use, or permit any of its sales associates or employees to adapt and use, any GMAC Real Estate materials or programs on an Internet (or other computer network) site or in any other manner without the prior written approval of GMAC Real Estate.

All building signs, yard signs, promotional items and printed materials shall adhere to the design, size, colors and other specifications (together, the "Specifications") set forth in the manuals or other communications supplied by GMAC Real Estate from time to time. No departure from the Specifications shall be permitted without the prior written approval of GMAC Real Estate which approval shall not be unreasonably withheld, denied or delayed; any such departure shall be considered a Default of this Agreement. Strategic-Partner's Licensed Site shall be required to display building signs in conformance with the Specifications within sixty (60) days of the Effective Date. If a zoning ordinance, regulation, lease or similar restriction precludes Strategic-Partner from using a sign consistent with the Specifications, prior to erection of an alternate sign, the details for such an alternate sign shall be presented for approval to GMAC Real Estate, with a copy of the relevant zoning ordinance, regulation, lease or similar restriction; GMAC Real Estate's approval shall not be unreasonably withheld, delayed or conditioned.

All business records, letterheads, business forms, advertising and other materials (excluding business cards) disseminated to the public and used in Strategic-Partner's business shall indicate Strategic-Partner's independent ownership of the brokerage business with the statement "An Independently Owned and Operated Firm".

GMAC Real Estate will provide the initial development of a new logo treatment for Strategic-Partner, together with a franchise opening/starter kit, including operating and presentation manuals, videotapes, audio tapes, advertising materials, magazines and marketing products, at no cost to Strategic-Partner.

### 5. TRAINING.

A. **Getting Connected Session.** For New Strategic-Partners: GMAC Real Estate shall conduct a Getting Connected Session ("GCS") in the Chicago, Illinois area, or such other location designated by GMAC Real Estate. Strategic-Partner or its designated manager must attend, and satisfactorily complete, the first available GCS after execution of this Agreement. GMAC Real Estate will pay the GCS registration fee for one attendee (either Strategic-Partner or its designated manager) to attend a GCS at the site selected by GMAC Real Estate, provided that such designated person attends the GCS within 12 months after the Effective Date. Strategic-Partner may elect to have additional persons attend a GCS, but it must pay the then-current GCS registration fee for each additional attendee.

For Renewing Strategic-Partners: Within six (6) months after renewal, Strategic-Partner shall send at least one key management representative to a GCS at a site designated by GMAC Real Estate. The representative must complete the GCS to GMAC Real Estate's reasonable satisfaction. Strategic-Partner must pay the GCS registration fee for its designated representative and for each additional attendee.

B. **Accountability in Management.** For both new and renewing Strategic-Partners, following the Effective Date at least one key management representative of Strategic-Partner must satisfactorily complete "Accountability in Management" training. Upon any subsequent changes in key management personnel at the Licensed Site, at least one key management representative must satisfactorily complete Accountability in Management training. Accountability in Management training is a week-long management training class currently provided by a third-party vendor. Strategic-Partner must pay the Accountability in Management training registration fee for each attendee.

C. **Premier Service℠.** Strategic-Partner and each of its managers and sales associates must satisfactorily complete Premier Service training within six (6) months following the later to occur of (i) the Effective Date or (ii) such individual first becoming associated with Strategic-Partner. Strategic-Partner must pay the registration fee for each attendee.

D. **Costs.** Strategic-Partner shall be responsible for all travel, living and other costs its attendees incur in association with attending the training programs described in Sections A, B, and C above and all other training programs.

6. **GRANT OF THE LICENSE.**

A. **Current Office.** Strategic-Partner represents that it presently operates, or will by the Effective Date operate, an office at the following location:

Location      136 Main Street, Brockton, MA 02301


GMAC Real Estate grants to Strategic-Partner a license to establish and/or operate a real estate brokerage office displaying the Marks at its existing office location, as set forth above (the "Licensed Site"). Although the license granted to Strategic-Partner is non-exclusive and similar licenses may be granted to others within Strategic-Partner's market area, GMAC Real Estate shall not grant to another strategic-partner a license to use the Marks at an office located at the Licensed Site.

Simultaneously with the execution of this Agreement, Strategic-Partner shall execute and deliver to GMAC Real Estate a written instrument, conveying to GMAC Real Estate Strategic-Partner's rights to any telephone numbers relating to the Licensed Site. GMAC Real Estate agrees that it will hold the instrument in escrow, and will not release the instrument or exercise its rights thereunder unless and until there exists an Event of Default under this Agreement.

B. **Additional Offices.** If Strategic-Partner desires to expand its real estate brokerage business, by opening an additional office or otherwise, it shall apply to GMAC Real Estate for

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

5

approval to do so, by submitting a written application at least ninety (90) days prior to the planned date for opening. Approval of such expansion shall be within GMAC Real Estate's sole discretion and, if granted, shall be in writing. If approved, Strategic-Partner and GMAC Real Estate will enter into a separate agreement, on the form then being offered by GMAC Real Estate, with regard to the new office. Strategic-Partner's application must be accompanied by payment of the applicable Joining Fee for the additional franchise. If the office expansion is not approved by GMAC Real Estate, the Joining Fee will be refunded.

     **C. Sublicensing Prohibited.** Strategic-Partner shall not sublicense, or permit a third-party to use, the GMAC Real Estate name or any other Mark.

## 7. CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE; PROVISION OF OTHER SETTLEMENT SERVICES.

     **A.** Nothing in this Agreement shall preclude Strategic-Partner or other strategic-partners from listing, selling or advertising any real estate, wherever it or the owner of the real estate may be located, including in areas serviced by Strategic-Partner or other strategic-partners, as applicable. GMAC Real Estate reserves the right: (i) to license other real estate brokers to use the Marks anywhere, other than at Strategic-Partner's Licensed Site, including areas adjacent to, or in proximity with, the Licensed Site; (ii) for GMAC Real Estate and its parents, subsidiaries, or affiliated entities to conduct activities, including real estate brokerage activities, mortgage, title insurance and relocation operations, in areas adjacent to, or in proximity with, the Licensed Site under the Marks or other marks; and (iii) for GMAC and its parents, subsidiaries, or affiliated entities to establish other franchises or company-owned outlets or other channels of distribution, selling or leasing similar products or services under a different mark. Additionally, GMAC Real Estate reserves the right to establish, and to have its parents, subsidiaries and/or affiliated entities establish, anywhere, franchises or company-owned businesses or other channels of distribution: (x) selling or leasing similar products or services under trademarks, service marks, trade dress, logos, designs, colors or other commercial symbols different from the Marks, or (y) offering dissimilar products or services under the Marks.

     **B.** Simultaneously with the execution of this Agreement, Strategic-Partner will enter into exclusive contractual relationships with GMAC Real Estate or its affiliates or designees pertaining to the delivery of other core real estate settlement services and/or products, including mortgage, title and closing services, home warranty and homeowner's insurance, provided, however, that both Strategic-Partner and GMAC Real Estate agree that the entry into such contractual relationships is beneficial to both parties. If Strategic-Partner does not enter into one or more of these contractual relationships with GMAC Real Estate or its affiliates as of the Effective Date, but subsequently decides during the Term of this Agreement to provide any such core real estate settlement services and/or products, Strategic-Partner agrees that it must do so exclusively through the entry into contractual relationships with GMAC Real Estate or its affiliates or designees, as to those services and/or products. Except for arrangements that Strategic-Partner has in place which pre-date the Effective Date, Strategic-Partner and its Owners and affiliates may not directly or indirectly offer any such core real estate settlement services and products of other vendors, and may not have relationships with other vendors of such services and products, during the Term of this Agreement. Any existing arrangements

which are to be excluded from this requirement will be noted in writing before this Agreement is signed. The mortgage business, CMC Mortgage, is excluded from this requirement.

## 8. NO CONFLICTING LICENSE / INTEREST.

During the period beginning on the Effective Date and ending on the last day of the Term, neither Strategic-Partner nor any of its principals or ownership interest holders (together, "Owners"), directly or indirectly, shall become affiliated with, establish or have an interest in: (a) any real estate brokerage franchising or similar system or service, other than one operated by GMAC Real Estate; (b) any real estate brokerage operation or business or real estate information center, which is not licensed by GMAC Real Estate; or (c) any business offering real estate settlement services and/or products including those described in Section 7.B. above, except in accordance with the provisions of Section 7.B. above. The provisions of this Section 8: (y) shall remain in effect through the last day of the Term, even if Strategic-Partner attempts to voluntarily terminate this Agreement or ceases operations or if this Agreement is terminated as the result of an Event of Default attributable to Strategic-Partner; or (z) shall have no further effect if this Agreement is terminated as the result of a Event of Default attributable to GMAC Real Estate. GMAC Real Estate acknowledges that the Owner's ownership interests in Mass Management Group, LLC, a property management company, will not constitute a violation of this provision and fees earned by Mass Management Group, LLC will not be subject to the provisions of this Agreement, provided Strategic-Partner operates Mass Management Group, LLC in accordance with the Commercial Exclusion Provisions defined below.

## 9. GROSS COMMISSION INCOME AND FEES / REAL PROPERTY.

A. Gross Commission Income, as defined below and where applicable, shall be used as the basis for the calculation of fees to be paid by Strategic-Partner to GMAC Real Estate.

B. "Gross Commission Income" ("GCI") includes (A) all commissions and fees received by Strategic-Partner from the sale, lease, transfer or other disposition (including mergers and similar transactions) (each a "Disposition") of Real Property (as defined below), including any note, obligation, lien or other consideration given to Strategic-Partner in lieu of a commission, less commissions and referral fees paid to cooperating and/or referring brokers in other brokerage entities, but excludes (B) all commissions and fees received by Strategic-Partner from property management, the Disposition of commercial real estate or the non-residential portion of farm properties and any other brokerage or similar activity, provided Strategic-Partner conducts such activities through a separate legal entity (with a Federal I.D. number different from Strategic-Partner's), which entity maintains its own office location and telephone number and does not use the Marks (the "Commercial Exclusion Provisions"). Specifically: (X) GCI includes any selling bonuses, document preparation fees, administration and similar fees received by Strategic-Partner; (Y) GCI does not include referral payments made by GMAC Real Estate to Strategic-Partner nor does it include cooperating brokers fees paid to cooperating brokers in other brokerage entities that Strategic-Partner receives at closing and distributes to the cooperating broker; and (Z) there shall not be deducted from the calculation of GCI Strategic-Partner's expenses, membership or other fees (including multiple listing service fees) or payments made to brokers, sales associates or employees working in association with, or licensed through, Strategic-Partner.

C. "Real Property" includes single and multiple unit residential housing, commercial properties, farm houses, vacant or unimproved land to be used for residential, recreation or commercial purposes, condominiums, cooperatives, townhouses, vacation houses, interests in interval-ownership/ time-share residential units and mobile homes when affixed to the ground.

10. FEES.

Strategic-Partner agrees to pay the following fees (in United States dollars) to GMAC Real Estate:

A. **Joining Fee**.    Simultaneously with the execution of this Agreement (if this Agreement is not being executed upon the expiration of a similar contract between Strategic-Partner and GMAC Real Estate or its predecessor), a Joining Fee in an amount equal to $20,000 if the Licensed Site is Strategic-Partner's first GMAC Real Estate office within a particular market area, or $7,500 if the Licensed Site is located within the same market area, as determined by GMAC Real Estate, as another GMAC Real Estate office owned by Strategic-Partner. Notwithstanding the foregoing, if Strategic-Partner qualifies for the Classic Market Program (as described hereinafter), the Joining Fee will be $7,500, regardless of the number of GMAC Real Estate offices Strategic-Partner operates. For purposes of this Agreement, the "Classic Market Program" is a reduced-Joining Fee program open to strategic-partners that (i) earned $499,999 or less of GCI in the twelve (12) calendar months immediately preceding the Effective Date and (ii) are not located within any Metropolitan Statistical Area, as determined in accordance with the then-current standards of the United States Office of Management and Budget.

B. **Royalty Fees**. In accordance with the provisions of Exhibit A, attached.

C. **Referral Office Fee**.   A Referral Office Fee of $504 per year, billed in monthly installments of $42 per month (or $485 if paid in full, in advance, on the Effective Date and on each subsequent anniversary date thereof). Strategic-Partner acknowledges that payment of the Referral Office Fee is required to help defray the costs of promoting GMAC Real Estate's broker to broker referral network and that payment of the Referral Office Fee does not insure that Strategic-Partner will receive any such broker to broker referrals.

D. **Referral Fee**.  A referral fee, in accordance with Section 15 below, to GMAC Real Estate and, as applicable, any of its strategic-partners, within 10 days of the receipt by Strategic-Partner of a commission or fee generated from a transaction which was referred to Strategic-Partner by GMAC Real Estate or any of its strategic-partners.

E. **Advertising Fee**.   In accordance with the provisions of Exhibit A, attached. Advertising Fees shall be used in connection with the Advertising Fund, described in Section 14 of this Agreement

F. **Business Conference Registration Fee**.  Each attendee each must pay the then-current registration fee.

## 11. PAYMENT OF FEES/REPORTING.

A. Strategic-Partner agrees to pay all fees as set forth above and on the appropriate Exhibit, and to use such forms or computer software as recommended by GMAC Real Estate. Strategic-Partner agrees to furnish reports to GMAC Real Estate as the latter may reasonably require, including, but not limited to, periodic financial reports and statements, as provided in this Agreement and as may be reasonably requested by GMAC Real Estate in the future. In addition, Strategic-Partner shall submit to GMAC Real Estate Receipt a copy of Ruben Coulanges' 2004 federal tax return.

B. GMAC Real Estate shall have the right to set-off any amounts due to Strategic-Partner (including Awards – as defined in Exhibit A, if applicable) against any amounts due from Strategic-Partner to GMAC Real Estate or to any Affiliate of GMAC Real Estate (an "Affiliate" of GMAC Real Estate is defined as an entity, the majority ownership of which is held, directly or through subsidiaries, by General Motors Acceptance Corporation). Within 90 days of receiving a notice, in writing, from GMAC Real Estate to do so, Strategic-Partner shall make all reports through a broker reporting system ("BRS") approved by GMAC Real Estate and shall make all payments to GMAC Real Estate, electronically, through an electronic funds transfer account/system ("EFT") approved by GMAC Real Estate, which may or may not use a BRS. After receipt of such written notice and within the above time period, Strategic-Partner shall install and use a BRS and/or EFT, including all required hardware and software. Acceptable BRS's and EFT's will be those set forth on a document prepared and distributed by GMAC Real Estate to Strategic-Partner, together with (or prior to) the service of the written notice referenced above. As to each BRS and EFT (as applicable), Strategic-Partner shall (A) continuously maintain a software support system through an agreement with a reputable and competent service provider, (B) promptly cause to be rectified all problems which interfere with the proper operation of the BRS, (C) install updated versions as they become available, and (D) enter promptly (within 48 hours of settlement or closing, as to fees based on GCI or transactions) and accurately all information requested, including information related to listings, pendings, offices and agents. In addition, as to each EFT: (Y) Strategic-Partner shall enter into and keep effective whatever agreements with third-parties (including Strategic-Partner's financial institution) are required to permit GMAC Real Estate to withdraw electronically from Strategic-Partner's account amounts to which GMAC Real Estate is entitled and to provide in such agreements that 30-days prior notification will be given to GMAC Real Estate before such agreements are terminated, suspended or materially changed, and (Z) Strategic-Partner shall maintain sufficient monies in its accounts to cover all withdrawals permitted to be made by GMAC Real Estate.

C. Strategic-Partner agrees to furnish to GMAC Real Estate, on an ongoing updated basis and in form as reasonably requested by GMAC Real Estate, a roster of sales agents, brokers and other persons associated with Strategic-Partner who are authorized and/or licensed to conduct real estate sales activities, which roster shall include, as to each such sales agent and broker, the name, address, real estate license number (with a copy of the license), date of association, date of termination, location of office from which each such sales agent and broker is operating and other items that may reasonably be requested by GMAC Real Estate, from time to time.

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

9

## 12. LATE PAYMENT.

If Strategic-Partner fails to make payment of any fee within 15 days of its due date: (a) Strategic-Partner shall pay to GMAC Real Estate interest on the payment due at the annual rate of prime plus 4%, but, in any event, not less than 12% nor more than 15%; "prime" is defined as the interest rate published in The Wall Street Journal (the "WSJ") in its money rate section on the 1st business day of each month, as the prime or base lending rate being offered on that day (if such interest rate is not so published in the WSJ, "prime" shall be the average prime or base lending rate, as of that date, being offered by Citibank, N.A., to its most credit-worthy customers for 90-day loans); (b) GMAC Real Estate shall have the right, at its option, to deduct all such amounts from any payments due to Strategic-Partner pursuant to this Agreement or otherwise; (c) if the delinquent payment is in connection with a deferred payment plan, subject to any contrary provision in any documentation evidencing such a deferred payment plan, all present and future payments shall be automatically accelerated and all amounts due under the plan shall be considered due and payable; and (d) at the option of GMAC Real Estate and after written notice has been served upon Strategic-Partner, GMAC Real Estate may terminate Strategic-Partner's right to receive referrals, change any territorial provisions and/or, if Strategic-Partner's Fee Schedule is based solely on GCI, terminate Strategic-Partner's right to receive Awards (as defined in Exhibit A, if applicable). In the event collection action is necessary to recover monies due to GMAC Real Estate, Strategic-Partner agrees to pay the costs of collection, including agency and attorneys fees and court costs.

## 13. VERIFICATION RIGHTS.

No later than one hundred twenty (120) days following the end of each calendar-year during the Term (including any calendar-year in which the Term expires), Strategic-Partner shall provide to GMAC Real Estate annual financial statements in a form acceptable to GMAC Real Estate. If Strategic-Partner is conducting a business which is not covered by this Agreement, Strategic-Partner shall maintain a separate set of books and records for its real estate brokerage operations. Strategic-Partner shall permit a GMAC Real Estate representative to inspect and audit Strategic-Partner's accounting records and books for each line of business in which Strategic-Partner engages. If it is determined that Strategic-Partner has reported to GMAC Real Estate any fees due under this Agreement which are 3% or more lower than the fees actually due hereunder, Strategic-Partner shall pay to GMAC Real Estate, in addition to the unpaid fees, interest on the unpaid fees as provided in Section 12, plus the actual travel costs and expenses of the auditors and other persons involved in the inspection and/or audit. GMAC Real Estate shall have the right to inspect Strategic-Partner's offices and to confer with Strategic-Partner, its sales associates and employees to assure compliance with the standards GMAC Real Estate prescribes from time to time. GMAC Real Estate also shall have the right, and Strategic-Partner and each of its Owners hereby confirms that each of them so authorizes GMAC Real Estate to complete a credit investigation concerning each or all of them from time to time during the Term, as and in whatever manner GMAC Real Estate deems necessary in its sole discretion.

## 14. ADVERTISING FUND.

A. Within its sole discretion, GMAC Real Estate (or an entity designated by GMAC Real Estate, in which event, such entity shall have all the rights and obligations of GMAC Real

Estate with respect to the Advertising Fund, as provided in this Section) may establish and operate a fund (the "Advertising Fund" or the "Fund") for the purpose of providing marketing and advertising relative to the Marks. The Advertising Fund shall consist of monies paid to GMAC Real Estate by entities using the Marks, including Strategic-Partner. The monies paid to GMAC Real Estate as Advertising Fees (or otherwise designated by GMAC Real Estate as monies to be used by the Advertising Fund) shall be used by GMAC Real Estate, within its sole discretion, to, among other things: (A) create, produce, administer and support (either in-house or outsourced) national, regional and local marketing, advertising, public relations, promotional and other programs (together, "Programs"); and (B) present and promote a national business conference.

B. The amount, type, timing, content, location, cost and all other matters relating to Programs sponsored by the Advertising Fund or to which the Advertising Fund contributes, shall be within the sole discretion of GMAC Real Estate. Monies expended from the Advertising Fund on Programs in areas served by Strategic-Partner are not required to be proportionate to the amount of Advertising Fees paid by Strategic-Partner. Expenditures from the Advertising Fund shall be charged first to earned interest, if any.

C. GMAC Real Estate, in any calendar year, may expend from the Advertising Fund amounts which are greater or lesser than either amounts received by the Advertising Fund in such year or amounts contained in the Advertising Fund during that year (regardless of when they were collected). If a lesser amount is expended, the balance shall be carried over to the next year; if a greater amount is expended, the excess amount shall be repaid to GMAC Real Estate (or to whomever provided such monies, if other than GMAC Real Estate) from fees received by the Advertising Fund in the next year.

D. In the event a strategic-partner is delinquent in the payments required to be made by it to the Advertising Fund, GMAC Real Estate shall have the right (but not the obligation) to undertake collection action against the delinquent strategic-partner and to charge the reasonable costs of collection (including, but not limited to, collection agency fees, attorney's fees and costs) to the Advertising Fund. GMAC Real Estate, within its sole discretion, shall have the right to settle, reduce, compromise or waive payments required to be made by a strategic-partner to the Advertising Fund.

E. Advertising Fees (and all other monies received by the Advertising Fund) shall be accounted for separately, but may be deposited and commingled with any other funds of GMAC Real Estate. On or before April 30 of each year, GMAC Real Estate shall prepare a financial statement of the Advertising Fund for the prior calendar year, which shall be certified by a senior officer of GMAC Real Estate and shall be forwarded to Strategic-Partner, upon Strategic-Partner's written request. Strategic-Partner shall have the right to reasonably review the books and records of the Advertising Fund at GMAC Real Estate's principal place of business, upon reasonable prior notice to GMAC Real Estate.

F. GMAC Real Estate shall have the right, in its sole discretion, to negotiate with any strategic-partner a different arrangement than that set forth in the Section entitled "Advertising Fees", relating to the payment of Advertising Fees, including, but not limited to, payments by such strategic-partner for designated local marketing in lieu of the payment by such strategic-

partner of Advertising Fees, or payments from the Advertising Fund to a strategic-partner for designated local marketing, where national or regional marketing is determined to be inappropriate or where other situations, peculiar to a local market, are determined by GMAC Real Estate, within its sole discretion, to require such action.

G. GMAC Real Estate, within its sole discretion and upon 30-days notice to Strategic-Partner, may suspend or discontinue (and, thereafter, within its sole discretion, reinstate) the Advertising Fund, provided that, upon a suspension or discontinuance, the Fund shall continue to be operated until all monies in the Fund are expended in accordance with the provisions of this Agreement.

H. GMAC Real Estate's obligations with respect to the Advertising Fund and the collection, maintenance and distribution of Advertising Fees are as set forth in, and limited to, those contained in the provisions of this Agreement. In no event shall GMAC Real Estate be deemed to have fiduciary obligations to Strategic-Partner as to the operations of the Advertising Fund.

## 15. REFERRALS.

A. **Broker to Broker Referrals**. With respect to a broker-to-broker referral to be made by Strategic-Partner, Strategic-Partner shall make each such referral to an eligible GMAC Real Estate strategic-partner or, if no such strategic-partner is located in the applicable area, then to another broker approved by GMAC Real Estate (hereinafter an "Authorized Alternative Broker"). All such referrals shall be made either by contacting GMAC Real Estate to have GMAC Real Estate facilitate the referral or by directly contacting such strategic-partner. The strategic-partner who places the referral must register the transaction with GMAC Real Estate. To register a referral, Strategic-Partner must submit the required referral form to include complete contact information as provided at the time that the referral is accepted by the destination broker. This referral form is required regardless of whether the destination broker is a strategic-partner of GMAC Real Estate or is an Authorized Alternative Broker. Strategic-Partner shall pay referral fees and royalties as set forth below.

If another GMAC Real Estate strategic-partner refers a transaction to Strategic-Partner, Strategic-Partner as the destination company will, within 10 days after it receives any GCI from that referred transaction, pay to the originating strategic-partner a fee equal to 25% of the GCI that Strategic-Partner earned from the referred transaction. Strategic-Partner then will pay Royalty Fees based on the net GCI from the referred transaction.

Likewise, if Strategic-Partner refers an outgoing transaction to another strategic-partner or Authorized Alternative Broker, that other broker will pay to Strategic-Partner a fee equal to 25% of the GCI it earned from the referred transaction. Strategic-Partner as the originating broker then will pay GMAC Real Estate a fee equal to 2.5% of the GCI that the other broker earned from the referred transaction (which may also be stated as 10% of the amount that Strategic-Partner received from the other broker).

B. In the event Strategic-Partner fails to comply with the above procedures or with the policies, standards or procedures adopted by GMAC Real Estate, from time to time, regarding

referrals, GMAC Real Estate may, at its option (and in addition to any other remedies available to it for a Default of this Agreement), suspend further referrals to Strategic-Partner, remove Strategic-Partner from the authorized referral directory, require referral training attendance, terminate this Agreement or take other action deemed appropriate.

C. Strategic-Partner acknowledges that it acquires no rights or expectations with respect to referrals, whether from corporate relocation activities or otherwise, beyond those expressly stated in this Section.

## 16. PREMIER SERVICE℠; PERFORMANCE STANDARDS.

A. Strategic-Partner agrees that retention of market coverage, consistent performance, recruitment and training of a full-time, professional sales staff and commitment to the programs of GMAC Real Estate are necessary for retention of the license granted by this Agreement. Of primary importance is Strategic-Partner's full engagement in the process of Premier Service℠, a systematic and measurable way to conduct business. In addition to satisfying the Premier Service training requirements described in Section 5.C. above, Strategic-Partner agrees to participate in the Premier Service survey process by registering the Licensed Site and requesting every buyer and seller represented by Strategic-Partner to complete a Premier Service survey upon completion of a transaction. Strategic-Partner is responsible to pay a one-time registration fee for the Licensed-Site and a fee for each survey sent to a buyer or seller. In addition, Strategic-Partner shall use Strategic-Partner's best efforts, and shall actively encourage its managers and sales agents, to implement third-party and affiliated programs sponsored by GMAC Real Estate, through its Strategic Alliance Group or otherwise.

B. Strategic-Partner's performance shall be reviewed annually on the anniversary of the Effective Date, beginning on the second anniversary of the Effective Date. Strategic-Partner's average GCI shall exceed, for the 1 year period being reviewed, 75% of the higher of (a) GCI attained during the first year after the Effective Date, or (b) GCI attained during the 1-year period prior to the 1-year period being reviewed, or (c) the average of the prior 3 years (if Strategic-Partner has been licensed for such period). Failure by Strategic-Partner to meet this performance standard shall constitute an Event of Default under this Agreement. Notwithstanding the provisions of this subparagraph (b), if the Market Area (as later defined) serviced by Strategic-Partner is negatively impacted as a whole, to the extent that the total sales volume, by dollar, of residential property sold during the year being reviewed is less than 90% of the total sales volume, by dollar, of residential property sold during the prior year, the percentage of GCI to be maintained by Strategic-Partner shall be reduced proportionately (e.g., if the total sales volume of the year being reviewed is 90% of the total sales volume of the prior year, the percentage required to be maintained by Strategic-Partner shall be reduced by 10%, i.e., to 67.5% - 10% of 75%). "Market Area" shall be the area serviced by the following multiple listing service: MLS Property Information Network (the "MLS"); total sales volume shall be as reflected by the records of the MLS.

## 17. ASSIGNMENT; OWNERSHIP; TRANSFERS; RIGHT OF FIRST REFUSAL.

A. **Assignment by GMAC Real Estate.** GMAC Real Estate shall have the right, within its sole discretion, to assign or transfer this Agreement and/or any of its rights or obligations

under this Agreement to a third-party, whether or not such third-party is affiliated with GMAC Real Estate.

B. **Transfer of Agreement, Assets by Strategic-Partner.**     Strategic-Partner acknowledges and agrees that GMAC Real Estate has entered into this Agreement in reliance upon the qualifications and representations of Strategic-Partner and, where Strategic-Partner is an entity, upon the qualifications and representations of both Strategic-Partner and Strategic-Partner's Owners (as defined in Section 8). Therefore, Strategic-Partner agrees that it shall not, without the prior written consent of GMAC Real Estate, Transfer (as defined in Section 17.E. below) this Agreement, any interest in its licensed business, or all or substantially all of its assets. GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement. Additionally, any such consent will be conditioned upon the following: (1) the Transfer of this Agreement may occur only in connection with the Transfer of the entire business conducted  pursuant to this Agreement; (2) the transferee has agreed, in writing, to honor Strategic-Partner's obligations under this Agreement; (3) all of Strategic-Partner's obligations to GMAC Real Estate (financial and otherwise) have been satisfied; (4) agreement by the transferee (or a principal of the transferee) to attend required training; (5) a copy of all relevant Transfer documentation is delivered to GMAC Real Estate; (6) at least 30-days prior written notice is given to GMAC Real Estate; and (7) the transferee executes a franchise agreement in the form as contained in the most recently filed offering circular, for the term indicated in that form (but not less than 5 years), commencing with the date of execution of the new agreement. Strategic-Partner shall remain liable to GMAC Real Estate pursuant to this Agreement with respect to all obligations which are based on actions or omissions prior to the effective date of the Transfer.

C. **Ownership.** Strategic-Partner certifies that: (i) Strategic-Partner is an individual or, if one of the entities described below is checked, it is that type of entity; and (ii) if Strategic-Partner is an entity, the Owners listed below are the only principals or persons holding an ownership interest in Strategic-Partner and the percentage of ownership interest held by each is set forth next to the name of each such person (if an ownership interest is held by another entity, Strategic-Partner certifies that there is set forth below each successive ownership interest, until individual ownership interests are reached and disclosed). Strategic-Partner shall notify GMAC Real Estate, in writing, prior to any change in the ownership interests (or the percentages) shown below or any change in the broker of record (the name of whom is set forth below).

    (X)         corporation:  organized under the laws of the State or Commonwealth of <u>Massachusetts</u>

    (\_)         limited liability company:  organized under the laws of the State or Commonwealth of _____

    (\_)         partnership (indicate type):  organized under the laws of the State or Commonwealth of _____

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

14

Owners:

Ruben Coulanges _____           100%

(Ownership interest holders listed)

Idelie Jean Baptiste _____
(Broker of Record)

D. **Transfer of Ownership Interests in Strategic-Partner.** The written consent of GMAC Real Estate shall be required with respect to any Transfer of an ownership interest equal to or greater than 10% of the total ownership interests in Strategic-Partner (including Transfers which, over a period of 2 years, each individually involve less than 10% of the ownership interests, but cumulatively, equal or exceed a Transfer of 10% or more of the ownership interests). GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement. Strategic-Partner shall provide at least 60 days prior written notice to GMAC Real Estate of any Transfer of the type described in the first sentence of this Section 17.D. (but, in the case of an Transfer upon the death of an Owner, within 30 days after the date of such death). Within 60 days of its receipt of the notification, GMAC Real Estate shall notify Strategic-Partner or transferee of its consent or refusal to consent to the proposed Transfer.

E. **Definition of a Transfer.** For purposes of Sections 17.B. and 17.D., the term "Transfer" shall mean any sale, lease, assignment, conveyance or other transfer including: (i) those occurring involuntarily or by operation of law, including those resulting from death, marriage, incompetency or similar events; (ii) those occurring through merger, acquisition, consolidation, dissolution, bankruptcy, execution or foreclosure sale or similar events or those occurring between/among the spouse and/or children of an Owner; and (iii) those occurring through any other voluntary act.

F. **Effect of Unauthorized Transfer.** In the event of a Transfer for which consent was required pursuant to this Section 17, but such consent was not obtained, both Strategic-Partner and the transferee shall be required to comply with the provisions of this Agreement and shall be obligated to GMAC Real Estate to do so. A failure to comply with the provisions of this Section 17 shall constitute an Event of Default under this Agreement.

G. **Right of First Refusal.** As to any Transfer referenced in 17.B. or 17.D. above (except a Transfer of ownership interests between/among the spouse and/or children of an Owner or between/among Owners), GMAC Real Estate shall have the right, at its option, to purchase (or otherwise have transferred to it) the stock and/or assets of Strategic-Partner, under substantially the same conditions as a proposed Transfer to a third-party (the "**Right of First Refusal**"). Prior to an Transfer to a third-party, Strategic-Partner shall serve upon GMAC Real Estate a copy of the term sheet, letter of intent or contract (the "**Offer Document**") whereby Strategic-Partner has agreed with a third-party to an Transfer, together with a certification from the transferor(s) that the Offer Document accurately and fully represents all the terms and conditions of the proposed Transfer and a copy of all due diligence materials furnished by Strategic-Partner to the third-party upon which the third-party based its offer as provided in the Offer Document. If, within 10

days of receipt by GMAC Real Estate of the above documentation (the "10-day Notice Period"), GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected to exercise its Right of First Refusal, GMAC Real Estate and Strategic-Partner shall be deemed to have entered into a contract based on the same terms set forth in the Offer Document and, thereafter, each party shall be bound by its terms, provided the Offer Document provides (and, shall be deemed to so provide, if it does not), that: (i) GMAC Real Estate shall have the right to substitute cash for any other form of payment provided in the Offer Document; and (ii) the date of closing or settlement shall be not less than 60 days from the date of service by GMAC Real Estate upon Strategic-Partner of the notice that it has elected to exercise its Right of First Refusal; and (iii) Strategic-Partner makes the customary warranties and representations given by the seller of the assets of, or ownership interests in, an entity operating a real estate brokerage business, including, but not limited to, those related to title, the operating condition of the assets, the validity of contracts and the extent of liabilities. If, within the 10-day Notice Period, GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected not to exercise its Right of First Refusal or if no notice is so served by GMAC Real Estate, GMAC Real Estate shall be deemed to have waived its Right of First Refusal for a period of 180 days from the beginning of the 10-day Notice Period (the "180-day Waiver Period"). If, within the 180-day Waiver Period, Strategic-Partner effectuates the Transfer in accordance with the terms and conditions of the Offer Document, the Right of First Refusal shall be considered terminated. If, within the 180-day Waiver Period, the Transfer is not effectuated in accordance with the terms and conditions of the Offer Document or any material term or condition of the Offer Document is changed, the Right of First Refusal shall be considered reinstated and the procedures set forth above shall be followed with respect to any proposed Transfer (including a proposed Transfer which was the subject of a Offer Document that was changed during any 180-day Waiver Period).

## 18. TERMINATION; DEFAULT; CROSS-DEFAULT.

This Agreement may be terminated upon any one of the following conditions (in addition to the conditions specifically mentioned elsewhere in this Agreement and unless otherwise provided by the law of the state in which Strategic-Partner is located). Prior to the effective date of termination, Strategic-Partner shall pay all monies due, or to become due pursuant to this Agreement, to GMAC Real Estate and shall furnish GMAC Real Estate with all required reports and records. After termination, GMAC Real Estate shall have no further obligations to Strategic-Partner.

A. **By Strategic-Partner.** If GMAC Real Estate is in Default (as defined in Section D. below) of this Agreement, Strategic-Partner may terminate this Agreement, effective upon service upon GMAC Real Estate of a written notice of termination (the "**Strategic-Partner's Termination Notice**"), provided, prior to the service of Strategic-Partner's Termination Notice, Strategic-Partner had served upon GMAC Real Estate a written notice of such Default (the "**Strategic-Partner's Default Notice**") which specified the nature and extent of the Default, including identification of the specific provision of this Agreement which GMAC Real Estate is in Default of, and GMAC Real Estate failed to cure such Default within 30 days after receipt of Strategic-Partner's Default Notice or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, GMAC Real Estate failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by

GMAC Real Estate within 90 days of the service of the Strategic-Partner's Default Notice, despite the diligent efforts of GMAC Real Estate to do so, Strategic-Partner shall have the right to serve Strategic-Partner's Termination Notice at any time thereafter, until the Default is cured).

The service of Strategic-Partner's Termination Notice by Strategic-Partner shall: (1) be deemed to be an irrevocable waiver by Strategic-Partner of the exclusivity of the Licensed Site and GMAC Real Estate shall be free to license other parties to use the Marks at the Licensed Site, and (2) relieve other strategic-partners of the Franchise of any obligations regarding the placement of referrals with Strategic-Partner.

B. **By GMAC Real Estate (Automatic).** Each of the following shall constitute an Event of Default, which, among other things, shall result in an automatic termination of this Agreement (unless GMAC Real Estate, in its sole discretion, notifies Strategic-Partner, in writing to the contrary), effective immediately, without notice to Strategic-Partner:

(1)    Strategic-Partner becomes insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy (or similar proceeding) is filed by Strategic-Partner or is filed against Strategic-Partner and is not opposed by Strategic-Partner; or if a final judgment in an amount of $25,000 or more is entered against Strategic-Partner and is not covered by a policy of insurance remains unsatisfied for a period of 60 days; or, if Strategic-Partner is an individual and except as otherwise provided in this Agreement, Strategic-Partner dies, or, if Strategic-Partner is an entity, Strategic-Partner ceases to exist; or if execution is levied against Strategic-Partner or Strategic-Partner's business, assets, ownership interest or property.

(2)    Strategic-Partner ceases to operate its real estate brokerage business, which shall include failing to keep its offices open and staffed during all regular business hours, properly equipped for the transaction of real estate brokerage activities; provided, however, that if Strategic-Partner's business premises are damaged or destroyed, Strategic-Partner shall have 30 days after such event in which to apply for approval from GMAC Real Estate to relocate or reconstruct the premises, which approval shall not be unreasonably withheld, delayed or conditioned. Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any cessation of its real estate brokerage business or the closure of any of its offices;

(3)    The real estate brokerage license of Strategic-Partner, of Strategic-Partner's broker of record (or the equivalent) or of any Owner is suspended, revoked or not renewed, or Strategic-Partner's right to do business in the jurisdiction in which any of Strategic-Partner's Licensed Sites is located. Strategic-Partner shall notify GMAC Real Estate, in writing, immediately upon the occurrence of any of the above events;

(4)    Strategic-Partner or any Owner conducts its real estate brokerage operations in such a fashion as to reflect unfavorably on GMAC Real Estate, its name, goodwill or reputation, or on the Marks, including, but not limited to, the employment of or other association with any individuals who have been convicted of a crime; or Strategic-Partner acts or fails to act in such a manner as to be in violation of any law or regulation. Without limiting the generality of the foregoing, any breach of the

representations or warranties set forth in Section 20.C. hereof shall result in automatic termination of this Agreement. Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any of the above events;

(5)   Strategic-Partner or any Owner purports to Transfer any rights or obligations under this Agreement or any interest in Strategic-Partner to a third party without GMAC Real Estate's prior written consent, contrary to the provisions of this Agreement;

(6)   Strategic-Partner or any Owner makes any material misrepresentation or omission in its application or Business and Financial History Form or Strategic-Partner maintains false books or records or makes any false reports or statements to GMAC Real Estate; or

(7)   Strategic-Partner or any Owner is in Default of any provision of this Agreement and was served with a GMAC Real Estate Default Notice (as defined below) in the preceding 12-month period.

**C. By GMAC Real Estate (Right To Cure).**  If Strategic-Partner or any Owner is in Default of this Agreement based on acts or omissions not referenced in Section 18.B., above, GMAC Real Estate, in addition to all other remedies available to it, may terminate this Agreement, effective upon service upon Strategic-Partner of a written notice of termination (the **"GMAC Real Estate Termination Notice"**), provided, prior to the service of the GMAC Real Estate Termination Notice, GMAC Real Estate had served upon Strategic-Partner a written notice of such Default (the **"GMAC Real Estate Default Notice"**) which specified the nature and extent of the Default and Strategic-Partner failed to cure such Default within 30 days after receipt of the GMAC Real Estate Default Notice, or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, Strategic-Partner failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by Strategic-Partner within 90 days of the service of the GMAC Real Estate Default Notice, despite the diligent efforts of Strategic-Partner to do so, GMAC Real Estate shall have the right to serve a GMAC Real Estate Termination Notice at any time thereafter, until the Default is cured).

**D. Default and Event of Default.**  The term **"Default"**, as used throughout this Agreement, shall mean a material failure to comply with a provision of this Agreement. The term **"Event of Default"**, as used throughout this Agreement, shall mean a Default for which this Agreement provides no period to cure or for which the period to cure has expired.

**E. Additional Remedies upon an Event of Default.**  Should Strategic-Partner commit an Event of Default, GMAC Real Estate, without terminating this Agreement, may, at its option, (and in addition to any other remedies available to it under this Agreement), suspend services to Strategic-Partner, remove Strategic-Partner from any GMAC Real Estate websites and other directories, eliminate Strategic-Partner's exclusive territory (if any) under this Agreement, suspend further referrals to Strategic-Partner and remove Strategic-Partner from the authorized referral directory, or take other action deemed appropriate.

**F. Cross-Default.** Notwithstanding any contrary provision of this Agreement or any other Franchise Agreement between Strategic-Partner (and/or its Owners or affiliates) and GMAC Real Estate (each such other Franchise Agreement being a "Sister Agreement"), any occurrence of Strategic-Partner's Default and/or Event of Default under this Agreement shall constitute a Default and/or Event of Default under each Sister Agreement, and any occurrence of Strategic-Partner's Default and/or Event of Default under any Sister Agreement shall constitute a Default and/or Event of Default under this Agreement.

## 19. OBLIGATIONS UPON TERMINATION.

A. Upon termination of this Agreement, for whatever reason, Strategic-Partner shall:

(1)    within 10 days of such termination, discontinue use of all Marks, including the words "GMAC Real Estate", or any derivation of those words, and refrain from holding itself out to the public in a manner that would suggest that it is a licensee or former licensee of GMAC Real Estate. Strategic-Partner agrees that GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of the Marks. In addition, if Strategic-Partner has used the words "GMAC Real Estate" as part of its internet domain name and such use has not terminated within 10 days of termination of this Agreement, Strategic-Partner will be deemed to have assigned its rights in such domain name to GMAC Real Estate, and GMAC Real Estate may take whatever actions it deems appropriate to terminate such domain name and Strategic-Partner's right to use the same;

(2)    on the date of such termination, pay to GMAC Real Estate all fees, charges and other amounts due to GMAC Real Estate, together with the following additional fees:

(a)    Royalty Fees and Advertising Fees, computed as set forth on Exhibit A, on GCI attributable to transactions in process on the termination date and to transactions under contract on the date of termination that settle or close within 30 days after termination; and

(b)    Referral Fees, computed as set forth above, on referrals sent or received prior to the termination date;

(3)    Surrender to GMAC Real Estate or, at the option of GMAC Real Estate, destroy all signs and documentation bearing the Marks, including yard signs, letterheads, advertising and marketing materials, business cards, manuals, training materials, client promotion materials and the like. GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of materials or programs which are part of the Franchise;

(4)    Take immediate steps to cancel all advertising, including advertising in the Yellow Pages of the telephone directory, which carries the Marks; and

(5)    Execute any documents necessary to effectuate its obligations under this Agreement and take such action as GMAC Real Estate deems reasonably necessary to

evidence the fact that Strategic-Partner has ceased using the Marks and has no further right to use the Marks.

B.  Upon termination of this Agreement pursuant to Section 18.B. or 18.C. above, in addition to the obligations set forth in Section 19.A. above:

(1)    Strategic-Partner shall:

(a)    pay to GMAC Real Estate all financial losses sustained by GMAC Real Estate as the result of the early termination (if the amount of such losses cannot be calculated exactly, they shall be estimated); and

(b)    remain obligated with respect to the provisions of Section 8 of this Agreement; and

(2)    Owners shall be personally liable to GMAC Real Estate for all financial obligations of Strategic-Partner to GMAC Real Estate, but limited to those obligations incurred prior to the date of termination and those based on losses attributable to the one-year period after the date of termination.

For purposes of section 19 b.(2), "losses attributable to the one-year period after the date of termination" shall mean the Total Fee Amounts (defined as Royalty Fees, Advertising Fees and Referral Office Fees) which would have been due from Strategic-Partner under the Agreement had Strategic-Partner performed under the Agreement for the one-year period following the termination date.  For purposes of calculating the Total Fee Amounts for such period, the monthly average of the Royalty Fees and Advertising Fees due from Strategic-Partner, as provided in Exhibit A of this Agreement, for the twenty-four (24) month period preceding the date of termination will be multiplied by twelve, and will be added to the actual Referral Office Fees due for the one-year period following the date of termination.  If the date of termination occurs prior to year three of this Agreement, the Royalty and Advertising Fees portion of the Total Fee Amounts will be based on the amount of such fees due to GMAC Real Estate for the twelve-month period preceding the date of termination.

C.  If, after termination of this Agreement, Strategic-Partner fails to comply with its obligations under this Section, in addition to any other payments required to be made by Strategic-Partner to GMAC Real Estate, Strategic-Partner shall reimburse GMAC Real Estate for all its costs related to its attempt to enforce its rights, including the payment of reasonable collection agency's fees, attorney's fees and costs.

## 20. REPRESENTATIONS AND WARRANTIES.

A.  Strategic-Partner represents that it is either an individual or an entity (properly formed and authorized to do business in the state in which the Licensed Site is located) licensed to sell real estate in the state in which the Licensed Site is located.

B.  Strategic-Partner acknowledges that GMAC Real Estate has delivered to Strategic-Partner, not less than 10 business days prior to the signing of this Agreement, a copy of the

Offering Circular concerning this franchise for the state in which the Licensed Site is located and in which Strategic-Partner intends to do business, which Strategic-Partner has had an opportunity to review. Strategic-Partner further acknowledges that GMAC Real Estate has not, either orally or in writing, represented that Strategic-Partner will achieve in the licensed business any specified level of sales or profit, nor represented the sales or profit level of any other licensee, but has referred Strategic-Partner to the Offering Circular which provides Strategic-Partner with the names, addresses and telephone numbers of other licensees of GMAC Real Estate, so that Strategic-Partner can make its own inquiry. Strategic-Partner further acknowledges that any additional inquiry pertaining to the nature of this franchise which Strategic-Partner has made to GMAC Real Estate, in writing, has been answered, in writing, to the satisfaction of Strategic-Partner.

C. Strategic-Partner acknowledges that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the "Anti-Terrorism Measures"). GMAC Real Estate therefore requires certain representations and warranties that the parties with whom it deals are not directly or indirectly involved in terrorism. Therefore, Strategic-Partner hereby represents and warrants that neither it nor any of its employees, agents, representatives or, as applicable, its principals, members, officers or directors, nor any other person or entity associated with Strategic-Partner (each, individually, a "Strategic-Partner Party" and collectively, the "Strategic-Partner Parties") is:

    (i)    a person or entity listed in the Annex to the Executive Order; or

    (ii)    a person or entity otherwise determined pursuant to the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism (such a person or entity and those persons and entities listed in the Annex to the Executive Order are referred to herein as "Terrorists"); or

    (iii)    a person or entity who assists, sponsors or who supports Terrorists or acts of terrorism ("Sponsors of Terrorism"); or

    (iv)    owned or controlled by Terrorists or Sponsors of Terrorism.

Furthermore, Strategic-Partner represents and warrants that neither it nor any Strategic-Partner Party will, during the term of this Agreement, become a person or entity described in clauses (i) – (iv) above.

## 21. ENTIRE AGREEMENT.

This Agreement is the entire agreement of the parties and supersedes any and all prior oral or written agreements or understandings between the parties relating to the subject matter of this Agreement.

## 22. INDEMNIFICATION AND INSURANCE.

Strategic-Partner shall defend, indemnify and hold harmless GMAC Real Estate, its shareholder, agents and employees, from and against any claims for damages, losses and expenses (including attorney's fees) resulting in any way from the conduct of Strategic-Partner's real estate brokerage business. This indemnification obligation shall survive the expiration or earlier termination of this Agreement.

In addition to, and not in substitution for, the above indemnification, Strategic-Partner shall, at its own expense, purchase and maintain: (a) comprehensive general liability insurance, including contractual, products/completed operations and personal injury coverage; (b) comprehensive automobile liability coverage, including owned, non-owned and hired automobiles used in Strategic-Partner's real estate brokerage operations; (c) errors and omissions insurance, with respect to Strategic-Partner's real estate brokerage operations. For the insurance referenced under clauses (a) and (b) above, the minimum limits required shall be $1,000,000 per occurrence for bodily injury and $500,000 per occurrence for property damage, with a maximum deduction of $5,000; for the insurance referenced in clause (c) above, the minimum limits shall be $1,000,000 per annum, with a maximum deduction of $5,000. GMAC Real Estate shall be named as an additional insured on each such policy. Workers Compensation insurance, to the extent required by the law of the state in which the Licensed Site is located, shall be purchased and maintained by Strategic-Partner on each employee and sales associate. All losses resulting from Strategic-Partner's failure to obtain insurance shall be borne by Strategic-Partner, only. In the event of cancellation, non-renewal or material change in Strategic-Partner's required insurance policies, Strategic-Partner shall serve upon GMAC Real Estate a notice of such action at least 30 days prior to the effective date of such action. Strategic-Partner shall deliver to GMAC Real Estate a copy of its insurance binder before the Effective Date and, thereafter, shall serve upon GMAC Real Estate continuous certificates of such coverages (which certificates shall provide that the applicable policies shall not be cancelled without serving upon GMAC Real Estate at least 30-days prior notification of such intended cancellation).

## 23. CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS.

A. **Choice of Law.** Except as expressly provided otherwise, this Agreement shall be construed in accordance with the laws of the state in which the Licensed Site is located. However, no law regulating the offer or sale of franchises, business opportunities or similar interests or governing the relationship between GMAC Real Estate and Strategic-Partner will apply unless its jurisdictional requirements are met independently without reference to this Section. All disputes regarding the validity of the arbitration agreement set forth in Section 23.B shall be governed by the laws of the State of Illinois, without regard for its conflict of laws principles.

B. **Arbitration.** GMAC Real Estate and Strategic-Partner agree that, except for controversies, disputes or claims (together or separately, "**Claims**") related to the improper use of the Marks, all Claims between GMAC Real Estate and its affiliates (and their respective shareholders, officers, directors, agents, and/or employees)(together, the "**GMAC Real Estate**

Parties"), and Strategic-Partner (and/or Strategic-Partner's Owners, guarantors, affiliates, and/or employees)(together, the "Strategic-Partner Parties") arising out of or related to:

    (1)    this Agreement or any other agreement between Strategic-Partner and GMAC Real Estate;

    (2)    GMAC Real Estate's relationship with Strategic-Partner; or

    (3)    any policy or standard relating to the Franchise or the franchised business;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association ("AAA"). The arbitration proceedings will be conducted by one arbitrator and, except as this section otherwise provides, according to the then current commercial arbitration rules of the American Arbitration Association. All proceedings will be conducted at a suitable location chosen by the arbitrator in the Chicago Metropolitan Area of the State of Illinois and will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

The arbitrator may not declare any Mark generic or otherwise invalid or, except as expressly provided by federal statute, award any punitive or exemplary damages against either party (GMAC Real Estate and Strategic-Partner waive, to the fullest extent permitted by law, except as expressly provided by federal statute, any right to, or claim for, punitive or exemplary damages against the other). The arbitrator shall be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. Each party shall be required to submit all Claims against the other or those Claims shall be forever waived. The arbitrator may not consider any settlement discussions that might have been made by either Strategic-Partner or GMAC Real Estate.

GMAC Real Estate and Strategic-Partner agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between any of the GMAC Real Estate Parties and any of the Strategic-Partner Parties may not be consolidated with any other arbitration proceeding between GMAC Real Estate and any other person or between Strategic-Partner and any other person.

Despite GMAC Real Estate's and Strategic-Partner's agreement to arbitrate, GMAC Real Estate and Strategic-Partner each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that GMAC Real Estate and Strategic-Partner must contemporaneously submit the dispute for arbitration on the merits as provided in this Section.

The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

C. **Waiver of Jury Trial.** To the extent permitted by law, Strategic-Partner and GMAC Real Estate each waives its right to a trial by jury in any litigation or arbitration proceeding arising from this Agreement or from actions taken pursuant to this Agreement or from the relationship between the parties resulting from this Agreement.

D. **Time Limitations for Claims.** Any claim by Strategic-Partner against GMAC Real Estate shall be barred unless, within one year from the date that Strategic-Partner knew, or should have known, of the facts upon which the claim is based, Strategic-Partner filed a formal request for arbitration against GMAC Real Estate, as set forth above.

## 24. MODIFICATION OF AGREEMENT.

Subject to GMAC Real Estate's right to modify its standards and specifications for use of the Marks and other aspects of the operation of a GMAC Real Estate business, no changes may be made in this Agreement unless in writing and signed by all parties.

## 25. SEVERABILITY.

Each Section and provision of this Agreement is severable and, if one portion is invalid, the remaining portions shall nevertheless remain in full force and effect.

## 26. NON-WAIVER.

No failure by GMAC Real Estate to take action on any Default or Event of Default of Strategic-Partner, whether it is a single instance or a series of instances, shall constitute a waiver of such Default or Event of Default or of the performance required of Strategic-Partner. No express waiver by GMAC Real Estate of any performance or Default or Event of Default of Strategic-Partner shall be construed as a waiver of any other or any future obligation or Default or Event of Default.

## 27. NOTICES; FACSIMILE AND ELECTRONIC MAIL.

A. Any notice provided for in this Agreement shall be in writing, addressed to GMAC Real Estate or Strategic-Partner at the respective addresses set forth at the beginning of this Agreement, and shall be served: (a) by personal delivery (which shall be effective upon such personal delivery) or (b) by certified mail, return receipt requested, properly addressed, postage prepaid (which shall be effective on the earlier of the date of delivery as indicated on the return receipt card or 3 days after deposit into the United States mails, or (c) by a nationally recognized overnight delivery service, properly addressed, delivery charges prepaid (which shall be effective on the earlier of the date of delivery as indicated on the carrier's receipt records or 2 days after delivery to the carrier).

B. Although not effective for purposes of giving notice pursuant to Section 27.A. above, each party consents to the other party forwarding facsimile and electronic mail transmissions to the consenting party as follows:

GMAC Real Estate:

To: Contract Administration @ 908-542-5526 (fax) and
susan_daniel@gmachs.com (e-mail)

Strategic Partner:

To: Ruben Coulanges @ 508-583-6901(fax) and r_coulanges@hotmail.com (e-mail)

Such consent will continue in effect until modified or terminated by written notice to the other party sent in accordance with subparagraph 27.a. above.

## 28. TERM AND RENEWAL.

The term of this Agreement shall be seven (7) years from the Effective Date (as later defined) (the "Term").

At the expiration of the Term, Strategic-Partner shall have the right to enter into a new, ten-year agreement with GMAC Real Estate, subject to the following conditions: (a) Strategic-Partner has provided GMAC Real Estate with written notice of its intent to execute a new agreement at least 180 days prior to the expiration of the Term, and (b) Strategic-Partner is not then and has not been in Default of this Agreement. The new agreement will be in the form then being offered by GMAC Real Estate. The new agreement may contain materially different terms than this Agreement, including those which relate to fees, payment of fees, performance standards, renewal terms and the Marks.

Subject to any contrary applicable state law, if Strategic-Partner continues to use the Marks after the end of the Term, but fails to execute a new agreement, Strategic-Partner will be deemed to be operating under the terms and conditions of the agreement then being offered by GMAC Real Estate, except that the term shall be deemed to be 180 days from the date that GMAC Real Estate is served with a notice of termination by Strategic-Partner (at its option, GMAC Real Estate shall have the right to shorten the term by the service upon Strategic-Partner of a notice fixing a shorter term) and, at the option of GMAC Real Estate but without notice being required, the Royalty Fees shall be increased to an amount equal to 10% of Strategic-Partner's monthly GCI, payable within 48 hours of the completion of each settlement and closing from which Strategic-Partner is entitled to be paid a commission.

## 29. EFFECTIVE DATE.

The parties intend that this Agreement be effective as of February 1, 2005 (the "Effective Date") conditioned upon:

1.) Strategic-Partner having submitted to GMAC Real Estate a copy of the Company's active real estate brokerage license issued by the appropriate regulatory agency of the Commonwealth of Massachusetts; and

2.) Receipt, review and acceptance by GMAC Real Estate of a completed Agent Verification Checklist, including copies of the active real estate brokerage sales agents' licenses for agents associated with Strategic-Partner and verifiable data, acceptable to GMAC Real Estate, documenting the GCI indicated in Strategic-Partner's franchise application; and

3.) Receipt by GMAC Real Estate of the declaration pages for all insurance policies secured by Company as required under Section 22 of the Franchise Agreement. GMAC Real Estate must be named as an additional insured under all of the insurance policies; and

Upon satisfaction of all of the foregoing conditions, or waiver thereof by GMAC Real Estate, GMAC Real Estate will provide Strategic-Partner with written confirmation of the same. If, however, the foregoing conditions are not satisfied by the Effective Date, GMAC Real Estate, at its sole option, may agree to amend the Effective Date to a later date or may terminate this Agreement by sending written notice of termination to Strategic-Partner.

## 30. LIMITATION OF DAMAGES.

Except for Strategic-Partner's obligation to indemnify GMAC Real Estate, as provided by common law or in the Section of this Agreement entitled "Indemnification and Insurance", neither party shall be liable to the other for consequential, punitive or exemplary damages.

## 31. CONFIDENTIALITY OF AGREEMENT.

Except as may be required by law, Strategic-Partner agrees not to publicize or disclose to any third party, without the prior written consent of GMAC Real Estate, the terms of this Agreement.

**[The remainder of this page has been intentionally left blank.]**

IN WITNESS WHEREOF, the parties have executed this Agreement.

GMAC REAL ESTATE, LLC

By: _Judith O'Brien_ (signature)

Print Name: Judith O'Brien

Title: Vice President

Date: _1-31-05_

SOUTH SHORE REALTY GROUP, INC.

By: _____ (signature)

Print Name: Ruben Coulanges

Title: President

Date: _1-19-05_

3/2004 Reg. Fran. Agmt
CHQO1/30423577.4

27

## ENDORSEMENT OF PRINCIPALS / OWNERSHIP INTEREST HOLDERS

Each of the Owners identified in Section 17.B. is executing this Agreement for the limited purpose of being personally bound by the provisions of Sections 3 (The Marks), 4 (Materials), 7 (Certain Activities Not Precluded; Rights Reserved; Provision of Other Settlement Services), 8 (No Conflicting License/Interest), 13 (Verification Rights), 17 (Assignment; Ownership; Transfers; Right of First Refusal), 18.F. (Cross-Default), 19.B. (Financial Obligations after Default) of this Agreement and 23 (Choice of Law and Forum; Arbitration; Waiver of Jury Trial; Time Limitation for Claims).

_____    Date:  1 - 19 - 05
Ruben Coulanges

### Exhibit A to the Franchise Agreement
### Royalty and Advertising Fees

**a.**     **Royalty Fees.**

Strategic-Partner shall pay to GMAC Real Estate, Royalty Fees, in accordance with the following:

(1)    _Amount._  Upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid Gross Commission Income ("GCI"), a Royalty Fee, in an amount equal to five percent (5%) of the GCI to which Strategic-Partner is entitled. In addition, if at the end of each twelve-month period following the Effective Date, the total amount of Royalty Fees paid by Strategic-Partner during such twelve-month period is less than $10,000 (the "Annual Royalty Fee Minimum"), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the Annual Royalty Fee Minimum and the total amount of Royalty Fees actually paid.

If this Agreement is the first contract between GMAC Real Estate and Strategic-Partner, Strategic-Partner shall not be required to pay the Royalty Fees which are based on GCI earned with respect to transactions under contract or in escrow on the Effective Date, provided, however, that such transactions are closed or settled within thirty (30) days after the Effective Date. As to transactions under contract or in escrow on the date of the termination of this Agreement, Strategic-Partner shall be required to pay those Royalty Fees which are based on GCI earned with respect to such transactions, if such transactions close or are settled within thirty (30) days of the termination date.

(2)    _Awards._  Within 105 days of the end of each calendar-year after the Effective Date, GMAC Real Estate shall pay to Strategic-Partner an award amount ("Award") equal to the following percentage of Strategic-Partner's past calendar-year's GCI:

## AWARD CHART

| Award Level | Gross Commission Income Range From | Gross Commission Income Range To | Maximum Range Amount | Award Multiplier Rate | Maximum Award For Range | Cumulative Maximum Award |
|---|---|---|---|---|---|---|
| 1 | 0 | $1,150,000 | $1,150,000 | N/A | $-0- | $-0- |
| 2 | 1,150,001 | 1,725,000 | 574,999 | N/A | 2,500 | 2,500 |
| 3 | 1,725,001 | 2,300,000 | 574,999 | 1.00 % | 5,750 | 8,250 |
| 4 | 2,300,001 | 4,025,000 | 1,724,999 | 1.25 % | 21,562 | 29,812 |
| 5 | 4,025,001 | 5,750,000 | 1,724,999 | 1.50 % | 25,875 | 55,687 |
| 6 | 5,750,001 | 7,500,000 | 1,749,999 | 1.75 % | 30,625 | 86,312 |
| 7 | 7,500,001 | 9,250,000 | 1,749,999 | 2.00 % | 35,000 | 121,312 |
| 8 | 9,250,001 | 10,950,000 | 1,699,999 | 2.25 % | 38,250 | 159,562 |
| 9 | 10,950,001 | 12,725,000 | 1,774,999 | 2.50 % | 44,375 | 203,937 |
| 10 | 12,725,001 | 15,025,000 | 2,299,999 | 2.75 % | 63,250 | 267,187 |
| 11 | 15,025,001 | 17,350,000 | 2,324,999 | 3.00 % | 69,750 | 336,937 |
| 12 | 17,350,001 | 20,825,000 | 3,474,999 | 3.25 % | 112,937 | 449,874 |
| 13 | 20,825,001 | 24,300,000 | 3,474,999 | 3.50 % | 121,625 | 571,499 |
| 14 | 24,300,001 | 56,600,000 | 32,299,999 | 3.75 % | 1,211,250 | 1,782,749 |
| 15 | 56,600,001 | and higher | as determined | 4.00 % | as calculated | as calculated |

(3)    Conditions of Awards. (a) Notwithstanding the above, Strategic-Partner shall be entitled to no Award in the event that: (i) at any time during the calendar-year for which the Award is applicable or on the date that the Award is to be given, an Event of Default existed or exists, as applicable, regarding this Agreement or any other contract with GMAC Real Estate or any Affiliate; or (ii) during the calendar-year for which the Award is applicable, Strategic-Partner had been more than 30 days in arrears of any payments required to be made by Strategic-Partner to GMAC Real Estate under this Agreement or under any other contract with GMAC Real Estate or any Affiliate; or (iii) on the date that Strategic-Partner would otherwise have been entitled to payment of an Award, this Agreement had been terminated and no new franchise agreement had been entered into between Strategic-Partner and GMAC Real Estate; and

(b)    For the purpose of calculating GCI with respect to Awards under this Section, Strategic-Partner's Licensed Sites contributing to the GCI shall include the Licensed Site listed in Section 6 as well as those other licensed sites (the "Sister Sites") subject to a Sister Agreement (as defined in Section 18.F), provided (i) each of those Sister Sites is owned by the same persons listed in Section 17.B. as Owners, in the same percentages listed in Section 17.B., and (ii) each of those Sister Sites is located within the same local market area. Strategic-Partner and GMAC Real Estate agree that GCI from the following Sister Sites will be considered together with the Licensed Site for purposes of determining any Award due Strategic-Partner:    N/A    .

(c)    The Gross Commission Income Range figures included in the Award Chart may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the figures in any year be greater than 5%). The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

b.    **Advertising Fees.**

Upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid GCI, Strategic-Partner shall pay to GMAC Real Estate an Advertising Fee, in an amount equal to 2% of the GCI to which Strategic-Partner is entitled, provided, however, the amount of the Advertising Fee in any calendar-month: (i) shall not exceed $870 for that calendar-month; and (ii) shall not be lower than $240 for that calendar-month regardless of transaction count (if this minimum amount has not been received by GMAC Real Estate during any month through payments based on a percentage of GCI for that calendar-month, the difference between this minimum amount and the payments actually received by GMAC Real Estate shall be paid by Strategic-Partner on the first business day after the last day of each calendar-month).

GCI generated by a sales agent shall be attributed to the office location (and/or Licensed Site) at which the sales agent's license is held or registered or, if the applicable state's licensing regulations do not provide for the holding or registration of sales agents' licenses at particular office locations, at the office location (and/or Licensed Site) from which the sales agent principally operates.

Minimum and maximum Advertising Fees may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the Advertising Fees in any year be greater than 5%). The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United

States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

A-1

### RECEIPT OF FRANCHISE-RELATED DOCUMENTS

The undersigned, personally and/or as an officer or ownership interest holder of the proposed franchisee, does hereby acknowledge receipt of the following documents, in form for execution, relating to the franchise of GMAC Real Estate, LLC:

[X] (1) Franchise Agreement
[ ] (2) State Rider for the State of _____
[ ] (3) Franchise Development Costs Note
[ ] (4) The Personal Guaranty of Note
[ ] (5) The Loan and Security Agreement
[ ] (6) The Pledge Agreement
[ ] (7) The Subordination Agreement
[ ] (8) The Term Loan Note
[ ] (9) Other (specify): _____

(Proposed franchisee must initial the box adjacent to the applicable documents)

I further acknowledge my understanding that it is my responsibility, individually and/or as an officer or ownership interest holder of the proposed franchisee, to review all such documents, so that I am fully familiar with the transaction contemplated thereby prior to signing the documents.

DATED: _____ 1 - 11 - 05 _____

A FEDERAL TRADE COMMISSION RULE REQUIRES THAT WE PROVIDE YOU WITH THE FRANCHISE-RELATED DOCUMENTS NOTED ABOVE AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO THE DATE THEY ARE TO BE EXECUTED.    PLEASE DO NOT SIGN OR RETURN THESE DOCUMENTS UNTIL FIVE (5) BUSINESS DAYS HAVE ELAPSED FROM THE DATE OF THIS RECEIPT.

_____

_____ individually

and/or as an officer or ownership interest holder of

_____

(a  Massachusetts _____ corporation)

(a _____ partnership)

(a _____ limited liability company)

# EXHIBIT C

# AMERICAN ARBITRATION ASSOCIATION

## COMMERCIAL ARBITRATION TRIBUNAL

In the Matter of the Arbitration between

Re:    51 115 01284 07
GMAC REAL ESTATE, LLC
and
South Shore Realty Group, Inc. d/b/a South Shore GMAC Real Estate
and
Ruben S. Coulanges
- Chicago, Illinois
Claim: $155,673.43

Case Manager: Gilbert A. Camarena

## AWARD OF ARBITRATOR

I, Paul Bernstein, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the parties on or about January 19, 2005, and the undersigned having been duly sworn, and the oral, face-to-face hearing having been held at the offices of the American Arbitration Association at 225 N. Michigan Ave., Suite # 1840, Chicago, IL 60601 on April 3, 2008, counsel for the Claimant appearing and a witness for Claimant only appearing and having offered sworn testimony based upon which several documents were admitted into evidence, and after the final argument of the attorney for the Claimant, the hearings being declared closed as of April 7, 2008 to allow counsel for Claimant to submit a more detailed time and billing statement for the most current billing period, and the undersigned, having fully reviewed the testimony of the witness and considered the written documents submitted to me and introduced into evidence by Claimant, no one appearing at the hearing on behalf of either Respondent, and having also considered the detailed time and billing information provided by Claimant in regard to Claimant's demands for attorney's fees against Respondents, I hereby, **AWARD**, as follows:

South Shore Realty Group, Inc., a corporation, d/b/a South Shore GMAC Real Estate organized under the laws of the State of Massachusetts("South Shore"), Respondent, shall pay to GMAC REAL ESTATE, LLC ("GMAC") the sum of One-Hundred-Fifty-Five Thousand, Six-Hundred Seventy-Three-Dollars and Forty-Three cents ($155,673.43) for GMAC'S damages as to claims made in this arbitration proceeding plus Eleven-Thousand, Four Hundred Dollars and no cents ($11,400.00) as and for the attorney's fees of Claimant, or the total sum of One-Hundred-Sixty-Seven Thousand, Seventy-Three-Dollars and Forty-Three cents ($167,073.43), not including arbitration filing and other fees and costs of the American Arbitration Association and not including the charges of the arbitrator.



Ruben S. Coulanges, personally and individually ("Coulanges"), Respondent, shall pay to GMAC REAL ESTATE, LLC ("GMAC") the sum of Fifty-Nine Thousand, Four-Hundred Sixty-Four-Dollars and Forty-Three cents ($59,464.43) for GMAC'S damages as to claims made in this proceedings plus Eleven-Thousand, Four-Hundred Dollars and no cents ($11,400.00) as and for the attorney's fees of Claimant, or the total sum of Seventy-Thousand Eight-Hundred Sixty-Four-Dollars and forty-three cents ($70,864.43), not including arbitration filing and other fees and costs of the American Arbitration Association and not including the charges of the arbitrator.

The award herein made for One-Hundred-Sixty-Seven Thousand, Seventy-Three-Dollars and Forty-Three cents ($167,073.43) is the full amount of the award in favor of GMAC and is against South Shore. The award made herein against Coulanges for Seventy-Thousand Eight-Hundred Sixty-Four-Dollars and forty-three cents ($70,864.43) is that part of the award in favor of GMAC against South Shore that reflects the contractual, personal guaranty and responsibility of Mr. Coulanges, Mr. Coulanges not being personally liable or responsible for the difference between One-Hundred-Sixty-Seven Thousand, Seventy-Three-Dollars and Forty-Three cents ($167,073.43) and Seventy-Thousand Eight-Hundred Sixty-Four-Dollars and forty-three cents ($70,864.43).

The administrative filing and case service fees of the American Arbitration Association, totaling $4,200.00, and the fees and expenses of the arbitrator, totaling $1,800.00 shall be borne entirely by South Shore and Coulanges jointly and severally.

Therefore, South Shore and Coulanges shall be liable jointly and severally to reimburse GMAC the sum of $6,000.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by GMAC.

Interest will accrue at the rate of interest provided by the laws of the State of Massachusetts until judgment is entered on this award from and after the date of this award and thereafter as provided by said State's applicable laws or rules in regard to the payment of interest on judgments.

The above sums are to be paid on or before ten days from the date of this Award.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are, hereby denied.

Signed: _____        DATED: April 9, 2008
                 Paul Bernstein, Esq. Arbitrator

CASE NO. ___08cv2242___

ATTACHMENT NO.____1____

EXHIBIT _____

TAB (DESCRIPTION) _____

AO440 (REV. 10/93) Summons in a Civil Action

# United States District Court
Northern District of Illinois

SUMMONS IN A CIVIL ACTION

GMAC Real Estate, LLC

vs.

Ruben Coulanges, et al

Defendant

**CASE NUMBER**: 08cv2242

**JUDGE:** Coar

**TO:**   South Shore Realty Group, Inc.
d/b/a South Shore GMAC Real Estate

YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and serve upon plaintiff's attorney:

Name  Eric Richard Lifvendahl
Address: 20 North Wacker Drive, Ste. 2100
City: Chicago, IL 60606

an answer to the complaint which is herewith served upon you, within **[20]** days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Michael W. Dobbins, Clerk

By:   M. Cowan
Deputy Clerk

Dated: 5/6/08

## RETURN OF SERVICE

| Service of the Summons and Complaint was made by me:^ | DATE |
|---|---|
| NAME OF SERVER (Print) | TITLE |

*Check one box below to indicate appropriate method of service:*

[ ]   Served personally upon the defendant.  Place where served:_____

_____

[ ]   Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
      discretion then residing therein.  Name of person with whom the summons and complaint were left:

_____

[ ]   Returned unexecuted:_____

[ ]   Other (specify): _____

_____

_____

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

### DECLARATION OF SERVER

        I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.


Executed on _____          _____
                        Date                                                    Signature of Server


                                                      _____

                                                         Address of Server

^As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

*AO440 (REV. 10/93) Summons in a Civil Action

# United States District Court
## Northern District of Illinois

### SUMMONS IN A CIVIL ACTION

GMAC Real Estate, LLC

**CASE NUMBER**: 08cv2242

vs.

**JUDGE:** Coar

Ruben Coulanges, et al

Defendant

**TO:**   South Shore Realty Group, Inc.
d/b/a South Shore GMAC Real Estate

YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and serve upon plaintiff's attorney:

Name  Eric Richard Lifvendahl
Address: 20 North Wacker Drive, Ste. 2100
City: Chicago, IL 60606

an answer to the complaint which is herewith served upon you, within **[20]** days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Michael W. Dobbins, Clerk

By:  M. Cowan
Deputy Clerk

Dated: 5/6/08

## RETURN OF SERVICE

| Service of the Summons and Complaint was made by me:^ | DATE |
|---|---|

| NAME OF SERVER (Print) | TITLE |
|---|---|

*Check one box below to indicate appropriate method of service:*

[ ]   Served personally upon the defendant.  Place where served:_____

_____

[ ]   Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.  Name of person with whom the summons and complaint were left:
_____

[ ]   Returned unexecuted:_____

[ ]   Other (specify): _____

_____

_____

_____

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

### DECLARATION OF SERVER

     I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                     Date                            Signature of Server

                                         _____
                                         Address of Server

^As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GMAC REAL ESTATE, LLC,                    )
                                          )
                    Plaintiff,            )          FILED:  APRIL 18, 2008
                                          )          08CV2242          CEM
vs.                                       )   No.    JUDGE COAR
                                          )          MAGISTRATE JUDGE COX
RUBEN COULANGES, SOUTH SHORE              )
REALTY GROUP, INC., d/b/a SOUTH           )
SHORE GMAC REAL ESTATE,                   )
                                          )
                    Defendants.           )

## MOTION FOR CONFIRMATION OF ARBITRATION AWARD AND JUDGMENT

Plaintiff and Claimant in the underlying arbitration GMAC Real Estate, LLC ("GMAC")

by its attorney Eric R. Lifvendahl, moves this Court to confirm the arbitration award entered on

April 9, 2008 by the American Arbitration Association ("AAA") and enter judgment on behalf of

GMAC pursuant to Federal Arbitration Act, §9.  In support of its motion, GMAC states as

follows:

1.      GMAC and Defendants (also the named Respondents in the arbitration) Ruben

Coulanges ("Coulanges") and South Shore Realty Group, Inc. d/b/a South Shore Realty Group

("South Shore") entered into a Franchise Agreement effective February 1, 2005.  A copy of the

Franchise Agreement is attached hereto as Exhibit A.

2.      Pursuant to Section 23 of the Franchise Agreement, the parties agreed that any

dispute would be resolved by arbitration before the AAA in Chicago.  (Ex. A, §23B, pp. 22-23).

The parties also agreed that the arbitration would be governed by the Federal Arbitration Act and

any judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

3.      Following a dispute over the Franchise Agreement GMAC filed an Arbitration Demand with AAA. (A copy of the Demand is attached as Exhibit B). As stated in the Demand, GMAC's principal place of business is Illinois.

4.      On April 3, 2008, an arbitration hearing in Case No. 51 115 01284 07 was held at AAA's offices in Chicago before the arbitrator Paul Bernstein.

5.      On April 9, 2008, arbitrator Bernstein issued an Award of Arbitrator ("Award"). (A copy of the Award is attached as Exhibit C).

6.      As states in the Award, defendant South Shore is ordered to pay GMAC a total of $167,073.43 excluding arbitration filing costs and fees.

7.      As stated in the Award, defendant Coulanges is ordered to pay GMAC $70,864.43 excluding arbitration costs and fees.

8.      Lastly, the Award found South Shore and Coulanges jointly and severally liable to GMAC for $6,000 for arbitration costs and fees.

9.      GMAC requests this Court enter an Order confirming the arbitration Award and entering judgment on behalf of GMAC. Attached hereto is a draft proposed order confirm the arbitration Award and entering judgment on behalf of GMAC.

WHEREFORE, Plaintiff GMAC Real Estate, LLC respectfully requests the Court enter an Order confirming the arbitration Award entered by arbitrator Paul Bernstein on April 9, 2008 and entering judgment against both Defendants.

Respectfully submitted,

GMAC Real Estate, LLC, Plaintiff

By:____/s/ Eric R. Lifvendahl_____
        One of its Attorneys

2

Eric R. Lifvendahl
Williams Montgomery & John Ltd.
20 North Wacker Drive
Suite 2100
Chicago, IL 60606
(312) 442-3200

Document #: 771582

08CV2242          CEM
JUDGE COAR
MAGISTRATE JUDGE COX

# EXHIBIT A

# GMAC REAL ESTATE, LLC

## REAL ESTATE FRANCHISE AGREEMENT

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4



# TABLE OF CONTENTS

**Page**

1.  THE FRANCHISE.......................................................................................................

2.  RELATIONSHIP OF THE PARTIES......................................................................1

3.  THE MARKS.............................................................................................................1

4.  MATERIALS..............................................................................................................2

5.  TRAINING..................................................................................................................4

6.  GRANT OF THE LICENSE......................................................................................4

7.  CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE; PROVISION OF OTHER SETTLEMENT SERVICES.................5

8.  NO CONFLICTING LICENSE / INTEREST.........................................................6

9.  GROSS COMMISSION INCOME AND FEES / REAL PROPERTY..................7

10. FEES............................................................................................................................7

11. PAYMENT OF FEES/REPORTING.......................................................................8

12. LATE PAYMENT.....................................................................................................9

13. VERIFICATION RIGHTS......................................................................................10

14. ADVERTISING FUND...........................................................................................10

15. REFERRALS............................................................................................................10

16. PREMIER SERVICE$^{SM}$; PERFORMANCE STANDARDS.................................12

17. ASSIGNMENT; OWNERSHIP; RIGHT OF FIRST REFUSAL.......................13

18. TERMINATION; DEFAULT; CROSS-DEFAULT..............................................13

19. OBLIGATIONS UPON TERMINATION..............................................................16

20. REPRESENTATIONS AND WARRANTIES.......................................................19

21. ENTIRE AGREEMENT..........................................................................................20

22. INDEMNIFICATION AND INSURANCE.............................................................21

23. CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS...........................................................22

24. MODIFICATION OF AGREEMENT.....................................................................22

25. SEVERABILITY......................................................................................................24

26. NON-WAIVER..........................................................................................................24

27. NOTICES; FACSIMILE AND ELECTRONIC MAIL........................................24

28. TERM AND RENEWAL.........................................................................................24
    .....................................................................................................................................25

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

i

29.    EFFECTIVE DATE...........................................................................................

30.    LIMITATION OF DAMAGES. ...............................................................................25

31.    CONFIDENTIALITY OF AGREEMENT.................................................................26
                                                                                                                    ....26

## EXHIBITS

Endorsement of Principals / Ownership Interest Holders
A     –         Royalty / Advertising Fees

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

ii

# REAL ESTATE FRANCHISE AGREEMENT

The parties, GMAC Real Estate, LLC, a Delaware limited liability company, with its principal offices at 2021 Spring Road, Suite 300, Oak Brook, Illinois 60523 ("GMAC Real Estate"); and

South Shore Realty Group, Inc.
Exact name under which real estate license is held ("**Strategic-Partner**"), whose principal place of business is located at 136 Main Street, Brockton, MA 02301
                                                ,

dba South Shore
(any change in dba requires prior written approval)

FEDERAL ID#51-0480418

agree as follows:

## 1. THE FRANCHISE.

GMAC Real Estate and its predecessors have developed a franchise system (the "Franchise") which will permit use of the Marks (as defined in Section 3), including the Mark "GMAC Real Estate", in the promotion and sale of Real Property (as defined in Section 9.C.). The Franchise provides those firms selected to be strategic-partners with the opportunity to use the Marks and to participate in the other benefits outlined in this Agreement.

GMAC Real Estate: (a) provides guidelines regarding the use of the GMAC Real Estate name and other Marks, which are intended to maximize the value of the nationally recognized image of GMAC Real Estate and improve the effectiveness of Strategic-Partner's advertising, public relations, personnel recruiting and sales promotion programs; (b) facilitates referrals between strategic-partners (but excluding referrals from GMAC Real Estate's affiliated relocation company, unless Strategic-Partner and/or Strategic-Partner's sales associates have qualified for such referrals, and then, subject to the conditions of such qualification); (c) provides systems and programs to deliver sales training and education, management training and client promotional materials to its strategic-partners; and (d) periodically provides a national business conference for the benefit of its strategic-partners.

GMAC Real Estate will strive to improve the Franchise through development of new programs and review of existing programs and will seek recommendations from its strategic-partners to strengthen the Franchise at local and national levels.

## 2. RELATIONSHIP OF THE PARTIES.

GMAC Real Estate and Strategic-Partner are each independently owned and operated businesses which share similar mutual interests with respect to real estate brokerage. Neither this Real Estate Franchise Agreement (this "Agreement"), nor the use of the term "Strategic-Partner" in this Agreement, is intended to create or shall be construed to create an agency, partnership, joint venture or employer-employee relationship between the parties. The GMAC

Real Estate business operated by Strategic-Partner is an independently owned and operated business and Strategic-Partner is solely responsible for its day-to-day conduct and activities. Strategic-Partner is not an agent (actual, implied or ostensible) of GMAC Real Estate. Neither party shall hold itself out to be an agent, partner, joint venturer or employee of the other party. Neither party shall have the right to bind or obligate the other party.

Strategic-Partner agrees to conduct its real estate brokerage business: (a) in such fashion as to reflect favorably at all times on GMAC Real Estate and the good name, goodwill and reputation of GMAC Real Estate and the Marks, and (b) in compliance with all laws and regulations pertaining to the operation of its real estate brokerage business.

## 3. THE MARKS.

A. **Ownership and Modification of the Marks.** GMAC Real Estate is the owner or licensee of the GMAC Real Estate trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols used to identify the products and services offered by GMAC Real Estate franchises, including the mark "GMAC Real Estate" (collectively the "Marks"). Strategic-Partner's right to use the Marks is derived solely from this Agreement and is limited to the operation of a real estate brokerage business by Strategic-Partner, pursuant to and in compliance with this Agreement and with all applicable standards, specifications and operating procedures prescribed by GMAC Real Estate, from time to time, during the term of this Agreement. Any unauthorized use of the Marks by Strategic-Partner shall constitute a Default (as defined in Section 18.D.) of this Agreement and an infringement of the rights of GMAC Real Estate in and to the Marks. GMAC Real Estate will protect and defend the Marks in the manner that it, in its sole discretion, determines is required. All goodwill resulting from Strategic-Partner's use and promotion of the Marks will accrue to the benefit of GMAC Real Estate.

If it becomes advisable at any time, in the sole discretion of GMAC Real Estate, to modify or discontinue use of any Mark and/or to require Strategic-Partner to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols, Strategic-Partner agrees to comply with the requirements of GMAC Real Estate to modify or otherwise discontinue the use of such Mark and/or to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs or other commercial symbols after notice to do so from GMAC Real Estate. All provisions of this Agreement applicable to the Marks shall apply to any other trademarks, service marks, trade dress, logos, designs, colors and commercial symbols later authorized by GMAC Real Estate, in writing, for use by and licensed to Strategic-Partner. The term "Marks" shall include any marks developed and/or registered in the future.

GMAC Real Estate shall have no obligation to reimburse Strategic-Partner for any expenditures made by Strategic-Partner to modify or discontinue the use of a Mark or to adopt additions to or substitutes for a discontinued Mark, including, without limitation, any expenditures relating to advertising or promotional materials or to compensate Strategic-Partner for any goodwill related to the discontinued or modified Mark. Notwithstanding the foregoing, if GMAC Real Estate changes the primary service mark of the Franchise so that it no longer includes the words "GMAC Real Estate" or some variation of those words, GMAC Real Estate will (a) provide Strategic-Partner 12 months' prior written notice of the change and (b) allow

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

2

Strategic-Partner to terminate this Agreement at the end of the twelve-month notice period. If Strategic-Partner elects to so terminate this Agreement, Strategic-Partner shall notify GMAC Real Estate, in writing, at least 90 days before the expiration of the 12-month notice period and shall comply with all post-termination obligations contained in this Agreement.

B. **Use of Marks.** To maintain the integrity of the Marks and the Franchise, GMAC Real Estate retains the right to control the quality of all materials and programs bearing the Marks and the manner in which the Marks are used.

The Marks shall be used: **(1)** only in conjunction with permanent real estate sales offices approved by GMAC Real Estate, and (2) only in the form and style authorized by GMAC Real Estate, as outlined from time to time in its manuals and other communications. Any departure from the restrictions set forth in the manuals or any use of the Marks on printed materials not outlined in the manuals must be approved in advance, in writing, by GMAC Real Estate. Use of the Marks on any publication (e.g., homeowner newsletter, decorating magazine, booklets, etc.) is specifically prohibited, unless the publication is approved in advance, in writing, by GMAC Real Estate.

Strategic-Partner will use the Marks in all real estate brokerage activities at or from the Licensed Site (as described in Section 6) during the term of this Agreement.

The Marks shall not be used to identify any property, goods or services provided by Strategic-Partner, other than those specifically approved, in writing, by GMAC Real Estate. Strategic-Partner will not use the Marks in any manner which indicates or implies the endorsement by GMAC Real Estate of any real property listed, sold or advertised by Strategic-Partner, including such real property's design, quality or price.

Strategic-Partner shall not use the GMAC Real Estate name or any other Mark as part of its corporate or entity name or in any other manner not expressly authorized, in writing, by GMAC Real Estate. The Marks shall be used as part of the trade name of Strategic-Partner in connection with all of, and limited to, its real estate brokerage activities. Strategic-Partner may use the GMAC Real Estate name (but not "GMAC" alone or any other Mark) as part of an Internet (or other computer network) domain name, provided that (i) such use complies with the standards set forth in the manuals or other communications supplied by GMAC Real Estate from time to time; (ii) prior written approval of the domain name is obtained from GMAC Real Estate; and (iii) upon termination of this Agreement for any reason, Strategic-Partner will comply with the terms of Section 19.A.(1) with regard to terminating its use of the GMAC Real Estate name as part of its domain name.

GMAC Real Estate reserves the right, in its sole discretion, to vary standards for any strategic-partner based upon the peculiarities or uniqueness of a strategic-partner's particular circumstances, business practices or any other conditions which GMAC Real Estate deems to require such variances. Strategic-Partner shall have no recourse against GMAC Real Estate for any variation from standard specifications and practices granted to any other strategic-partner and shall not be entitled to require GMAC Real Estate to grant Strategic-Partner a like or similar variation.

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

3

## 4. MATERIALS.

The use of any GMAC Real Estate materials (including copyrighted materials) is restricted to use by Strategic-Partner in its own business. Strategic-Partner shall not use for its own benefit (except as provided in this Agreement) or license to, or otherwise permit, third-parties to use or reproduce, in any form or manner, GMAC Real Estate materials or programs, or adapt and use, or permit any of its sales associates or employees to adapt and use, any GMAC Real Estate materials or programs on an Internet (or other computer network) site or in any other manner without the prior written approval of GMAC Real Estate.

All building signs, yard signs, promotional items and printed materials shall adhere to the design, size, colors and other specifications (together, the "Specifications") set forth in the manuals or other communications supplied by GMAC Real Estate from time to time. No departure from the Specifications shall be permitted without the prior written approval of GMAC Real Estate which approval shall not be unreasonably withheld, denied or delayed; any such departure shall be considered a Default of this Agreement. Strategic-Partner's Licensed Site shall be required to display building signs in conformance with the Specifications within sixty (60) days of the Effective Date. If a zoning ordinance, regulation, lease or similar restriction precludes Strategic-Partner from using a sign consistent with the Specifications, prior to erection of an alternate sign, the details for such an alternate sign shall be presented for approval to GMAC Real Estate, with a copy of the relevant zoning ordinance, regulation, lease or similar restriction; GMAC Real Estate's approval shall not be unreasonably withheld, delayed or conditioned.

All business records, letterheads, business forms, advertising and other materials (excluding business cards) disseminated to the public and used in Strategic-Partner's business shall indicate Strategic-Partner's independent ownership of the brokerage business with the statement "An Independently Owned and Operated Firm".

GMAC Real Estate will provide the initial development of a new logo treatment for Strategic-Partner, together with a franchise opening/starter kit, including operating and presentation manuals, videotapes, audio tapes, advertising materials, magazines and marketing products, at no cost to Strategic-Partner.

## 5. TRAINING.

A. **Getting Connected Session.** For New Strategic-Partners: GMAC Real Estate shall conduct a Getting Connected Session ("GCS") in the Chicago, Illinois area, or such other location designated by GMAC Real Estate. Strategic-Partner or its designated manager must attend, and satisfactorily complete, the first available GCS after execution of this Agreement. GMAC Real Estate will pay the GCS registration fee for one attendee (either Strategic-Partner or its designated manager) to attend a GCS at the site selected by GMAC Real Estate, provided that such designated person attends the GCS within 12 months after the Effective Date. Strategic-Partner may elect to have additional persons attend a GCS, but it must pay the then-current GCS registration fee for each additional attendee.

For Renewing Strategic-Partners: Within six (6) months after renewal, Strategic-Partner shall send at least one key management representative to a GCS at a site designated by GMAC Real Estate. The representative must complete the GCS to GMAC Real Estate's reasonable satisfaction. Strategic-Partner must pay the GCS registration fee for its designated representative and for each additional attendee.

**B. Accountability in Management.** For both new and renewing Strategic-Partners, following the Effective Date at least one key management representative of Strategic-Partner must satisfactorily complete "Accountability in Management" training. Upon any subsequent changes in key management personnel at the Licensed Site, at least one key management representative must satisfactorily complete Accountability in Management training. Accountability in Management training is a week-long management training class currently provided by a third-party vendor. Strategic-Partner must pay the Accountability in Management training registration fee for each attendee.

**C. Premier Service℠.** Strategic-Partner and each of its managers and sales associates must satisfactorily complete Premier Service training within six (6) months following the later to occur of (i) the Effective Date or (ii) such individual first becoming associated with Strategic-Partner. Strategic-Partner must pay the registration fee for each attendee.

**D. Costs.** Strategic-Partner shall be responsible for all travel, living and other costs its attendees incur in association with attending the training programs described in Sections A, B, and C above and all other training programs.

## 6. GRANT OF THE LICENSE.

**A. Current Office.** Strategic-Partner represents that it presently operates, or will by the Effective Date operate, an office at the following location:

Location      136 Main Street, Brockton, MA 02301

GMAC Real Estate grants to Strategic-Partner a license to establish and/or operate a real estate brokerage office displaying the Marks at its existing office location, as set forth above (the "Licensed Site"). Although the license granted to Strategic-Partner is non-exclusive and similar licenses may be granted to others within Strategic-Partner's market area, GMAC Real Estate shall not grant to another strategic-partner a license to use the Marks at an office located at the Licensed Site.

Simultaneously with the execution of this Agreement, Strategic-Partner shall execute and deliver to GMAC Real Estate a written instrument, conveying to GMAC Real Estate Strategic-Partner's rights to any telephone numbers relating to the Licensed Site. GMAC Real Estate agrees that it will hold the instrument in escrow, and will not release the instrument or exercise its rights thereunder unless and until there exists an Event of Default under this Agreement.

**B. Additional Offices.** If Strategic-Partner desires to expand its real estate brokerage business, by opening an additional office or otherwise, it shall apply to GMAC Real Estate for

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

5

approval to do so, by submitting a written application at least ninety (90) days prior to the planned date for opening. Approval of such expansion shall be within GMAC Real Estate's sole discretion and, if granted, shall be in writing. If approved, Strategic-Partner and GMAC Real Estate will enter into a separate agreement, on the form then being offered by GMAC Real Estate, with regard to the new office. Strategic-Partner's application must be accompanied by payment of the applicable Joining Fee for the additional franchise. If the office expansion is not approved by GMAC Real Estate, the Joining Fee will be refunded.

C. **Sublicensing Prohibited.** Strategic-Partner shall not sublicense, or permit a third-party to use, the GMAC Real Estate name or any other Mark.

7. **CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE; PROVISION OF OTHER SETTLEMENT SERVICES.**

A. Nothing in this Agreement shall preclude Strategic-Partner or other strategic-partners from listing, selling or advertising any real estate, wherever it or the owner of the real estate may be located, including in areas serviced by Strategic-Partner or other strategic-partners, as applicable. GMAC Real Estate reserves the right: (i) to license other real estate brokers to use the Marks anywhere, other than at Strategic-Partner's Licensed Site, including areas adjacent to, or in proximity with, the Licensed Site; (ii) for GMAC Real Estate and its parents, subsidiaries, or affiliated entities to conduct activities, including real estate brokerage activities, mortgage, title insurance and relocation operations, in areas adjacent to, or in proximity with, the Licensed Site under the Marks or other marks; and (iii) for GMAC and its parents, subsidiaries, or affiliated entities to establish other franchises or company-owned outlets or other channels of distribution, selling or leasing similar products or services under a different mark. Additionally, GMAC Real Estate reserves the right to establish, and to have its parents, subsidiaries and/or affiliated entities establish, anywhere, franchises or company-owned businesses or other channels of distribution: (x) selling or leasing similar products or services under trademarks, service marks, trade dress, logos, designs, colors or other commercial symbols different from the Marks, or (y) offering dissimilar products or services under the Marks.

B. Simultaneously with the execution of this Agreement, Strategic-Partner will enter into exclusive contractual relationships with GMAC Real Estate or its affiliates or designees pertaining to the delivery of other core real estate settlement services and/or products, including mortgage, title and closing services, home warranty and homeowner's insurance, provided, however, that both Strategic-Partner and GMAC Real Estate agree that the entry into such contractual relationships is beneficial to both parties. If Strategic-Partner does not enter into one or more of these contractual relationships with GMAC Real Estate or its affiliates as of the Effective Date, but subsequently decides during the Term of this Agreement to provide any such core real estate settlement services and/or products, Strategic-Partner agrees that it must do so exclusively through the entry into contractual relationships with GMAC Real Estate or its affiliates or designees, as to those services and/or products. Except for arrangements that Strategic-Partner has in place which pre-date the Effective Date, Strategic-Partner and its Owners and affiliates may not directly or indirectly offer any such core real estate settlement services and products of other vendors, and may not have relationships with other vendors of such services and products, during the Term of this Agreement. Any existing arrangements

which are to be excluded from this requirement will be noted in writing before this Agreement is signed. The mortgage business, CMC Mortgage, is excluded from this requirement.

## 8.  NO CONFLICTING LICENSE / INTEREST.

During the period beginning on the Effective Date and ending on the last day of the Term, neither Strategic-Partner nor any of its principals or ownership interest holders (together, "Owners"), directly or indirectly, shall become affiliated with, establish or have an interest in: (a) any real estate brokerage franchising or similar system or service, other than one operated by GMAC Real Estate; (b) any real estate brokerage operation or business or real estate information center, which is not licensed by GMAC Real Estate; or (c) any business offering real estate settlement services and/or products including those described in Section 7.B. above, except in accordance with the provisions of Section 7.B. above. The provisions of this Section 8: (y) shall remain in effect through the last day of the Term, even if Strategic-Partner attempts to voluntarily terminate this Agreement or ceases operations or if this Agreement is terminated as the result of an Event of Default attributable to Strategic-Partner; or (z) shall have no further effect if this Agreement is terminated as the result of a Event of Default attributable to GMAC Real Estate. GMAC Real Estate acknowledges that the Owner's ownership interests in Mass Management Group, LLC, a property management company, will not constitute a violation of this provision and fees earned by Mass Management Group, LLC will not be subject to the provisions of this Agreement, provided Strategic-Partner operates Mass Management Group, LLC in accordance with the Commercial Exclusion Provisions defined below.

## 9.  GROSS COMMISSION INCOME AND FEES / REAL PROPERTY.

A.  Gross Commission Income, as defined below and where applicable, shall be used as the basis for the calculation of fees to be paid by Strategic-Partner to GMAC Real Estate.

B.  "Gross Commission Income" ("GCI") includes (A) all commissions and fees received by Strategic-Partner from the sale, lease, transfer or other disposition (including mergers and similar transactions) (each a "Disposition") of Real Property (as defined below), including any note, obligation, lien or other consideration given to Strategic-Partner in lieu of a commission, less commissions and referral fees paid to cooperating and/or referring brokers in other brokerage entities, but excludes (B) all commissions and fees received by Strategic-Partner from property management, the Disposition of commercial real estate or the non-residential portion of farm properties and any other brokerage or similar activity, provided Strategic-Partner conducts such activities through a separate legal entity (with a Federal I.D. number different from Strategic-Partner's), which entity maintains its own office location and telephone number and does not use the Marks (the "Commercial Exclusion Provisions"). Specifically: (X) GCI includes any selling bonuses, document preparation fees, administration and similar fees received by Strategic-Partner; (Y) GCI does not include referral payments made by GMAC Real Estate to Strategic-Partner nor does it include cooperating brokers fees paid to cooperating brokers in other brokerage entities that Strategic-Partner receives at closing and distributes to the cooperating broker; and (Z) there shall not be deducted from the calculation of GCI Strategic-Partner's expenses, membership or other fees (including multiple listing service fees) or payments made to brokers, sales associates or employees working in association with, or licensed through, Strategic-Partner.

C. **"Real Property"** includes single and multiple unit residential housing, commercial properties, farm houses, vacant or unimproved land to be used for residential, recreation or commercial purposes, condominiums, cooperatives, townhouses, vacation houses, interests in interval-ownership/ time-share residential units and mobile homes when affixed to the ground.

## 10. FEES.

Strategic-Partner agrees to pay the following fees (in United States dollars) to GMAC Real Estate:

A. **Joining Fee.** Simultaneously with the execution of this Agreement (if this Agreement is not being executed upon the expiration of a similar contract between Strategic-Partner and GMAC Real Estate or its predecessor), a Joining Fee in an amount equal to $20,000 if the Licensed Site is Strategic-Partner's first GMAC Real Estate office within a particular market area, or $7,500 if the Licensed Site is located within the same market area, as determined by GMAC Real Estate, as another GMAC Real Estate office owned by Strategic-Partner. Notwithstanding the foregoing, if Strategic-Partner qualifies for the Classic Market Program (as described hereinafter), the Joining Fee will be $7,500, regardless of the number of GMAC Real Estate offices Strategic-Partner operates. For purposes of this Agreement, the "Classic Market Program" is a reduced-Joining Fee program open to strategic-partners that (i) earned $499,999 or less of GCI in the twelve (12) calendar months immediately preceding the Effective Date and (ii) are not located within any Metropolitan Statistical Area, as determined in accordance with the then-current standards of the United States Office of Management and Budget.

B. **Royalty Fees.** In accordance with the provisions of Exhibit A, attached.

C. **Referral Office Fee.** A Referral Office Fee of $504 per year, billed in monthly installments of $42 per month (or $485 if paid in full, in advance, on the Effective Date and on each subsequent anniversary date thereof). Strategic-Partner acknowledges that payment of the Referral Office Fee is required to help defray the costs of promoting GMAC Real Estate's broker to broker referral network and that payment of the Referral Office Fee does not insure that Strategic-Partner will receive any such broker to broker referrals.

D. **Referral Fee.** A referral fee, in accordance with Section 15 below, to GMAC Real Estate and, as applicable, any of its strategic-partners, within 10 days of the receipt by Strategic-Partner of a commission or fee generated from a transaction which was referred to Strategic-Partner by GMAC Real Estate or any of its strategic-partners.

E. **Advertising Fee.** In accordance with the provisions of Exhibit A, attached. Advertising Fees shall be used in connection with the Advertising Fund, described in Section 14 of this Agreement

F. **Business Conference Registration Fee.** Each attendee each must pay the then-current registration fee.

## 11. PAYMENT OF FEES/REPORTING.

A. Strategic-Partner agrees to pay all fees as set forth above and on the appropriate Exhibit, and to use such forms or computer software as recommended by GMAC Real Estate. Strategic-Partner agrees to furnish reports to GMAC Real Estate as the latter may reasonably require, including, but not limited to, periodic financial reports and statements, as provided in this Agreement and as may be reasonably requested by GMAC Real Estate in the future. In addition, Strategic-Partner shall submit to GMAC Real Estate Receipt a copy of Ruben Coulanges' 2004 federal tax return.

B. GMAC Real Estate shall have the right to set-off any amounts due to Strategic-Partner (including Awards -- as defined in Exhibit A, if applicable) against any amounts due from Strategic-Partner to GMAC Real Estate or to any Affiliate of GMAC Real Estate (an "Affiliate" of GMAC Real Estate is defined as an entity, the majority ownership of which is held, directly or through subsidiaries, by General Motors Acceptance Corporation). Within 90 days of receiving a notice, in writing, from GMAC Real Estate to do so, Strategic-Partner shall make all reports through a broker reporting system ("BRS") approved by GMAC Real Estate and shall make all payments to GMAC Real Estate, electronically, through an electronic funds transfer account/system ("EFT") approved by GMAC Real Estate, which may or may not use a BRS. After receipt of such written notice and within the above time period, Strategic-Partner shall install and use a BRS and/or EFT, including all required hardware and software. Acceptable BRS's and EFT's will be those set forth on a document prepared and distributed by GMAC Real Estate to Strategic-Partner, together with (or prior to) the service of the written notice referenced above. As to each BRS and EFT (as applicable), Strategic-Partner shall (A) continuously maintain a software support system through an agreement with a reputable and competent service provider, (B) promptly cause to be rectified all problems which interfere with the proper operation of the BRS, (C) install updated versions as they become available, and (D) enter promptly (within 48 hours of settlement or closing, as to fees based on GCI or transactions) and accurately all information requested, including information related to listings, pendings, offices and agents. In addition, as to each EFT: (Y) Strategic-Partner shall enter into and keep effective whatever agreements with third-parties (including Strategic-Partner's financial institution) are required to permit GMAC Real Estate to withdraw electronically from Strategic-Partner's account amounts to which GMAC Real Estate is entitled and to provide in such agreements that 30-days prior notification will be given to GMAC Real Estate before such agreements are terminated, suspended or materially changed, and (Z) Strategic-Partner shall maintain sufficient monies in its accounts to cover all withdrawals permitted to be made by GMAC Real Estate.

C. Strategic-Partner agrees to furnish to GMAC Real Estate, on an ongoing updated basis and in form as reasonably requested by GMAC Real Estate, a roster of sales agents, brokers and other persons associated with Strategic-Partner who are authorized and/or licensed to conduct real estate sales activities, which roster shall include, as to each such sales agent and broker, the name, address, real estate license number (with a copy of the license), date of association, date of termination, location of office from which each such sales agent and broker is operating and other items that may reasonably be requested by GMAC Real Estate, from time to time.

## 12. LATE PAYMENT.

If Strategic-Partner fails to make payment of any fee within 15 days of its due date: (a) Strategic-Partner shall pay to GMAC Real Estate interest on the payment due at the annual rate of prime plus 4%, but, in any event, not less than 12% nor more than 15%; "prime" is defined as the interest rate published in The Wall Street Journal (the "WSJ") in its money rate section on the 1st business day of each month, as the prime or base lending rate being offered on that day (if such interest rate is not so published in the WSJ, "prime" shall be the average prime or base lending rate, as of that date, being offered by Citibank, N.A., to its most credit-worthy customers for 90-day loans); (b) GMAC Real Estate shall have the right, at its option, to deduct all such amounts from any payments due to Strategic-Partner pursuant to this Agreement or otherwise; (c) if the delinquent payment is in connection with a deferred payment plan, subject to any contrary provision in any documentation evidencing such a deferred payment plan, all present and future payments shall be automatically accelerated and all amounts due under the plan shall be considered due and payable; and (d) at the option of GMAC Real Estate and after written notice has been served upon Strategic-Partner, GMAC Real Estate may terminate Strategic-Partner's right to receive referrals, change any territorial provisions and/or, if Strategic-Partner's Fee Schedule is based solely on GCI, terminate Strategic-Partner's right to receive Awards (as defined in Exhibit A, if applicable). In the event collection action is necessary to recover monies due to GMAC Real Estate, Strategic-Partner agrees to pay the costs of collection, including agency and attorneys fees and court costs.

## 13. VERIFICATION RIGHTS.

No later than one hundred twenty (120) days following the end of each calendar-year during the Term (including any calendar-year in which the Term expires), Strategic-Partner shall provide to GMAC Real Estate annual financial statements in a form acceptable to GMAC Real Estate. If Strategic-Partner is conducting a business which is not covered by this Agreement, Strategic-Partner shall maintain a separate set of books and records for its real estate brokerage operations. Strategic-Partner shall permit a GMAC Real Estate representative to inspect and audit Strategic-Partner's accounting records and books for each line of business in which Strategic-Partner engages. If it is determined that Strategic-Partner has reported to GMAC Real Estate any fees due under this Agreement which are 3% or more lower than the fees actually due hereunder, Strategic-Partner shall pay to GMAC Real Estate, in addition to the unpaid fees, interest on the unpaid fees as provided in Section 12, plus the actual travel costs and expenses of the auditors and other persons involved in the inspection and/or audit. GMAC Real Estate shall have the right to inspect Strategic-Partner's offices and to confer with Strategic-Partner, its sales associates and employees to assure compliance with the standards GMAC Real Estate prescribes from time to time. GMAC Real Estate also shall have the right, and Strategic-Partner and each of its Owners hereby confirms that each of them so authorizes GMAC Real Estate to complete a credit investigation concerning each or all of them from time to time during the Term, as and in whatever manner GMAC Real Estate deems necessary in its sole discretion.

## 14. ADVERTISING FUND.

A. Within its sole discretion, GMAC Real Estate (or an entity designated by GMAC Real Estate, in which event, such entity shall have all the rights and obligations of GMAC Real

Estate with respect to the Advertising Fund, as provided in this Section) may establish and operate a fund (the "Advertising Fund" or the "Fund") for the purpose of providing marketing and advertising relative to the Marks. The Advertising Fund shall consist of monies paid to GMAC Real Estate by entities using the Marks, including Strategic-Partner. The monies paid to GMAC Real Estate as Advertising Fees (or otherwise designated by GMAC Real Estate as monies to be used by the Advertising Fund) shall be used by GMAC Real Estate, within its sole discretion, to, among other things: (A) create, produce, administer and support (either in-house or outsourced) national, regional and local marketing, advertising, public relations, promotional and other programs (together, "Programs"); and (B) present and promote a national business conference.

B. The amount, type, timing, content, location, cost and all other matters relating to Programs sponsored by the Advertising Fund or to which the Advertising Fund contributes, shall be within the sole discretion of GMAC Real Estate. Monies expended from the Advertising Fund on Programs in areas served by Strategic-Partner are not required to be proportionate to the amount of Advertising Fees paid by Strategic-Partner. Expenditures from the Advertising Fund shall be charged first to earned interest, if any.

C. GMAC Real Estate, in any calendar year, may expend from the Advertising Fund amounts which are greater or lesser than either amounts received by the Advertising Fund in such year or amounts contained in the Advertising Fund during that year (regardless of when they were collected). If a lesser amount is expended, the balance shall be carried over to the next year; if a greater amount is expended, the excess amount shall be repaid to GMAC Real Estate (or to whomever provided such monies, if other than GMAC Real Estate) from fees received by the Advertising Fund in the next year.

D. In the event a strategic-partner is delinquent in the payments required to be made by it to the Advertising Fund, GMAC Real Estate shall have the right (but not the obligation) to undertake collection action against the delinquent strategic-partner and to charge the reasonable costs of collection (including, but not limited to, collection agency fees, attorney's fees and costs) to the Advertising Fund. GMAC Real Estate, within its sole discretion, shall have the right to settle, reduce, compromise or waive payments required to be made by a strategic-partner to the Advertising Fund.

E. Advertising Fees (and all other monies received by the Advertising Fund) shall be accounted for separately, but may be deposited and commingled with any other funds of GMAC Real Estate. On or before April 30 of each year, GMAC Real Estate shall prepare a financial statement of the Advertising Fund for the prior calendar year, which shall be certified by a senior officer of GMAC Real Estate and shall be forwarded to Strategic-Partner, upon Strategic-Partner's written request. Strategic-Partner shall have the right to reasonably review the books and records of the Advertising Fund at GMAC Real Estate's principal place of business, upon reasonable prior notice to GMAC Real Estate.

F. GMAC Real Estate shall have the right, in its sole discretion, to negotiate with any strategic-partner a different arrangement than that set forth in the Section entitled "Advertising Fees", relating to the payment of Advertising Fees, including, but not limited to, payments by such strategic-partner for designated local marketing in lieu of the payment by such strategic-

partner of Advertising Fees, or payments from the Advertising Fund to a strategic-partner for designated local marketing, where national or regional marketing is determined to be inappropriate or where other situations, peculiar to a local market, are determined by GMAC Real Estate, within its sole discretion, to require such action.

G. GMAC Real Estate, within its sole discretion and upon 30-days notice to Strategic-Partner, may suspend or discontinue (and, thereafter, within its sole discretion, reinstate) the Advertising Fund, provided that, upon a suspension or discontinuance, the Fund shall continue to be operated until all monies in the Fund are expended in accordance with the provisions of this Agreement.

H. GMAC Real Estate's obligations with respect to the Advertising Fund and the collection, maintenance and distribution of Advertising Fees are as set forth in, and limited to, those contained in the provisions of this Agreement. In no event shall GMAC Real Estate be deemed to have fiduciary obligations to Strategic-Partner as to the operations of the Advertising Fund.

## 15. REFERRALS.

A. **Broker to Broker Referrals**. With respect to a broker-to-broker referral to be made by Strategic-Partner, Strategic-Partner shall make each such referral to an eligible GMAC Real Estate strategic-partner or, if no such strategic-partner is located in the applicable area, then to another broker approved by GMAC Real Estate (hereinafter an "Authorized Alternative Broker"). All such referrals shall be made either by contacting GMAC Real Estate to have GMAC Real Estate facilitate the referral or by directly contacting such strategic-partner. The strategic-partner who places the referral must register the transaction with GMAC Real Estate. To register a referral, Strategic-Partner must submit the required referral form to include complete contact information as provided at the time that the referral is accepted by the destination broker. This referral form is required regardless of whether the destination broker is a strategic-partner of GMAC Real Estate or is an Authorized Alternative Broker. Strategic-Partner shall pay referral fees and royalties as set forth below.

If another GMAC Real Estate strategic-partner refers a transaction to Strategic-Partner, Strategic-Partner as the destination company will, within 10 days after it receives any GCI from that referred transaction, pay to the originating strategic-partner a fee equal to 25% of the GCI that Strategic-Partner earned from the referred transaction. Strategic-Partner then will pay Royalty Fees based on the net GCI from the referred transaction.

Likewise, if Strategic-Partner refers an outgoing transaction to another strategic-partner or Authorized Alternative Broker, that other broker will pay to Strategic-Partner a fee equal to 25% of the GCI it earned from the referred transaction. In that instance, Strategic-Partner as the originating broker then will pay GMAC Real Estate a fee equal to 2.5% of the GCI that the other broker earned from the referred transaction (which may also be stated as 10% of the amount that Strategic-Partner received from the other broker).

B. In the event Strategic-Partner fails to comply with the above procedures or with the policies, standards or procedures adopted by GMAC Real Estate, from time to time, regarding

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

12

referrals, GMAC Real Estate may, at its option (and in addition to any other remedies available to it for a Default of this Agreement), suspend further referrals to Strategic-Partner, remove Strategic-Partner from the authorized referral directory, require referral training attendance, terminate this Agreement or take other action deemed appropriate.

C. Strategic-Partner acknowledges that it acquires no rights or expectations with respect to referrals, whether from corporate relocation activities or otherwise, beyond those expressly stated in this Section.

## 16. PREMIER SERVICE℠; PERFORMANCE STANDARDS.

A. Strategic-Partner agrees that retention of market coverage, consistent performance, recruitment and training of a full-time, professional sales staff and commitment to the programs of GMAC Real Estate are necessary for retention of the license granted by this Agreement. Of primary importance is Strategic-Partner's full engagement in the process of Premier Service℠, a systematic and measurable way to conduct business. In addition to satisfying the Premier Service training requirements described in Section 5.C. above, Strategic-Partner agrees to participate in the Premier Service survey process by registering the Licensed Site and requesting every buyer and seller represented by Strategic-Partner to complete a Premier Service survey upon completion of a transaction. Strategic-Partner is responsible to pay a one-time registration fee for the Licensed-Site and a fee for each survey sent to a buyer or seller. In addition, Strategic-Partner shall use Strategic-Partner's best efforts, and shall actively encourage its managers and sales agents, to implement third-party and affiliated programs sponsored by GMAC Real Estate, through its Strategic Alliance Group or otherwise.

B. Strategic-Partner's performance shall be reviewed annually on the anniversary of the Effective Date, beginning on the second anniversary of the Effective Date. Strategic-Partner's average GCI shall exceed, for the 1 year period being reviewed, 75% of the higher of (a) GCI attained during the first year after the Effective Date, or (b) GCI attained during the 1-year period prior to the 1-year period being reviewed, or (c) the average of the prior 3 years (if Strategic-Partner has been licensed for such period). Failure by Strategic-Partner to meet this performance standard shall constitute an Event of Default under this Agreement. Notwithstanding the provisions of this subparagraph (b), if the Market Area (as later defined) serviced by Strategic-Partner is negatively impacted as a whole, to the extent that the total sales volume, by dollar, of residential property sold during the year being reviewed is less than 90% of the total sales volume, by dollar, of residential property sold during the prior year, the percentage of GCI to be maintained by Strategic-Partner shall be reduced proportionately (e.g., if the total sales volume of the year being reviewed is 90% of the total sales volume of the prior year, the percentage required to be maintained by Strategic-Partner shall be reduced by 10%, i.e., to 67.5% - 10% of 75%). "**Market Area**" shall be the area serviced by the following multiple listing service: MLS Property Information Network (the "**MLS**"); total sales volume shall be as reflected by the records of the MLS.

## 17. ASSIGNMENT; OWNERSHIP; TRANSFERS; RIGHT OF FIRST REFUSAL.

A. **Assignment by GMAC Real Estate.** GMAC Real Estate shall have the right, within its sole discretion, to assign or transfer this Agreement and/or any of its rights or obligations

under this Agreement to a third-party, whether or not such third-party is affiliated with GMAC Real Estate.

B. **Transfer of Agreement, Assets by Strategic-Partner.** Strategic-Partner acknowledges and agrees that GMAC Real Estate has entered into this Agreement in reliance upon the qualifications and representations of Strategic-Partner and, where Strategic-Partner is an entity, upon the qualifications and representations of both Strategic-Partner and Strategic-Partner's Owners (as defined in Section 8). Therefore, Strategic-Partner agrees that it shall not, without the prior written consent of GMAC Real Estate, Transfer (as defined in Section 17.E. below) this Agreement, any interest in its licensed business, or all or substantially all of its assets. GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement. Additionally, any such consent will be conditioned upon the following: (1) the Transfer of this Agreement may occur only in connection with the Transfer of the entire business conducted pursuant to this Agreement; (2) the transferee has agreed, in writing, to honor Strategic-Partner's obligations under this Agreement; (3) all of Strategic-Partner's obligations to GMAC Real Estate (financial and otherwise) have been satisfied; (4) agreement by the transferee (or a principal of the transferee) to attend required training; (5) a copy of all relevant Transfer documentation is delivered to GMAC Real Estate; (6) at least 30-days prior written notice is given to GMAC Real Estate; and (7) the transferee executes a franchise agreement in the form as contained in the most recently filed offering circular, for the term indicated in that form (but not less than 5 years), commencing with the date of execution of the new agreement. Strategic-Partner shall remain liable to GMAC Real Estate pursuant to this Agreement with respect to all obligations which are based on actions or omissions prior to the effective date of the Transfer.

C. **Ownership.** Strategic-Partner certifies that: (i) Strategic-Partner is an individual or, if one of the entities described below is checked, it is that type of entity; and (ii) if Strategic-Partner is an entity, the Owners listed below are the only principals or persons holding an ownership interest in Strategic-Partner and the percentage of ownership interest held by each is set forth next to the name of each such person (if an ownership interest is held by another entity, Strategic-Partner certifies that there is set forth below each successive ownership interest, until individual ownership interests are reached and disclosed). Strategic-Partner shall notify GMAC Real Estate, in writing, prior to any change in the ownership interests (or the percentages) shown below or any change in the broker of record (the name of whom is set forth below).

(X)      corporation: organized under the laws of the State or Commonwealth of Massachusetts _____

(_)      limited liability company: organized under the laws of the State or Commonwealth of _____

(_)      partnership (indicate type): organized under the laws of the State or Commonwealth of _____

3/2004 Reg. Fran. Agmt
CHO01/30423577.4

14

Owners:

Ruben Coulanges _____    100%

(Ownership interest holders listed)

Idelie Jean Baptiste _____
(Broker of Record)

**D. Transfer of Ownership Interests in Strategic-Partner.** The written consent of GMAC Real Estate shall be required with respect to any Transfer of an ownership interest equal to or greater than 10% of the total ownership interests in Strategic-Partner (including Transfers which, over a period of 2 years, each individually involve less than 10% of the ownership interests, but cumulatively, equal or exceed a Transfer of 10% or more of the ownership interests). GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement. Strategic-Partner shall provide at least 60 days prior written notice to GMAC Real Estate of any Transfer of the type described in the first sentence of this Section 17.D. (but, in the case of an Transfer upon the death of an Owner, within 30 days after the date of such death). Within 60 days of its receipt of the notification, GMAC Real Estate shall notify Strategic-Partner or transferee of its consent or refusal to consent to the proposed Transfer.

**E. Definition of a Transfer.** For purposes of Sections 17.B. and 17.D., the term "Transfer" shall mean any sale, lease, assignment, conveyance or other transfer including: (i) those occurring involuntarily or by operation of law, including those resulting from death, marriage, incompetency or similar events; (ii) those occurring through merger, acquisition, consolidation, dissolution, bankruptcy, execution or foreclosure sale or similar events or those occurring between/among the spouse and/or children of an Owner; and (iii) those occurring through any other voluntary act.

**F. Effect of Unauthorized Transfer.** In the event of a Transfer for which consent was required pursuant to this Section 17, but such consent was not obtained, both Strategic-Partner and the transferee shall be required to comply with the provisions of this Agreement and shall be obligated to GMAC Real Estate to do so. A failure to comply with the provisions of this Section 17 shall constitute an Event of Default under this Agreement.

**G. Right of First Refusal.** As to any Transfer referenced in 17.B. or 17.D. above (except a Transfer of ownership interests between/among the spouse and/or children of an Owner or between/among Owners), GMAC Real Estate shall have the right, at its option, to purchase (or otherwise have transferred to it) the stock and/or assets of Strategic-Partner, under substantially the same conditions as a proposed Transfer to a third-party (the "**Right of First Refusal**"). Prior to an Transfer to a third-party, Strategic-Partner shall serve upon GMAC Real Estate a copy of the term sheet, letter of intent or contract (the "**Offer Document**") whereby Strategic-Partner has agreed with a third-party to an Transfer, together with a certification from the transferor(s) that the Offer Document accurately and fully represents all the terms and conditions of the proposed Transfer and a copy of all due diligence materials furnished by Strategic-Partner to the third-party upon which the third-party based its offer as provided in the Offer Document. If, within 10

days of receipt by GMAC Real Estate of the above documentation (the "10-day Notice Period"), GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected to exercise its Right of First Refusal, GMAC Real Estate and Strategic-Partner shall be deemed to have entered into a contract based on the same terms set forth in the Offer Document and, thereafter, each party shall be bound by its terms, provided the Offer Document provides (and, shall be deemed to so provide, if it does not), that: (i) GMAC Real Estate shall have the right to substitute cash for any other form of payment provided in the Offer Document; and (ii) the date of closing or settlement shall be not less than 60 days from the date of service by GMAC Real Estate upon Strategic-Partner of the notice that it has elected to exercise its Right of First Refusal; and (iii) Strategic-Partner makes the customary warranties and representations given by the seller of the assets of, or ownership interests in, an entity operating a real estate brokerage business, including, but not limited to, those related to title, the operating condition of the assets, the validity of contracts and the extent of liabilities. If, within the 10-day Notice Period, GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected not to exercise its Right of First Refusal or if no notice is so served by GMAC Real Estate, GMAC Real Estate shall be deemed to have waived its Right of First Refusal for a period of 180 days from the beginning of the 10-day Notice Period (the "180-day Waiver Period"). If, within the 180-day Waiver Period, Strategic-Partner effectuates the Transfer in accordance with the terms and conditions of the Offer Document, the Right of First Refusal shall be considered terminated. If, within the 180-day Waiver Period, the Transfer is not effectuated in accordance with the terms and conditions of the Offer Document or any material term or condition of the Offer Document is changed, the Right of First Refusal shall be considered reinstated and the procedures set forth above shall be followed with respect to any proposed Transfer (including a proposed Transfer which was the subject of a Offer Document that was changed during any 180-day Waiver Period).

## 18. TERMINATION; DEFAULT; CROSS-DEFAULT.

This Agreement may be terminated upon any one of the following conditions (in addition to the conditions specifically mentioned elsewhere in this Agreement and unless otherwise provided by the law of the state in which Strategic-Partner is located). Prior to the effective date of termination, Strategic-Partner shall pay all monies due, or to become due pursuant to this Agreement, to GMAC Real Estate and shall furnish GMAC Real Estate with all required reports and records. After termination, GMAC Real Estate shall have no further obligations to Strategic-Partner.

A. **By Strategic-Partner.** If GMAC Real Estate is in Default (as defined in Section D. below) of this Agreement, Strategic-Partner may terminate this Agreement, effective upon service upon GMAC Real Estate of a written notice of termination (the "**Strategic-Partner's Termination Notice**"), provided, prior to the service of Strategic-Partner's Termination Notice, Strategic-Partner had served upon GMAC Real Estate a written notice of such Default (the "**Strategic-Partner's Default Notice**") which specified the nature and extent of the Default, including identification of the specific provision of this Agreement which GMAC Real Estate is in Default of, and GMAC Real Estate failed to cure such Default within 30 days after receipt of Strategic-Partner's Default Notice or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, GMAC Real Estate failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by

GMAC Real Estate within 90 days of the service of the Strategic-Partner's Default Notice, despite the diligent efforts of GMAC Real Estate to do so, Strategic-Partner shall have the right to serve Strategic-Partner's Termination Notice at any time thereafter, until the Default is cured).

The service of Strategic-Partner's Termination Notice by Strategic-Partner shall: (1) be deemed to be an irrevocable waiver by Strategic-Partner of the exclusivity of the Licensed Site and GMAC Real Estate shall be free to license other parties to use the Marks at the Licensed Site, and (2) relieve other strategic-partners of the Franchise of any obligations regarding the placement of referrals with Strategic-Partner.

**B. By GMAC Real Estate (Automatic).** Each of the following shall constitute an Event of Default, which, among other things, shall result in an automatic termination of this Agreement (unless GMAC Real Estate, in its sole discretion, notifies Strategic-Partner, in writing to the contrary), effective immediately, without notice to Strategic-Partner:

(1)     Strategic-Partner becomes insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy (or similar proceeding) is filed by Strategic-Partner or is filed against Strategic-Partner and is not opposed by Strategic-Partner; or if a final judgment in an amount of $25,000 or more is entered against Strategic-Partner and is not covered by a policy of insurance remains unsatisfied for a period of 60 days; or, if Strategic-Partner is an individual and except as otherwise provided in this Agreement, Strategic-Partner dies, or, if Strategic-Partner is an entity, Strategic-Partner ceases to exist; or if execution is levied against Strategic-Partner or Strategic-Partner's business, assets, ownership interest or property.

(2)     Strategic-Partner ceases to operate its real estate brokerage business, which shall include failing to keep its offices open and staffed during all regular business hours, properly equipped for the transaction of real estate brokerage activities; provided, however, that if Strategic-Partner's business premises are damaged or destroyed, Strategic-Partner shall have 30 days after such event in which to apply for approval from GMAC Real Estate to relocate or reconstruct the premises, which approval shall not be unreasonably withheld, delayed or conditioned.  Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any cessation of its real estate brokerage business or the closure of any of its offices;

(3)     The real estate brokerage license of Strategic-Partner, of Strategic-Partner's broker of record (or the equivalent) or of any Owner is suspended, revoked or not renewed, or Strategic-Partner's right to do business in the jurisdiction in which any of Strategic-Partner's Licensed Sites is located.  Strategic-Partner shall notify GMAC Real Estate, in writing, immediately upon the occurrence of any of the above events;

(4)     Strategic-Partner or any Owner conducts its real estate brokerage operations in such a fashion as to reflect unfavorably on GMAC Real Estate, its name, goodwill or reputation, or on the Marks, including, but not limited to, the employment of or other association with any individuals who have been convicted of a crime; or Strategic-Partner acts or fails to act in such a manner as to be in violation of any law or regulation.  Without limiting the generality of the foregoing, any breach of the

representations or warranties set forth in Section 20.C. hereof shall result in automatic termination of this Agreement.   Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any of the above events;

(5)    Strategic-Partner or any Owner purports to Transfer any rights or obligations under this Agreement or any interest in Strategic-Partner to a third party without GMAC Real Estate's prior written consent, contrary to the provisions of this Agreement;

(6)    Strategic-Partner or any Owner makes any material misrepresentation or omission in its application or Business and Financial History Form or Strategic-Partner maintains false books or records or makes any false reports or statements to GMAC Real Estate; or

(7)    Strategic-Partner or any Owner is in Default of any provision of this Agreement and was served with a GMAC Real Estate Default Notice (as defined below) in the preceding 12-month period.

C.  **By GMAC Real Estate (Right To Cure).**  If Strategic-Partner or any Owner is in Default of this Agreement based on acts or omissions not referenced in Section 18.B., above, GMAC Real Estate, in addition to all other remedies available to it, may terminate this Agreement, effective upon service upon Strategic-Partner of a written notice of termination (the "GMAC Real Estate Termination Notice"), provided, prior to the service of the GMAC Real Estate Termination Notice, GMAC Real Estate had served upon Strategic-Partner a written notice of such Default (the "GMAC Real Estate Default Notice") which specified the nature and extent of the Default and Strategic-Partner failed to cure such Default within 30 days after receipt of the GMAC Real Estate Default Notice, or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, Strategic-Partner failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by Strategic-Partner within 90 days of the service of the GMAC Real Estate Default Notice, despite the diligent efforts of Strategic-Partner to do so, GMAC Real Estate shall have the right to serve a GMAC Real Estate Termination Notice at any time thereafter, until the Default is cured).

D.  **Default and Event of Default.**  The term "Default", as used throughout this Agreement, shall mean a material failure to comply with a provision of this Agreement.  The term "Event of Default", as used throughout this Agreement, shall mean a Default for which this Agreement provides no period to cure or for which the period to cure has expired.

E.  **Additional Remedies upon an Event of Default.**  Should Strategic-Partner commit an Event of Default, GMAC Real Estate, without terminating this Agreement, may, at its option, (and in addition to any other remedies available to it under this Agreement), suspend services to Strategic-Partner, remove Strategic-Partner from any GMAC Real Estate websites and other directories, eliminate Strategic-Partner's exclusive territory (if any) under this Agreement, suspend further referrals to Strategic-Partner and remove Strategic-Partner from the authorized referral directory, or take other action deemed appropriate.

F. **Cross-Default.** Notwithstanding any contrary provision of this Agreement or any other Franchise Agreement between Strategic-Partner (and/or its Owners or affiliates) and GMAC Real Estate (each such other Franchise Agreement being a "**Sister Agreement**"), any occurrence of Strategic-Partner's Default and/or Event of Default under this Agreement shall constitute a Default and/or Event of Default under each Sister Agreement, and any occurrence of Strategic-Partner's Default and/or Event of Default under any Sister Agreement shall constitute a Default and/or Event of Default under this Agreement.

## 19. OBLIGATIONS UPON TERMINATION.

A. Upon termination of this Agreement, for whatever reason, Strategic-Partner shall:

(1)    within 10 days of such termination, discontinue use of all Marks, including the words "GMAC Real Estate", or any derivation of those words, and refrain from holding itself out to the public in a manner that would suggest that it is a licensee or former licensee of GMAC Real Estate. Strategic-Partner agrees that GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of the Marks. In addition, if Strategic-Partner has used the words "GMAC Real Estate" as part of its internet domain name and such use has not terminated within 10 days of termination of this Agreement, Strategic-Partner will be deemed to have assigned its rights in such domain name to GMAC Real Estate, and GMAC Real Estate may take whatever actions it deems appropriate to terminate such domain name and Strategic-Partner's right to use the same;

(2)    on the date of such termination, pay to GMAC Real Estate all fees, charges and other amounts due to GMAC Real Estate, together with the following additional fees:

(a)    Royalty Fees and Advertising Fees, computed as set forth on Exhibit A, on GCI attributable to transactions in process on the termination date and to transactions under contract on the date of termination that settle or close within 30 days after termination; and

(b)    Referral Fees, computed as set forth above, on referrals sent or received prior to the termination date;

(3)    Surrender to GMAC Real Estate or, at the option of GMAC Real Estate, destroy all signs and documentation bearing the Marks, including yard signs, letterheads, advertising and marketing materials, business cards, manuals, training materials, client promotion materials and the like. GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of materials or programs which are part of the Franchise;

(4)    Take immediate steps to cancel all advertising, including advertising in the Yellow Pages of the telephone directory, which carries the Marks; and

(5)    Execute any documents necessary to effectuate its obligations under this Agreement and take such action as GMAC Real Estate deems reasonably necessary to

evidence the fact that Strategic-Partner has ceased using the Marks and has no further right to use the Marks.

B.  Upon termination of this Agreement pursuant to Section 18.B. or 18.C. above, in addition to the obligations set forth in Section 19.A. above:

(1)  Strategic-Partner shall:

(a)  pay to GMAC Real Estate all financial losses sustained by GMAC Real Estate as the result of the early termination (if the amount of such losses cannot be calculated exactly, they shall be estimated); and

(b)  remain obligated with respect to the provisions of Section 8 of this Agreement; and

(2)  Owners shall be personally liable to GMAC Real Estate for all financial obligations of Strategic-Partner to GMAC Real Estate, but limited to those obligations incurred prior to the date of termination and those based on losses attributable to the one-year period after the date of termination.

For purposes of section 19 b.(2), "losses attributable to the one-year period after the date of termination" shall mean the Total Fee Amounts (defined as Royalty Fees, Advertising Fees and Referral Office Fees) which would have been due from Strategic-Partner under the Agreement had Strategic-Partner performed under the Agreement for the one-year period following the termination date.  For purposes of calculating the Total Fee Amounts for such period, the monthly average of the Royalty Fees and Advertising Fees due from Strategic-Partner, as provided in Exhibit A of this Agreement, for the twenty-four (24) month period preceding the date of termination will be multiplied by twelve, and will be added to the actual Referral Office Fees due for the one-year period following the date of termination.  If the date of termination occurs prior to year three of this Agreement, the Royalty and Advertising Fees portion of the Total Fee Amounts will be based on the amount of such fees due to GMAC Real Estate for the twelve-month period preceding the date of termination.

C.  If, after termination of this Agreement, Strategic-Partner fails to comply with its obligations under this Section, in addition to any other payments required to be made by Strategic-Partner to GMAC Real Estate, Strategic-Partner shall reimburse GMAC Real Estate for all its costs related to its attempt to enforce its rights, including the payment of reasonable collection agency's fees, attorney's fees and costs.

## 20. REPRESENTATIONS AND WARRANTIES.

A.  Strategic-Partner represents that it is either an individual or an entity (properly formed and authorized to do business in the state in which the Licensed Site is located) licensed to sell real estate in the state in which the Licensed Site is located.

B.  Strategic-Partner acknowledges that GMAC Real Estate has delivered to Strategic-Partner, not less than 10 business days prior to the signing of this Agreement, a copy of the

Offering Circular concerning this franchise for the state in which the Licensed Site is located and in which Strategic-Partner intends to do business, which Strategic-Partner has had an opportunity to review. Strategic-Partner further acknowledges that GMAC Real Estate has not, either orally or in writing, represented that Strategic-Partner will achieve in the licensed business any specified level of sales or profit, nor represented the sales or profit level of any other licensee, but has referred Strategic-Partner to the Offering Circular which provides Strategic-Partner with the names, addresses and telephone numbers of other licensees of GMAC Real Estate, so that Strategic-Partner can make its own inquiry. Strategic-Partner further acknowledges that any additional inquiry pertaining to the nature of this franchise which Strategic-Partner has made to GMAC Real Estate, in writing, has been answered, in writing, to the satisfaction of Strategic-Partner.

C. Strategic-Partner acknowledges that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the "Anti-Terrorism Measures"). GMAC Real Estate therefore requires certain representations and warranties that the parties with whom it deals are not directly or indirectly involved in terrorism. Therefore, Strategic-Partner hereby represents and warrants that neither it nor any of its employees, agents, representatives or, as applicable, its principals, members, officers or directors, nor any other person or entity associated with Strategic-Partner (each, individually, a "Strategic-Partner Party" and collectively, the "Strategic-Partner Parties") is:

(i)　　a person or entity listed in the Annex to the Executive Order; or

(ii)　　a person or entity otherwise determined pursuant to the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism (such a person or entity and those persons and entities listed in the Annex to the Executive Order are referred to herein as "Terrorists"); or

(iii)　　a person or entity who assists, sponsors or who supports Terrorists or acts of terrorism ("Sponsors of Terrorism"); or

(iv)　　owned or controlled by Terrorists or Sponsors of Terrorism.

Furthermore, Strategic-Partner represents and warrants that neither it nor any Strategic-Partner Party will, during the term of this Agreement, become a person or entity described in clauses (i) – (iv) above.

## 21. ENTIRE AGREEMENT.

This Agreement is the entire agreement of the parties and supersedes any and all prior oral or written agreements or understandings between the parties relating to the subject matter of this Agreement.

## 22. INDEMNIFICATION AND INSURANCE.

Strategic-Partner shall defend, indemnify and hold harmless GMAC Real Estate, its shareholder, agents and employees, from and against any claims for damages, losses and expenses (including attorney's fees) resulting in any way from the conduct of Strategic-Partner's real estate brokerage business. This indemnification obligation shall survive the expiration or earlier termination of this Agreement.

In addition to, and not in substitution for, the above indemnification, Strategic-Partner shall, at its own expense, purchase and maintain: (a) comprehensive general liability insurance, including contractual, products/completed operations and personal injury coverage; (b) comprehensive automobile liability coverage, including owned, non-owned and hired automobiles used in Strategic-Partner's real estate brokerage operations; (c) errors and omissions insurance, with respect to Strategic-Partner's real estate brokerage operations. For the insurance referenced under clauses (a) and (b) above, the minimum limits required shall be $1,000,000 per occurrence for bodily injury and $500,000 per occurrence for property damage, with a maximum deduction of $5,000; for the insurance referenced in clause (c) above, the minimum limits shall be $1,000,000 per annum, with a maximum deduction of $5,000. GMAC Real Estate shall be named as an additional insured on each such policy. Workers Compensation insurance, to the extent required by the law of the state in which the Licensed Site is located, shall be purchased and maintained by Strategic-Partner on each employee and sales associate. All losses resulting from Strategic-Partner's failure to obtain insurance shall be borne by Strategic-Partner, only. In the event of cancellation, non-renewal or material change in Strategic-Partner's required insurance policies, Strategic-Partner shall serve upon GMAC Real Estate a notice of such action at least 30 days prior to the effective date of such action. Strategic-Partner shall deliver to GMAC Real Estate a copy of its insurance binder before the Effective Date and, thereafter, shall serve upon GMAC Real Estate continuous certificates of such coverages (which certificates shall provide that the applicable policies shall not be cancelled without serving upon GMAC Real Estate at least 30-days prior notification of such intended cancellation).

## 23. CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS.

A. **Choice of Law.** Except as expressly provided otherwise, this Agreement shall be construed in accordance with the laws of the state in which the Licensed Site is located. However, no law regulating the offer or sale of franchises, business opportunities or similar interests or governing the relationship between GMAC Real Estate and Strategic-Partner will apply unless its jurisdictional requirements are met independently without reference to this Section. All disputes regarding the validity of the arbitration agreement set forth in Section 23.B shall be governed by the laws of the State of Illinois, without regard for its conflict of laws principles.

B. **Arbitration.** GMAC Real Estate and Strategic-Partner agree that, except for controversies, disputes or claims (together or separately, "Claims") related to the improper use of the Marks, all Claims between GMAC Real Estate and its affiliates (and their respective shareholders, officers, directors, agents, and/or employees)(together, the "GMAC Real Estate

Parties"), and Strategic-Partner (and/or Strategic-Partner's Owners, guarantors, affiliates, and/or employees)(together, the "**Strategic-Partner Parties**") arising out of or related to:

    (1)    this Agreement or any other agreement between Strategic-Partner and GMAC Real Estate;

    (2)    GMAC Real Estate's relationship with Strategic-Partner; or

    (3)    any policy or standard relating to the Franchise or the franchised business;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association ("AAA"). The arbitration proceedings will be conducted by one arbitrator and, except as this section otherwise provides, according to the then current commercial arbitration rules of the American Arbitration Association. All proceedings will be conducted at a suitable location chosen by the arbitrator in the Chicago Metropolitan Area of the State of Illinois and will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

The arbitrator may not declare any Mark generic or otherwise invalid or, except as expressly provided by federal statute, award any punitive or exemplary damages against either party (GMAC Real Estate and Strategic-Partner waive, to the fullest extent permitted by law, except as expressly provided by federal statute, any right to, or claim for, punitive or exemplary damages against the other). The arbitrator shall be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. Each party shall be required to submit all Claims against the other or those Claims shall be forever waived. The arbitrator may not consider any settlement discussions that might have been made by either Strategic-Partner or GMAC Real Estate.

GMAC Real Estate and Strategic-Partner agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between any of the GMAC Real Estate Parties and any of the Strategic-Partner Parties may not be consolidated with any other arbitration proceeding between GMAC Real Estate and any other person or between Strategic-Partner and any other person.

Despite GMAC Real Estate's and Strategic-Partner's agreement to arbitrate, GMAC Real Estate and Strategic-Partner each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that GMAC Real Estate and Strategic-Partner must contemporaneously submit the dispute for arbitration on the merits as provided in this Section.

The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

C. **Waiver of Jury Trial.** To the extent permitted by law, Strategic-Partner and GMAC Real Estate each waives its right to a trial by jury in any litigation or arbitration proceeding arising from this Agreement or from actions taken pursuant to this Agreement or from the relationship between the parties resulting from this Agreement.

D. **Time Limitations for Claims.** Any claim by Strategic-Partner against GMAC Real Estate shall be barred unless, within one year from the date that Strategic-Partner knew, or should have known, of the facts upon which the claim is based, Strategic-Partner filed a formal request for arbitration against GMAC Real Estate, as set forth above.

## 24. MODIFICATION OF AGREEMENT.

Subject to GMAC Real Estate's right to modify its standards and specifications for use of the Marks and other aspects of the operation of a GMAC Real Estate business, no changes may be made in this Agreement unless in writing and signed by all parties.

## 25. SEVERABILITY.

Each Section and provision of this Agreement is severable and, if one portion is invalid, the remaining portions shall nevertheless remain in full force and effect.

## 26. NON-WAIVER.

No failure by GMAC Real Estate to take action on any Default or Event of Default of Strategic-Partner, whether it is a single instance or a series of instances, shall constitute a waiver of such Default or Event of Default or of the performance required of Strategic-Partner. No express waiver by GMAC Real Estate of any performance or Default or Event of Default of Strategic-Partner shall be construed as a waiver of any other or any future obligation or Default or Event of Default.

## 27. NOTICES; FACSIMILE AND ELECTRONIC MAIL.

A. Any notice provided for in this Agreement shall be in writing, addressed to GMAC Real Estate or Strategic-Partner at the respective addresses set forth at the beginning of this Agreement, and shall be served: (a) by personal delivery (which shall be effective upon such personal delivery) or (b) by certified mail, return receipt requested, properly addressed, postage prepaid (which shall be effective on the earlier of the date of delivery as indicated on the return receipt card or 3 days after deposit into the United States mails, or (c) by a nationally recognized overnight delivery service, properly addressed, delivery charges prepaid (which shall be effective on the earlier of the date of delivery as indicated on the carrier's receipt records or 2 days after delivery to the carrier).

B. Although not effective for purposes of giving notice pursuant to Section 27.A. above, each party consents to the other party forwarding facsimile and electronic mail transmissions to the consenting party as follows:

GMAC Real Estate:

To: Contract Administration @ 908-542-5526 (fax) and susan_daniel@gmachs.com (e-mail)

Strategic Partner:

To: <u>Ruben Coulanges</u> @ <u>508-583-6901</u>(fax) and <u>r_coulanges@hotmail.com</u> (e-mail)

Such consent will continue in effect until modified or terminated by written notice to the other party sent in accordance with subparagraph 27.a. above.

## 28. TERM AND RENEWAL.

The term of this Agreement shall be seven (7) years from the Effective Date (as later defined) (the "Term").

At the expiration of the Term, Strategic-Partner shall have the right to enter into a new, ten-year agreement with GMAC Real Estate, subject to the following conditions: (a) Strategic-Partner has provided GMAC Real Estate with written notice of its intent to execute a new agreement at least 180 days prior to the expiration of the Term, and (b) Strategic-Partner is not then and has not been in Default of this Agreement. The new agreement will be in the form then being offered by GMAC Real Estate. The new agreement may contain materially different terms than this Agreement, including those which relate to fees, payment of fees, performance standards, renewal terms and the Marks.

Subject to any contrary applicable state law, if Strategic-Partner continues to use the Marks after the end of the Term, but fails to execute a new agreement, Strategic-Partner will be deemed to be operating under the terms and conditions of the agreement then being offered by GMAC Real Estate, except that the term shall be deemed to be 180 days from the date that GMAC Real Estate is served with a notice of termination by Strategic-Partner (at its option, GMAC Real Estate shall have the right to shorten the term by the service upon Strategic-Partner of a notice fixing a shorter term) and, at the option of GMAC Real Estate but without notice being required, the Royalty Fees shall be increased to an amount equal to 10% of Strategic-Partner's monthly GCI, payable within 48 hours of the completion of each settlement and closing from which Strategic-Partner is entitled to be paid a commission.

## 29. EFFECTIVE DATE.

The parties intend that this Agreement be effective as of February 1, 2005 (the "**Effective Date**") conditioned upon:

1.) Strategic-Partner having submitted to GMAC Real Estate a copy of the Company's active real estate brokerage license issued by the appropriate regulatory agency of the Commonwealth of Massachusetts; and

2.) Receipt, review and acceptance by GMAC Real Estate of a completed Agent Verification Checklist, including copies of the active real estate brokerage sales agents' licenses for agents associated with Strategic-Partner and verifiable data, acceptable to GMAC Real Estate, documenting the GCI indicated in Strategic-Partner's franchise application; and

3.) Receipt by GMAC Real Estate of the declaration pages for all insurance policies secured by Company as required under Section 22 of the Franchise Agreement. GMAC Real Estate must be named as an additional insured under all of the insurance policies; and

Upon satisfaction of all of the foregoing conditions, or waiver thereof by GMAC Real Estate, GMAC Real Estate will provide Strategic-Partner with written confirmation of the same. If, however, the foregoing conditions are not satisfied by the Effective Date, GMAC Real Estate, at its sole option, may agree to amend the Effective Date to a later date or may terminate this Agreement by sending written notice of termination to Strategic-Partner.

## 30. LIMITATION OF DAMAGES.

Except for Strategic-Partner's obligation to indemnify GMAC Real Estate, as provided by common law or in the Section of this Agreement entitled "Indemnification and Insurance", neither party shall be liable to the other for consequential, punitive or exemplary damages.

## 31. CONFIDENTIALITY OF AGREEMENT.

Except as may be required by law, Strategic-Partner agrees not to publicize or disclose to any third party, without the prior written consent of GMAC Real Estate, the terms of this Agreement.

**[The remainder of this page has been intentionally left blank.]**

IN WITNESS WHEREOF, the parties have executed this Agreement.

GMAC REAL ESTATE, LLC

By: _Judith O'Brien_

Print Name: Judith O'Brien

Title: Vice President

Date: _1-31-05_

SOUTH SHORE REALTY GROUP, INC.

By: _____

Print Name: Ruben Coulanges

Title: President

Date: _1-19-05_

3/2004 Reg. Fran. Agrmt
CHGO1/30423577.4

27

# ENDORSEMENT OF PRINCIPALS / OWNERSHIP INTEREST HOLDERS

Each of the Owners identified in Section 17.B. is executing this Agreement for the limited purpose of being personally bound by the provisions of Sections 3 (The Marks), 4 (Materials), 7 (Certain Activities Not Precluded; Rights Reserved; Provision of Other Settlement Services), 8 (No Conflicting License/Interest), 13 (Verification Rights), 17 (Assignment; Ownership; Transfers; Right of First Refusal), 18.F. (Cross-Default), 19.B. (Financial Obligations after Default) of this Agreement and 23 (Choice of Law and Forum; Arbitration; Waiver of Jury Trial; Time Limitation for Claims).

_____     Date: ___1 - 19 - 05_____
Ruben Coulanges

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

28

08CV2242　　CEM

JUDGE COAR

MAGISTRATE JUDGE COX

## Exhibit A to the Franchise Agreement
## Royalty and Advertising Fees

a.　　**Royalty Fees.**

Strategic-Partner shall pay to GMAC Real Estate, Royalty Fees, in accordance with the following:

(1)　　Amount. Upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid Gross Commission Income ("GCI"), a Royalty Fee, in an amount equal to five percent (5%) of the GCI to which Strategic-Partner is entitled. In addition, if at the end of each twelve-month period following the Effective Date, the total amount of Royalty Fees paid by Strategic-Partner during such twelve-month period is less than $10,000 (the "Annual Royalty Fee Minimum"), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the Annual Royalty Fee Minimum and the total amount of Royalty Fees actually paid.

If this Agreement is the first contract between GMAC Real Estate and Strategic-Partner, Strategic-Partner shall not be required to pay the Royalty Fees which are based on GCI earned with respect to transactions under contract or in escrow on the Effective Date, provided, however, that such transactions are closed or settled within thirty (30) days after the Effective Date. As to transactions under contract or in escrow on the date of the termination of this Agreement, Strategic-Partner shall be required to pay those Royalty Fees which are based on GCI earned with respect to such transactions, if such transactions close or are settled within thirty (30) days of the termination date.

(2)　　Awards. Within 105 days of the end of each calendar-year after the Effective Date, GMAC Real Estate shall pay to Strategic-Partner an award amount ("**Award**") equal to the following percentage of Strategic-Partner's past calendar-year's GCI:

### AWARD CHART

| Award Level | Gross Commission Income Range From | Gross Commission Income Range To | Maximum Range Amount | Award Multiplier Rate | Maximum Award For Range | Cumulative Maximum Award |
|---|---|---|---|---|---|---|
| 1 | 0 | $1,150,000 | $1,150,000 | N/A | $-0- | $-0- |
| 2 | 1,150,001 | 1,725,000 | 574,999 | N/A | 2,500 | 2,500 |
| 3 | 1,725,001 | 2,300,000 | 574,999 | 1.00 % | 5,750 | 8,250 |
| 4 | 2,300,001 | 4,025,000 | 1,724,999 | 1.25 % | 21,562 | 29,812 |
| 5 | 4,025,001 | 5,750,000 | 1,724,999 | 1.50 % | 25,875 | 55,687 |
| 6 | 5,750,001 | 7,500,000 | 1,749,999 | 1.75 % | 30,625 | 86,312 |
| 7 | 7,500,001 | 9,250,000 | 1,749,999 | 2.00 % | 35,000 | 121,312 |
| 8 | 9,250,001 | 10,950,000 | 1,699,999 | 2.25 % | 38,250 | 159,562 |
| 9 | 10,950,001 | 12,725,000 | 1,774,999 | 2.50 % | 44,375 | 203,937 |
| 10 | 12,725,001 | 15,025,000 | 2,299,999 | 2.75 % | 63,250 | 267,187 |
| 11 | 15,025,001 | 17,350,000 | 2,324,999 | 3.00 % | 69,750 | 336,937 |
| 12 | 17,350,001 | 20,825,000 | 3,474,999 | 3.25 % | 112,937 | 449,874 |
| 13 | 20,825,001 | 24,300,000 | 3,474,999 | 3.50 % | 121,625 | 571,499 |
| 14 | 24,300,001 | 56,600,000 | 32,299.999 | 3.75 % | 1,211,250 | 1,782,749 |
| 15 | 56,600,001 | and higher | as determined | 4.00 % | as calculated | as calculated |

(3)    Conditions of Awards.    (a) Notwithstanding the above, Strategic-Partner shall be entitled to no Award in the event that:  (i) at any time during the calendar-year for which the Award is applicable on or on the date that the Award is to be given, an Event of Default existed or exists, as applicable, regarding this Agreement or any other contract with GMAC Real Estate or any Affiliate; or (ii) during the calendar-year for which the Award is applicable, Strategic-Partner had been more than 30 days in arrears of any payments required to be made by Strategic-Partner to GMAC Real Estate under this Agreement or under any other contract with GMAC Real Estate or any Affiliate; or (iii) on the date that Strategic-Partner would otherwise have been entitled to payment of an Award, this Agreement had been terminated and no new franchise agreement had been entered into between Strategic-Partner and GMAC Real Estate; and

(b)    For the purpose of calculating GCI with respect to Awards under this Section, Strategic-Partner's Licensed Sites contributing to the GCI shall include the Licensed Site listed in Section 6 as well as those other licensed sites (the "Sister Sites") subject to a Sister Agreement (as defined in Section 18.F), provided (i) each of those Sister Sites is owned by the same persons listed in Section 17.B. as Owners, in the same percentages listed in Section 17.B., and (ii) each of those Sister Sites is located within the same local market area. Strategic-Partner and GMAC Real Estate agree that GCI from the following Sister Sites will be considered together with the Licensed Site for purposes of determining any Award due Strategic-Partner: _____N/A_____.

(c)    The Gross Commission Income Range figures included in the Award Chart may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the figures in any year be greater than 5%). The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

b.    Advertising Fees.

Upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid GCI, Strategic-Partner shall pay to GMAC Real Estate an Advertising Fee, in an amount equal to 2% of the GCI to which Strategic-Partner is entitled, provided, however, the amount of the Advertising Fee in any calendar-month:  (i) shall not exceed $870 for that calendar-month; and (ii) shall not be lower than $240 for that calendar-month regardless of transaction count (if this minimum amount has not been received by GMAC Real Estate during any month through payments based on a percentage of GCI for that calendar-month, the difference between this minimum amount and the payments actually received by GMAC Real Estate shall be paid by Strategic-Partner on the first business day after the last day of each calendar-month).

GCI generated by a sales agent shall be attributed to the office location (and/or Licensed Site) at which the sales agent's license is held or registered or, if the applicable state's licensing regulations do not provide for the holding or registration of sales agents' licenses at particular office locations, at the office location (and/or Licensed Site) from which the sales agent principally operates.

Minimum and maximum Advertising Fees may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the Advertising Fees in any year be greater than 5%). The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United

States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

A-3

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

A-1

## RECEIPT OF FRANCHISE-RELATED DOCUMENTS

The undersigned, personally and/or as an officer or ownership interest holder of the proposed franchisee, does hereby acknowledge receipt of the following documents, in form for execution, relating to the franchise of GMAC Real Estate, LLC:

[X]  (1)  Franchise Agreement
[ ]  (2)  State Rider for the State of _____
[ ]  (3)  Franchise Development Costs Note
[ ]  (4)  The Personal Guaranty of Note
[ ]  (5)  The Loan and Security Agreement
[ ]  (6)  The Pledge Agreement
[ ]  (7)  The Subordination Agreement
[ ]  (8)  The Term Loan Note
[ ]  (9)  Other (specify): _____

(Proposed franchisee must initial the box adjacent to the applicable documents)

I further acknowledge my understanding that it is my responsibility, individually and/or as an officer or ownership interest holder of the proposed franchisee, to review all such documents, so that I am fully familiar with the transaction contemplated thereby prior to signing the documents.

DATED: _____ 1 - 11 - 05 _____

A FEDERAL TRADE COMMISSION RULE REQUIRES THAT WE PROVIDE YOU WITH THE FRANCHISE-RELATED DOCUMENTS NOTED ABOVE AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO THE DATE THEY ARE TO BE EXECUTED.   PLEASE DO NOT SIGN OR RETURN THESE DOCUMENTS UNTIL FIVE (5) BUSINESS DAYS HAVE ELAPSED FROM THE DATE OF THIS RECEIPT.

_____ individually

and/or as an officer or ownership interest holder of

_____

(a ___Massachusetts___ corporation)

(a _____ partnership)

(a _____ limited liability company)

# EXHIBIT B

27516.00BUBV/Document #: 751607

IN ARBITRATION

GMAC REAL ESTATE, LLC,

        Complainant,

vs.                                    Case No.

RUBEN COULANGES,
SOUTH SHORE REALTY
GROUP, INC., d/b/a SOUTH
SHORE GMAC REAL ESTATE,

        Respondents.

## DEMAND FOR ARBITRATION

Complainant, GMAC Real Estate, LLC ("GMACRE"), by its attorneys, Williams Montgomery & John Ltd, and for its Complaint and Demand for Arbitration against Respondents, Ruben Coulanges and South Shore Realty Group, Inc d/b/a South Shore GMAC Real Estate, alleges as follows:

### Parties

1.      GMACRE is a limited liability company organized under the laws of the State of Delaware having its principal place of business in the State of Illinois. GMACRE is engaged in the business of granting to others ("franchisees") the right to operate residential real estate brokerage offices using various trade and services marks, including the mark "GMAC® Real Estate" (the "GMAC Marks").

2.      Upon information and belief, Ruben Coulanges ("Coulanges") is a resident and citizen of the State of Massachusetts. Coulanges is a former franchisee of GMACRE.



EXHIBIT

B

3.     Upon information and belief, South Shore Realty Group, Inc. d/b/a South Shore GMAC Real Estate ("South Shore") is a corporation organized and existing under the laws of the State of Massachusetts.  South Shore is a former franchisee of GMACRE.

4.     This is an action for breach of contract and an accounting.

5.     For many years prior to the acts complained of herein, Complainant has been continuously engaged in providing commercial and residential real estate brokerage services to the public.

### Facts Common to All Counts

### The Parties' Written Real Estate Service Contract

6.     On or about January 19, 2005, Coulanges and South Shore entered into a written GMAC Real Estate, LLC Real Estate Franchise Agreement (the "Franchise Agreement") with GMACRE pursuant to which GMACRE granted Coulanges and South Shore a franchise to operate residential real estate offices at the following locations:

136 Main Street, Brockton, MA 02301

7.     Under the Franchise Agreement, Coulanges and South Shore received, among other things, a limited license to use the GMAC Marks in connections with the operation of that office.  The term of the Franchise Agreement was to be seven (7) years from the effective date of February 1, 2005, or through February 1, 2012.  The Franchise Agreement was executed by Coulanges as President of South Shore on January 19, 2005.  A true and correct copy of the Franchise Agreement is attached hereto as Exhibit A and incorporated herein by reference.

8.     Under the Franchise Agreement, Coulanges and South Shore agreed, among other things, to pay GMACRE certain fees, including Franchise Fees, Referral Fees, Royalty Fees and Advertising Fees.  The Franchise Fees, which were due and payable on a monthly basis, were

2

computed as a percentage of the commission and fees income Coulanges and South Shore generated from the sale of residential real property.

9.      Under Section 11 of the Franchise Agreement, Respondents agreed to furnish GMAC with financial reports and statements.

10.      Under Section 18 of the Franchise Agreement, it is an event of default, and grounds for termination of the Franchise Agreement, if Coulanges and South Shore failed to comply with their payment obligations and failed to cure that breach within 30 days after their receipt of notice of breach.

11.      Under Paragraph 23(B) of the Franchise Agreement any dispute with respect to the Agreement "must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association ("AAA")." The arbitration proceeding is to be conducted by one arbitrator according to the commercial arbitration rules of AAA. All proceedings are to be conducted in the Chicago Metropolitan Area in the State of Illinois.

### Coulanges and South Shore's Default and Failure to Pay GMACRE the Amounts Due Under the Franchise Agreement

12.      By letter dated May 11, 2006, GMACRE advised Coulanges and South Shore that they were in default of their obligations under the Franchise Agreement.

13.      The Notice of Default letter advised that Coulanges and South Shore owed GMACRE past due fees of $18,986.22 under the Agreement and that the Respondents failed to submit reports required under Section 11 of the Agreement for the period between February 2006 to April 2006. The estimated amount of fees due for the months in which reports were not filed was estimated to be $3,654.22. The letter advised that if the amounts were not paid and the reports were not filed within 30 days, then GMACRE would have no choice but to consider termination of the Agreement. Coulanges and South Shore failed to comply with these requests.

14.    By letter dated March 26, 2007, GMACRE gave Coulanges and South Shore Notice of Termination of the Franchise Agreement, effective March 26, 2007. South Shore was advised that it remained liable for $18,045.00 in outstanding transaction and advertising fees (estimated due to non-reporting by the Respondents), and a statement balance of $16,855.43.

15.    In accordance with the terms of the Franchise Agreement, South Shore remains obligated to remit additional fees based on any closings occurring on or prior to the termination date, any closings occurring after the termination date attributable to listings obtained on or prior to the termination date, and any referrals sent or received on or before the termination date.

16.    Under Section 13 of the Franchise Agreement, GMACRE reserved the right to conduct a post-termination audit of the Respondents' transaction documents.

17.    GMACRE has been deprived of the future stream of anticipated revenue for the remaining term of the Franchise Agreement, in an estimated amount of $120,773.00. The total amount owed to GMACRE is estimated at $155,673.43.

18.    The Notice of Termination letter further advised Coulanges that in accordance with Section 19(B)(2) of the Franchise Agreement, he is personally liable for all fees owed by South Shore as of the date of termination, and for the loss of future revenue attributable to the one-year period following termination. This liability is estimated at $59,464.43.

19.    Respondents have failed to pay the amounts due and owing as stated in the March 26, 2007 Notice of Termination letter.

20.    Under Section 19(C) of the Franchise Agreement, Coulanges and South Shore agreed to reimburse GMACRE for all of the costs it incurred, including reasonable attorneys' fees, in enforcing its rights under the Agreement.

21.    GMACRE has fully performed its obligations under the Franchise Agreement.

4

22.    Ruben Coulanges executed an Endorsement of Principals agreeing to be personally bound by the provisions of the Franchise Agreement relating to, among others, Section 19(B) (the financial obligations incurred by South Shore prior to the date of termination and those based on losses attributable to the one-year period after the date of termination). (Exhibit A, p. 28).

## COUNT I

### (Breach of Contract – Franchise Agreement)

23.    GMACRE realleges and incorporates by reference paragraphs 1 through 22 of its Demand, inclusive, as and for this paragraph 23, as if fully set forth herein.

24.    Coulanges and South Shore have breached the Franchise Agreement by, among other things, failing and refusing to pay outstanding transaction fees, advertising fees, and statement balances due to GMACRE and to submit financial reports.

25.    As a direct and proximate result of Alchester and Grifferty's breaches of the Franchise Agreement, GMACRE has suffered damages in an amount in excess of $155,673.43.

WHEREFORE, Complainant prays for an entry of a judgment against Respondents in an amount in excess of $155,673.43, plus all attorneys' fees and costs associated with this action, plus all pre and post-judgment interest.

## COUNT II

### (Accounting)

26.    GMACRE realleges and incorporates by reference paragraphs 1 through 25 of its Complaint, inclusive, as and for this paragraph 26, as if fully set forth herein.

5

27.     GMACRE is entitled to an accounting from Respondents Coulanges and South Shore for all activity conducted by the business for the period prior to termination for which Respondents failed to furnish required reports.

28.     GMACRE cannot make an exact (estimates of fees owed can be estimated in accordance with the Franchise Agreement) determination as to what additional fees are due and owing to it from the Respondents until an accounting is completed and all pertinent reports and/or statements are examined.

WHEREFORE, Complainant prays for entry of a judgment against Respondents for an accounting for all activity conducted by the business for the period prior to termination for which Respondents failed to furnish required reports, and for Complainant's costs in this action, including its reasonable attorneys' fees, plus pre and post-judgment interest.

Respectfully submitted,

By: *Thomas F. Falkenberg*
Thomas F. Falkenberg
One of the Attorneys for the Complainant

Thomas F. Falkenberg
Hanson L. Williams
WILLIAMS MONTGOMERY & JOHN, LTD.
Attorneys for Complainant GMAC Real Estate, LLC
20 North Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 443-3200
(312) 630-8500 (fax)

6

# GMAC REAL ESTATE, LLC

## REAL ESTATE FRANCHISE AGREEMENT



EXHIBIT

A

# TABLE OF CONTENTS

Page

1.   THE FRANCHISE................................................................................................1

2.   RELATIONSHIP OF THE PARTIES..................................................................1

3.   THE MARKS.......................................................................................................2

4.   MATERIALS........................................................................................................4

5.   TRAINING...........................................................................................................4

6.   GRANT OF THE LICENSE................................................................................5

7.   CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC
     REAL ESTATE; PROVISION OF OTHER SETTLEMENT SERVICES........6

8.   NO CONFLICTING LICENSE / INTEREST......................................................7

9.   GROSS COMMISSION INCOME AND FEES / REAL PROPERTY...............7

10.  FEES....................................................................................................................8

11.  PAYMENT OF FEES/REPORTING..................................................................9

12.  LATE PAYMENT..............................................................................................10

13.  VERIFICATION RIGHTS.................................................................................10

14.  ADVERTISING FUND......................................................................................10

15.  REFERRALS......................................................................................................12

16.  PREMIER SERVICE[SM]; PERFORMANCE STANDARDS..........................13

17.  ASSIGNMENT; OWNERSHIP; RIGHT OF FIRST REFUSAL......................13

18.  TERMINATION; DEFAULT; CROSS-DEFAULT..........................................16

19.  OBLIGATIONS UPON TERMINATION.........................................................19

20.  REPRESENTATIONS AND WARRANTIES...................................................20

21.  ENTIRE AGREEMENT.....................................................................................21

22.  INDEMNIFICATION AND INSURANCE.......................................................22

23.  CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY
     TRIAL; TIME LIMITATION FOR CLAIMS....................................................22

24.  MODIFICATION OF AGREEMENT................................................................24

25.  SEVERABILITY.................................................................................................24

26.  NON-WAIVER....................................................................................................24

27.  NOTICES; FACSIMILE AND ELECTRONIC MAIL......................................24

28.  TERM AND RENEWAL....................................................................................25

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

i

29.    EFFECTIVE DATE.................................................................................................25

30.    LIMITATION OF DAMAGES. ............................................................................26

31.    CONFIDENTIALITY OF AGREEMENT...........................................................26

## EXHIBITS

Endorsement of Principals / Ownership Interest Holders
A        –         Royalty / Advertising Fees

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

ii

# REAL ESTATE FRANCHISE AGREEMENT

The parties, GMAC Real Estate, LLC, a Delaware limited liability company, with its principal offices at 2021 Spring Road, Suite 300, Oak Brook, Illinois 60523 ("GMAC Real Estate"); and

South Shore Realty Group, Inc.
Exact name under which real estate license is held ("Strategic-Partner"), whose principal place of business is located at 136 Main Street, Brockton, MA 02301

dba South Shore
(any change in dba requires prior written approval)

FEDERAL ID#51-0480418

agree as follows:

## 1. THE FRANCHISE.

GMAC Real Estate and its predecessors have developed a franchise system (the "Franchise") which will permit use of the Marks (as defined in Section 3), including the Mark "GMAC Real Estate", in the promotion and sale of Real Property (as defined in Section 9.C.). The Franchise provides those firms selected to be strategic-partners with the opportunity to use the Marks and to participate in the other benefits outlined in this Agreement.

GMAC Real Estate: (a) provides guidelines regarding the use of the GMAC Real Estate name and other Marks, which are intended to maximize the value of the nationally recognized image of GMAC Real Estate and improve the effectiveness of Strategic-Partner's advertising, public relations, personnel recruiting and sales promotion programs; (b) facilitates referrals between strategic-partners (but excluding referrals from GMAC Real Estate's affiliated relocation company, unless Strategic-Partner and/or Strategic-Partner's sales associates have qualified for such referrals, and then, subject to the conditions of such qualification); (c) provides systems and programs to deliver sales training and education, management training and client promotional materials to its strategic-partners; and (d) periodically provides a national business conference for the benefit of its strategic-partners.

GMAC Real Estate will strive to improve the Franchise through development of new programs and review of existing programs and will seek recommendations from its strategic-partners to strengthen the Franchise at local and national levels.

## 2. RELATIONSHIP OF THE PARTIES.

GMAC Real Estate and Strategic-Partner are each independently owned and operated businesses which share similar mutual interests with respect to real estate brokerage. Neither this Real Estate Franchise Agreement (this "Agreement"), nor the use of the term "Strategic-Partner" in this Agreement, is intended to create or shall be construed to create an agency, partnership, joint venture or employer-employee relationship between the parties. The GMAC

Real Estate business operated by Strategic-Partner is an independently owned and operated business and Strategic-Partner is solely responsible for its day-to-day conduct and activities. Strategic-Partner is not an agent (actual, implied or ostensible) of GMAC Real Estate. Neither party shall hold itself out to be an agent, partner, joint venturer or employee of the other party. Neither party shall have the right to bind or obligate the other party.

Strategic-Partner agrees to conduct its real estate brokerage business: (a) in such fashion as to reflect favorably at all times on GMAC Real Estate and the good name, goodwill and reputation of GMAC Real Estate and the Marks, and (b) in compliance with all laws and regulations pertaining to the operation of its real estate brokerage business.

## 3. THE MARKS.

A. **Ownership and Modification of the Marks.** GMAC Real Estate is the owner or licensee of the GMAC Real Estate trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols used to identify the products and services offered by GMAC Real Estate franchises, including the mark "GMAC Real Estate" (collectively the "Marks"). Strategic-Partner's right to use the Marks is derived solely from this Agreement and is limited to the operation of a real estate brokerage business by Strategic-Partner, pursuant to and in compliance with this Agreement and with all applicable standards, specifications and operating procedures prescribed by GMAC Real Estate, from time to time, during the term of this Agreement. Any unauthorized use of the Marks by Strategic-Partner shall constitute a Default (as defined in Section 18.D.) of this Agreement and an infringement of the rights of GMAC Real Estate in and to the Marks. GMAC Real Estate will protect and defend the Marks in the manner that it, in its sole discretion, determines is required. All goodwill resulting from Strategic-Partner's use and promotion of the Marks will accrue to the benefit of GMAC Real Estate.

If it becomes advisable at any time, in the sole discretion of GMAC Real Estate, to modify or discontinue use of any Mark and/or to require Strategic-Partner to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols, Strategic-Partner agrees to comply with the requirements of GMAC Real Estate to modify or otherwise discontinue the use of such Mark and/or to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs or other commercial symbols after notice to do so from GMAC Real Estate. All provisions of this Agreement applicable to the Marks shall apply to any other trademarks, service marks, trade dress, logos, designs, colors and commercial symbols later authorized by GMAC Real Estate, in writing, for use by and licensed to Strategic-Partner. The term "Marks" shall include any marks developed and/or registered in the future.

GMAC Real Estate shall have no obligation to reimburse Strategic-Partner for any expenditures made by Strategic-Partner to modify or discontinue the use of a Mark or to adopt additions to or substitutes for a discontinued Mark, including, without limitation, any expenditures relating to advertising or promotional materials or to compensate Strategic-Partner for any goodwill related to the discontinued or modified Mark. Notwithstanding the foregoing, if GMAC Real Estate changes the primary service mark of the Franchise so that it no longer includes the words "GMAC Real Estate" or some variation of those words, GMAC Real Estate will (a) provide Strategic-Partner 12 months' prior written notice of the change and (b) allow

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

2

Strategic-Partner to terminate this Agreement at the end of the twelve-month notice period. If Strategic-Partner elects to so terminate this Agreement, Strategic-Partner shall notify GMAC Real Estate, in writing, at least 90 days before the expiration of the 12-month notice period and shall comply with all post-termination obligations contained in this Agreement.

B. **Use of Marks.** To maintain the integrity of the Marks and the Franchise, GMAC Real Estate retains the right to control the quality of all materials and programs bearing the Marks and the manner in which the Marks are used.

The Marks shall be used: (1) only in conjunction with permanent real estate sales offices approved by GMAC Real Estate, and (2) only in the form and style authorized by GMAC Real Estate, as outlined from time to time in its manuals and other communications. Any departure from the restrictions set forth in the manuals or any use of the Marks on printed materials not outlined in the manuals must be approved in advance, in writing, by GMAC Real Estate. Use of the Marks on any publication (e.g., homeowner newsletter, decorating magazine, booklets, etc.) is specifically prohibited, unless the publication is approved in advance, in writing, by GMAC Real Estate.

Strategic-Partner will use the Marks in all real estate brokerage activities at or from the Licensed Site (as described in Section 6) during the term of this Agreement.

The Marks shall not be used to identify any property, goods or services provided by Strategic-Partner, other than those specifically approved, in writing, by GMAC Real Estate. Strategic-Partner will not use the Marks in any manner which indicates or implies the endorsement by GMAC Real Estate of any real property listed, sold or advertised by Strategic-Partner, including such real property's design, quality or price.

Strategic-Partner shall not use the GMAC Real Estate name or any other Mark as part of its corporate or entity name or in any other manner not expressly authorized, in writing, by GMAC Real Estate. The Marks shall be used as part of the trade name of Strategic-Partner in connection with all of, and limited to, its real estate brokerage activities. Strategic-Partner may use the GMAC Real Estate name (but not "GMAC" alone or any other Mark) as part of an Internet (or other computer network) domain name, provided that (i) such use complies with the standards set forth in the manuals or other communications supplied by GMAC Real Estate from time to time; (ii) prior written approval of the domain name is obtained from GMAC Real Estate; and (iii) upon termination of this Agreement for any reason, Strategic-Partner will comply with the terms of Section 19.A.(1) with regard to terminating its use of the GMAC Real Estate name as part of its domain name.

GMAC Real Estate reserves the right, in its sole discretion, to vary standards for any strategic-partner based upon the peculiarities or uniqueness of a strategic-partner's particular circumstances, business practices or any other conditions which GMAC Real Estate deems to require such variances. Strategic-Partner shall have no recourse against GMAC Real Estate for any variation from standard specifications and practices granted to any other strategic-partner and shall not be entitled to require GMAC Real Estate to grant Strategic-Partner a like or similar variation.

## 4.  MATERIALS.

The use of any GMAC Real Estate materials (including copyrighted materials) is restricted to use by Strategic-Partner in its own business. Strategic-Partner shall not use for its own benefit (except as provided in this Agreement) or license to, or otherwise permit, third-parties to use or reproduce, in any form or manner, GMAC Real Estate materials or programs, or adapt and use, or permit any of its sales associates or employees to adapt and use, any GMAC Real Estate materials or programs on an Internet (or other computer network) site or in any other manner without the prior written approval of GMAC Real Estate.

All building signs, yard signs, promotional items and printed materials shall adhere to the design, size, colors and other specifications (together, the "Specifications") set forth in the manuals or other communications supplied by GMAC Real Estate from time to time. No departure from the Specifications shall be permitted without the prior written approval of GMAC Real Estate which approval shall not be unreasonably withheld, denied or delayed; any such departure shall be considered a Default of this Agreement. Strategic-Partner's Licensed Site shall be required to display building signs in conformance with the Specifications within sixty (60) days of the Effective Date. If a zoning ordinance, regulation, lease or similar restriction precludes Strategic-Partner from using a sign consistent with the Specifications, prior to erection of an alternate sign, the details for such an alternate sign shall be presented for approval to GMAC Real Estate, with a copy of the relevant zoning ordinance, regulation, lease or similar restriction; GMAC Real Estate's approval shall not be unreasonably withheld, delayed or conditioned.

All business records, letterheads, business forms, advertising and other materials (excluding business cards) disseminated to the public and used in Strategic-Partner's business shall indicate Strategic-Partner's independent ownership of the brokerage business with the statement "An Independently Owned and Operated Firm".

GMAC Real Estate will provide the initial development of a new logo treatment for Strategic-Partner, together with a franchise opening/starter kit, including operating and presentation manuals, videotapes, audio tapes, advertising materials, magazines and marketing products, at no cost to Strategic-Partner.

## 5.  TRAINING.

A. Getting Connected Session. For New Strategic-Partners: GMAC Real Estate shall conduct a Getting Connected Session ("GCS") in the Chicago, Illinois area, or such other location designated by GMAC Real Estate. Strategic-Partner or its designated manager must attend, and satisfactorily complete, the first available GCS after execution of this Agreement. GMAC Real Estate will pay the GCS registration fee for one attendee (either Strategic-Partner or its designated manager) to attend a GCS at the site selected by GMAC Real Estate, provided that such designated person attends the GCS within 12 months after the Effective Date. Strategic-Partner may elect to have additional persons attend a GCS, but it must pay the then-current GCS registration fee for each additional attendee.

For Renewing Strategic-Partners: Within six (6) months after renewal, Strategic-Partner shall send at least one key management representative to a GCS at a site designated by GMAC Real Estate. The representative must complete the GCS to GMAC Real Estate's reasonable satisfaction. Strategic-Partner must pay the GCS registration fee for its designated representative and for each additional attendee.

B. **Accountability in Management.** For both new and renewing Strategic-Partners, following the Effective Date at least one key management representative of Strategic-Partner must satisfactorily complete "Accountability in Management" training. Upon any subsequent changes in key management personnel at the Licensed Site, at least one key management representative must satisfactorily complete Accountability in Management training. Accountability in Management training is a week-long management training class currently provided by a third-party vendor. Strategic-Partner must pay the Accountability in Management training registration fee for each attendee.

C. **Premier Service℠.** Strategic-Partner and each of its managers and sales associates must satisfactorily complete Premier Service training within six (6) months following the later to occur of (i) the Effective Date or (ii) such individual first becoming associated with Strategic-Partner. Strategic-Partner must pay the registration fee for each attendee.

D. **Costs.** Strategic-Partner shall be responsible for all travel, living and other costs its attendees incur in association with attending the training programs described in Sections A, B, and C above and all other training programs.

6. **GRANT OF THE LICENSE.**

A. **Current Office.** Strategic-Partner represents that it presently operates, or will by the Effective Date operate, an office at the following location:

Location     136 Main Street, Brockton, MA 02301

GMAC Real Estate grants to Strategic-Partner a license to establish and/or operate a real estate brokerage office displaying the Marks at its existing office location, as set forth above (the "Licensed Site"). Although the license granted to Strategic-Partner is non-exclusive and similar licenses may be granted to others within Strategic-Partner's market area, GMAC Real Estate shall not grant to another strategic-partner a license to use the Marks at an office located at the Licensed Site.

Simultaneously with the execution of this Agreement, Strategic-Partner shall execute and deliver to GMAC Real Estate a written instrument, conveying to GMAC Real Estate Strategic-Partner's rights to any telephone numbers relating to the Licensed Site. GMAC Real Estate agrees that it will hold the instrument in escrow, and will not release the instrument or exercise its rights thereunder unless and until there exists an Event of Default under this Agreement.

B. **Additional Offices.** If Strategic-Partner desires to expand its real estate brokerage business, by opening an additional office or otherwise, it shall apply to GMAC Real Estate for

approval to do so, by submitting a written application at least ninety (90) days prior to the planned date for opening. Approval of such expansion shall be within GMAC Real Estate's sole discretion and, if granted, shall be in writing. If approved, Strategic-Partner and GMAC Real Estate will enter into a separate agreement, on the form then being offered by GMAC Real Estate, with regard to the new office. Strategic-Partner's application must be accompanied by payment of the applicable Joining Fee for the additional franchise. If the office expansion is not approved by GMAC Real Estate, the Joining Fee will be refunded.

C. **Sublicensing Prohibited.** Strategic-Partner shall not sublicense, or permit a third-party to use, the GMAC Real Estate name or any other Mark.

## 7. CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE; PROVISION OF OTHER SETTLEMENT SERVICES.

A. Nothing in this Agreement shall preclude Strategic-Partner or other strategic-partners from listing, selling or advertising any real estate, wherever it or the owner of the real estate may be located, including in areas serviced by Strategic-Partner or other strategic-partners, as applicable. GMAC Real Estate reserves the right: (i) to license other real estate brokers to use the Marks anywhere, other than at Strategic-Partner's Licensed Site, including areas adjacent to, or in proximity with, the Licensed Site; (ii) for GMAC Real Estate and its parents, subsidiaries, or affiliated entities to conduct activities, including real estate brokerage activities, mortgage, title insurance and relocation operations, in areas adjacent to, or in proximity with, the Licensed Site under the Marks or other marks; and (iii) for GMAC and its parents, subsidiaries, or affiliated entities to establish other franchises or company-owned outlets or other channels of distribution, selling or leasing similar products or services under a different mark. Additionally, GMAC Real Estate reserves the right to establish, and to have its parents, subsidiaries and/or affiliated entities establish, anywhere, franchises or company-owned businesses or other channels of distribution: (x) selling or leasing similar products or services under trademarks, service marks, trade dress, logos, designs, colors or other commercial symbols different from the Marks, or (y) offering dissimilar products or services under the Marks.

B. Simultaneously with the execution of this Agreement, Strategic-Partner will enter into exclusive contractual relationships with GMAC Real Estate or its affiliates or designees pertaining to the delivery of other core real estate settlement services and/or products, including mortgage, title and closing services, home warranty and homeowner's insurance, provided, however, that both Strategic-Partner and GMAC Real Estate agree that the entry into such contractual relationships is beneficial to both parties. If Strategic-Partner does not enter into one or more of these contractual relationships with GMAC Real Estate or its affiliates as of the Effective Date, but subsequently decides during the Term of this Agreement to provide any such core real estate settlement services and/or products, Strategic-Partner agrees that it must do so exclusively through the entry into contractual relationships with GMAC Real Estate or its affiliates or designees, as to those services and/or products. Except for arrangements that Strategic-Partner has in place which pre-date the Effective Date, Strategic-Partner and its Owners and affiliates may not directly or indirectly offer any such core real estate settlement services and products of other vendors, and may not have relationships with other vendors of such services and products, during the Term of this Agreement. Any existing arrangements

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

6

which are to be excluded from this requirement will be noted in writing before this Agreement is signed. The mortgage business, CMC Mortgage, is excluded from this requirement.

## 8.  NO CONFLICTING LICENSE / INTEREST.

During the period beginning on the Effective Date and ending on the last day of the Term, neither Strategic-Partner nor any of its principals or ownership interest holders (together, "Owners"), directly or indirectly, shall become affiliated with, establish or have an interest in: (a) any real estate brokerage franchising or similar system or service, other than one operated by GMAC Real Estate; (b) any real estate brokerage operation or business or real estate information center, which is not licensed by GMAC Real Estate; or (c) any business offering real estate settlement services and/or products including those described in Section 7.B. above, except in accordance with the provisions of Section 7.B. above. The provisions of this Section 8: (y) shall remain in effect through the last day of the Term, even if Strategic-Partner attempts to voluntarily terminate this Agreement or ceases operations or if this Agreement is terminated as the result of an Event of Default attributable to Strategic-Partner; or (z) shall have no further effect if this Agreement is terminated as the result of a Event of Default attributable to GMAC Real Estate. GMAC Real Estate acknowledges that the Owner's ownership interests in Mass Management Group, LLC, a property management company, will not constitute a violation of this provision and fees earned by Mass Management Group, LLC will not be subject to the provisions of this Agreement, provided Strategic-Partner operates Mass Management Group, LLC in accordance with the Commercial Exclusion Provisions defined below.

## 9.  GROSS COMMISSION INCOME AND FEES / REAL PROPERTY.

A.  Gross Commission Income, as defined below and where applicable, shall be used as the basis for the calculation of fees to be paid by Strategic-Partner to GMAC Real Estate.

B.  "Gross Commission Income" ("GCI") includes (A) all commissions and fees received by Strategic-Partner from the sale, lease, transfer or other disposition (including mergers and similar transactions) (each a "Disposition") of Real Property (as defined below), including any note, obligation, lien or other consideration given to Strategic-Partner in lieu of a commission, less commissions and referral fees paid to cooperating and/or referring brokers in other brokerage entities, but excludes (B) all commissions and fees received by Strategic-Partner from property management, the Disposition of commercial real estate or the non-residential portion of farm properties and any other brokerage or similar activity, provided Strategic-Partner conducts such activities through a separate legal entity (with a Federal I.D. number different from Strategic-Partner's), which entity maintains its own office location and telephone number and does not use the Marks (the "Commercial Exclusion Provisions"). Specifically: (X) GCI includes any selling bonuses, document preparation fees, administration and similar fees received by Strategic-Partner; (Y) GCI does not include referral payments made by GMAC Real Estate to Strategic-Partner nor does it include cooperating brokers fees paid to cooperating brokers in other brokerage entities that Strategic-Partner receives at closing and distributes to the cooperating broker; and (Z) there shall not be deducted from the calculation of GCI Strategic-Partner's expenses, membership or other fees (including multiple listing service fees) or payments made to brokers, sales associates or employees working in association with, or licensed through, Strategic-Partner.

C.  "Real Property" includes single and multiple unit residential housing, commercial properties, farm houses, vacant or unimproved land to be used for residential, recreation or commercial purposes, condominiums, cooperatives, townhouses, vacation houses, interests in interval-ownership/ time-share residential units and mobile homes when affixed to the ground.

10. FEES.

Strategic-Partner agrees to pay the following fees (in United States dollars) to GMAC Real Estate:

A.  **Joining Fee.**  Simultaneously with the execution of this Agreement (if this Agreement is not being executed upon the expiration of a similar contract between Strategic-Partner and GMAC Real Estate or its predecessor), a Joining Fee in an amount equal to $20,000 if the Licensed Site is Strategic-Partner's first GMAC Real Estate office within a particular market area, or $7,500 if the Licensed Site is located within the same market area, as determined by GMAC Real Estate, as another GMAC Real Estate office owned by Strategic-Partner. Notwithstanding the foregoing, if Strategic-Partner qualifies for the Classic Market Program (as described hereinafter), the Joining Fee will be $7,500, regardless of the number of GMAC Real Estate offices Strategic-Partner operates.  For purposes of this Agreement, the "Classic Market Program" is a reduced-Joining Fee program open to strategic-partners that (i) earned $499,999 or less of GCI in the twelve (12) calendar months immediately preceding the Effective Date and (ii) are not located within any Metropolitan Statistical Area, as determined in accordance with the then-current standards of the United States Office of Management and Budget.

B.  **Royalty Fees.**  In accordance with the provisions of Exhibit A, attached.

C.  **Referral Office Fee.**  A Referral Office Fee of $504 per year, billed in monthly installments of $42 per month (or $485 if paid in full, in advance, on the Effective Date and on each subsequent anniversary date thereof).  Strategic-Partner acknowledges that payment of the Referral Office Fee is required to help defray the costs of promoting GMAC Real Estate's broker to broker referral network and that payment of the Referral Office Fee does not insure that Strategic-Partner will receive any such broker to broker referrals.

D.  **Referral Fee.**  A referral fee, in accordance with Section 15 below, to GMAC Real Estate and, as applicable, any of its strategic-partners, within 10 days of the receipt by Strategic-Partner of a commission or fee generated from a transaction which was referred to Strategic-Partner by GMAC Real Estate or any of its strategic-partners.

E.  **Advertising Fee.**  In accordance with the provisions of Exhibit A, attached. Advertising Fees shall be used in connection with the Advertising Fund, described in Section 14 of this Agreement

F.  **Business Conference Registration Fee.**  Each attendee each must pay the then-current registration fee.

## 11. PAYMENT OF FEES/REPORTING.

A. Strategic-Partner agrees to pay all fees as set forth above and on the appropriate Exhibit, and to use such forms or computer software as recommended by GMAC Real Estate. Strategic-Partner agrees to furnish reports to GMAC Real Estate as the latter may reasonably require, including, but not limited to, periodic financial reports and statements, as provided in this Agreement and as may be reasonably requested by GMAC Real Estate in the future. In addition, Strategic-Partner shall submit to GMAC Real Estate Receipt a copy of Ruben Coulanges' 2004 federal tax return.

B. GMAC Real Estate shall have the right to set-off any amounts due to Strategic-Partner (including Awards – as defined in Exhibit A, if applicable) against any amounts due from Strategic-Partner to GMAC Real Estate or to any Affiliate of GMAC Real Estate (an "**Affiliate**" of GMAC Real Estate is defined as an entity, the majority ownership of which is held, directly or through subsidiaries, by General Motors Acceptance Corporation). Within 90 days of receiving a notice, in writing, from GMAC Real Estate to do so, Strategic-Partner shall make all reports through a broker reporting system ("BRS") approved by GMAC Real Estate and shall make all payments to GMAC Real Estate, electronically, through an electronic funds transfer account/system ("EFT") approved by GMAC Real Estate, which may or may not use a BRS. After receipt of such written notice and within the above time period, Strategic-Partner shall install and use a BRS and/or EFT, including all required hardware and software. Acceptable BRS's and EFT's will be those set forth on a document prepared and distributed by GMAC Real Estate to Strategic-Partner, together with (or prior to) the service of the written notice referenced above. As to each BRS and EFT (as applicable), Strategic-Partner shall (A) continuously maintain a software support system through an agreement with a reputable and competent service provider, (B) promptly cause to be rectified all problems which interfere with the proper operation of the BRS, (C) install updated versions as they become available, and (D) enter promptly (within 48 hours of settlement or closing, as to fees based on GCI or transactions) and accurately all information requested, including information related to listings, pendings, offices and agents. In addition, as to each EFT: (Y) Strategic-Partner shall enter into and keep effective whatever agreements with third-parties (including Strategic-Partner's financial institution) are required to permit GMAC Real Estate to withdraw electronically from Strategic-Partner's account amounts to which GMAC Real Estate is entitled and to provide in such agreements that 30-days prior notification will be given to GMAC Real Estate before such agreements are terminated, suspended or materially changed, and (Z) Strategic-Partner shall maintain sufficient monies in its accounts to cover all withdrawals permitted to be made by GMAC Real Estate.

C. Strategic-Partner agrees to furnish to GMAC Real Estate, on an ongoing updated basis and in form as reasonably requested by GMAC Real Estate, a roster of sales agents, brokers and other persons associated with Strategic-Partner who are authorized and/or licensed to conduct real estate sales activities, which roster shall include, as to each such sales agent and broker, the name, address, real estate license number (with a copy of the license), date of association, date of termination, location of office from which each such sales agent and broker is operating and other items that may reasonably be requested by GMAC Real Estate, from time to time.

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

9

## 12. LATE PAYMENT.

If Strategic-Partner fails to make payment of any fee within 15 days of its due date: (a) Strategic-Partner shall pay to GMAC Real Estate interest on the payment due at the annual rate of prime plus 4%, but, in any event, not less than 12% nor more than 15%; "prime" is defined as the interest rate published in The Wall Street Journal (the "WSJ") in its money rate section on the 1st business day of each month, as the prime or base lending rate being offered on that day (if such interest rate is not so published in the WSJ, "prime" shall be the average prime or base lending rate, as of that date, being offered by Citibank, N.A., to its most credit-worthy customers for 90-day loans); (b) GMAC Real Estate shall have the right, at its option, to deduct all such amounts from any payments due to Strategic-Partner pursuant to this Agreement or otherwise; (c) if the delinquent payment is in connection with a deferred payment plan, subject to any contrary provision in any documentation evidencing such a deferred payment plan, all present and future payments shall be automatically accelerated and all amounts due under the plan shall be considered due and payable; and (d) at the option of GMAC Real Estate and after written notice has been served upon Strategic-Partner, GMAC Real Estate may terminate Strategic-Partner's right to receive referrals, change any territorial provisions and/or, if Strategic-Partner's Fee Schedule is based solely on GCI, terminate Strategic-Partner's right to receive Awards (as defined in Exhibit A, if applicable). In the event collection action is necessary to recover monies due to GMAC Real Estate, Strategic-Partner agrees to pay the costs of collection, including agency and attorneys fees and court costs.

## 13. VERIFICATION RIGHTS.

No later than one hundred twenty (120) days following the end of each calendar-year during the Term (including any calendar-year in which the Term expires), Strategic-Partner shall provide to GMAC Real Estate annual financial statements in a form acceptable to GMAC Real Estate. If Strategic-Partner is conducting a business which is not covered by this Agreement, Strategic-Partner shall maintain a separate set of books and records for its real estate brokerage operations. Strategic-Partner shall permit a GMAC Real Estate representative to inspect and audit Strategic-Partner's accounting records and books for each line of business in which Strategic-Partner engages. If it is determined that Strategic-Partner has reported to GMAC Real Estate any fees due under this Agreement which are 3% or more lower than the fees actually due hereunder, Strategic-Partner shall pay to GMAC Real Estate, in addition to the unpaid fees, interest on the unpaid fees as provided in Section 12, plus the actual travel costs and expenses of the auditors and other persons involved in the inspection and/or audit. GMAC Real Estate shall have the right to inspect Strategic-Partner's offices and to confer with Strategic-Partner, its sales associates and employees to assure compliance with the standards GMAC Real Estate prescribes from time to time. GMAC Real Estate also shall have the right, and Strategic-Partner and each of its Owners hereby confirms that each of them so authorizes GMAC Real Estate to complete a credit investigation concerning each or all of them from time to time during the Term, as and in whatever manner GMAC Real Estate deems necessary in its sole discretion.

## 14. ADVERTISING FUND.

A. Within its sole discretion, GMAC Real Estate (or an entity designated by GMAC Real Estate, in which event, such entity shall have all the rights and obligations of GMAC Real

Estate with respect to the Advertising Fund, as provided in this Section) may establish and operate a fund (the "Advertising Fund" or the "Fund") for the purpose of providing marketing and advertising relative to the Marks. The Advertising Fund shall consist of monies paid to GMAC Real Estate by entities using the Marks, including Strategic-Partner. The monies paid to GMAC Real Estate as Advertising Fees (or otherwise designated by GMAC Real Estate as monies to be used by the Advertising Fund) shall be used by GMAC Real Estate, within its sole discretion, to, among other things: (A) create, produce, administer and support (either in-house or outsourced) national, regional and local marketing, advertising, public relations, promotional and other programs (together, "Programs"); and (B) present and promote a national business conference.

B. The amount, type, timing, content, location, cost and all other matters relating to Programs sponsored by the Advertising Fund or to which the Advertising Fund contributes, shall be within the sole discretion of GMAC Real Estate. Monies expended from the Advertising Fund on Programs in areas served by Strategic-Partner are not required to be proportionate to the amount of Advertising Fees paid by Strategic-Partner. Expenditures from the Advertising Fund shall be charged first to earned interest, if any.

C. GMAC Real Estate, in any calendar year, may expend from the Advertising Fund amounts which are greater or lesser than either amounts received by the Advertising Fund in such year or amounts contained in the Advertising Fund during that year (regardless of when they were collected). If a lesser amount is expended, the balance shall be carried over to the next year; if a greater amount is expended, the excess amount shall be repaid to GMAC Real Estate (or to whomever provided such monies, if other than GMAC Real Estate) from fees received by the Advertising Fund in the next year.

D. In the event a strategic-partner is delinquent in the payments required to be made by it to the Advertising Fund, GMAC Real Estate shall have the right (but not the obligation) to undertake collection action against the delinquent strategic-partner and to charge the reasonable costs of collection (including, but not limited to, collection agency fees, attorney's fees and costs) to the Advertising Fund. GMAC Real Estate, within its sole discretion, shall have the right to settle, reduce, compromise or waive payments required to be made by a strategic-partner to the Advertising Fund.

E. Advertising Fees (and all other monies received by the Advertising Fund) shall be accounted for separately, but may be deposited and commingled with any other funds of GMAC Real Estate. On or before April 30 of each year, GMAC Real Estate shall prepare a financial statement of the Advertising Fund for the prior calendar year, which shall be certified by a senior officer of GMAC Real Estate and shall be forwarded to Strategic-Partner, upon Strategic-Partner's written request. Strategic-Partner shall have the right to reasonably review the books and records of the Advertising Fund at GMAC Real Estate's principal place of business, upon reasonable prior notice to GMAC Real Estate.

F. GMAC Real Estate shall have the right, in its sole discretion, to negotiate with any strategic-partner a different arrangement than that set forth in the Section entitled "Advertising Fees", relating to the payment of Advertising Fees, including, but not limited to, payments by such strategic-partner for designated local marketing in lieu of the payment by such strategic-

partner of Advertising Fees, or payments from the Advertising Fund to a strategic-partner for designated local marketing, where national or regional marketing is determined to be inappropriate or where other situations, peculiar to a local market, are determined by GMAC Real Estate, within its sole discretion, to require such action.

G. GMAC Real Estate, within its sole discretion and upon 30-days notice to Strategic-Partner, may suspend or discontinue (and, thereafter, within its sole discretion, reinstate) the Advertising Fund, provided that, upon a suspension or discontinuance, the Fund shall continue to be operated until all monies in the Fund are expended in accordance with the provisions of this Agreement.

H. GMAC Real Estate's obligations with respect to the Advertising Fund and the collection, maintenance and distribution of Advertising Fees are as set forth in, and limited to, those contained in the provisions of this Agreement. In no event shall GMAC Real Estate be deemed to have fiduciary obligations to Strategic-Partner as to the operations of the Advertising Fund.

## 15. REFERRALS.

A. **Broker to Broker Referrals**. With respect to a broker-to-broker referral to be made by Strategic-Partner, Strategic-Partner shall make each such referral to an eligible GMAC Real Estate strategic-partner or, if no such strategic-partner is located in the applicable area, then to another broker approved by GMAC Real Estate (hereinafter an "Authorized Alternative Broker"). All such referrals shall be made either by contacting GMAC Real Estate to have GMAC Real Estate facilitate the referral or by directly contacting such strategic-partner. The strategic-partner who places the referral must register the transaction with GMAC Real Estate. To register a referral, Strategic-Partner must submit the required referral form to include complete contact information as provided at the time that the referral is accepted by the destination broker. This referral form is required regardless of whether the destination broker is a strategic-partner of GMAC Real Estate or is an Authorized Alternative Broker. Strategic-Partner shall pay referral fees and royalties as set forth below.

If another GMAC Real Estate strategic-partner refers a transaction to Strategic-Partner, Strategic-Partner as the destination company will, within 10 days after it receives any GCI from that referred transaction, pay to the originating strategic-partner a fee equal to 25% of the GCI that Strategic-Partner earned from the referred transaction. Strategic-Partner then will pay Royalty Fees based on the net GCI from the referred transaction.

Likewise, if Strategic-Partner refers an outgoing transaction to another strategic-partner or Authorized Alternative Broker, that other broker will pay to Strategic-Partner a fee equal to 25% of the GCI it earned from the referred transaction. In that instance, Strategic-Partner as the originating broker then will pay GMAC Real Estate a fee equal to 2.5% of the GCI that the other broker earned from the referred transaction (which may also be stated as 10% of the amount that Strategic-Partner received from the other broker).

B. In the event Strategic-Partner fails to comply with the above procedures or with the policies, standards or procedures adopted by GMAC Real Estate, from time to time, regarding

referrals, GMAC Real Estate may, at its option (and in addition to any other remedies available to it for a Default of this Agreement), suspend further referrals to Strategic-Partner, remove Strategic-Partner from the authorized referral directory, require referral training attendance, terminate this Agreement or take other action deemed appropriate.

C. Strategic-Partner acknowledges that it acquires no rights or expectations with respect to referrals, whether from corporate relocation activities or otherwise, beyond those expressly stated in this Section.

## 16. PREMIER SERVICE℠; PERFORMANCE STANDARDS.

A. Strategic-Partner agrees that retention of market coverage, consistent performance, recruitment and training of a full-time, professional sales staff and commitment to the programs of GMAC Real Estate are necessary for retention of the license granted by this Agreement. Of primary importance is Strategic-Partner's full engagement in the process of Premier Service℠, a systematic and measurable way to conduct business. In addition to satisfying the Premier Service training requirements described in Section 5.C. above, Strategic-Partner agrees to participate in the Premier Service survey process by registering the Licensed Site and requesting every buyer and seller represented by Strategic-Partner to complete a Premier Service survey upon completion of a transaction. Strategic-Partner is responsible to pay a one-time registration fee for the Licensed-Site and a fee for each survey sent to a buyer or seller. In addition, Strategic-Partner shall use Strategic-Partner's best efforts, and shall actively encourage its managers and sales agents, to implement third-party and affiliated programs sponsored by GMAC Real Estate, through its Strategic Alliance Group or otherwise.

B. Strategic-Partner's performance shall be reviewed annually on the anniversary of the Effective Date, beginning on the second anniversary of the Effective Date. Strategic-Partner's average GCI shall exceed, for the 1 year period being reviewed, 75% of the higher of (a) GCI attained during the first year after the Effective Date, or (b) GCI attained during the 1-year period prior to the 1-year period being reviewed, or (c) the average of the prior 3 years (if Strategic-Partner has been licensed for such period). Failure by Strategic-Partner to meet this performance standard shall constitute an Event of Default under this Agreement. Notwithstanding the provisions of this subparagraph (b), if the Market Area (as later defined) serviced by Strategic-Partner is negatively impacted as a whole, to the extent that the total sales volume, by dollar, of residential property sold during the year being reviewed is less than 90% of the total sales volume, by dollar, of residential property sold during the prior year, the percentage of GCI to be maintained by Strategic-Partner shall be reduced proportionately (e.g., if the total sales volume of the year being reviewed is 90% of the total sales volume of the prior year, the percentage required to be maintained by Strategic-Partner shall be reduced by 10%, i.e., to 67.5% - 10% of 75%). "Market Area" shall be the area serviced by the following multiple listing service: MLS Property Information Network (the "MLS"); total sales volume shall be as reflected by the records of the MLS.

## 17. ASSIGNMENT; OWNERSHIP; TRANSFERS; RIGHT OF FIRST REFUSAL.

A. **Assignment by GMAC Real Estate.** GMAC Real Estate shall have the right, within its sole discretion, to assign or transfer this Agreement and/or any of its rights or obligations

under this Agreement to a third-party, whether or not such third-party is affiliated with GMAC Real Estate.

**B. Transfer of Agreement, Assets by Strategic-Partner.** Strategic-Partner acknowledges and agrees that GMAC Real Estate has entered into this Agreement in reliance upon the qualifications and representations of Strategic-Partner and, where Strategic-Partner is an entity, upon the qualifications and representations of both Strategic-Partner and Strategic-Partner's Owners (as defined in Section 8). Therefore, Strategic-Partner agrees that it shall not, without the prior written consent of GMAC Real Estate, Transfer (as defined in Section 17.E. below) this Agreement, any interest in its licensed business, or all or substantially all of its assets. GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement. Additionally, any such consent will be conditioned upon the following: (1) the Transfer of this Agreement may occur only in connection with the Transfer of the entire business conducted pursuant to this Agreement; (2) the transferee has agreed, in writing, to honor Strategic-Partner's obligations under this Agreement; (3) all of Strategic-Partner's obligations to GMAC Real Estate (financial and otherwise) have been satisfied; (4) agreement by the transferee (or a principal of the transferee) to attend required training; (5) a copy of all relevant Transfer documentation is delivered to GMAC Real Estate; (6) at least 30-days prior written notice is given to GMAC Real Estate; and (7) the transferee executes a franchise agreement in the form as contained in the most recently filed offering circular, for the term indicated in that form (but not less than 5 years), commencing with the date of execution of the new agreement. Strategic-Partner shall remain liable to GMAC Real Estate pursuant to this Agreement with respect to all obligations which are based on actions or omissions prior to the effective date of the Transfer.

**C. Ownership.** Strategic-Partner certifies that: (i) Strategic-Partner is an individual or, if one of the entities described below is checked, it is that type of entity; and (ii) if Strategic-Partner is an entity, the Owners listed below are the only principals or persons holding an ownership interest in Strategic-Partner and the percentage of ownership interest held by each is set forth next to the name of each such person (if an ownership interest is held by another entity, Strategic-Partner certifies that there is set forth below each successive ownership interest, until individual ownership interests are reached and disclosed). Strategic-Partner shall notify GMAC Real Estate, in writing, prior to any change in the ownership interests (or the percentages) shown below or any change in the broker of record (the name of whom is set forth below).

    (X)        corporation: organized under the laws of the State or Commonwealth of <u>Massachusetts</u>

    ( )        limited liability company: organized under the laws of the State or Commonwealth of _____

    ( )        partnership (indicate type): organized under the laws of the State or Commonwealth of _____

Owners:

Ruben Coulanges _____    <u>100%</u>

(Ownership interest holders listed)

Idelie Jean Baptiste _____
(Broker of Record)

**D. Transfer of Ownership Interests in Strategic-Partner.** The written consent of GMAC Real Estate shall be required with respect to any Transfer of an ownership interest equal to or greater than 10% of the total ownership interests in Strategic-Partner (including Transfers which, over a period of 2 years, each individually involve less than 10% of the ownership interests, but cumulatively, equal or exceed a Transfer of 10% or more of the ownership interests). GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement. Strategic-Partner shall provide at least 60 days prior written notice to GMAC Real Estate of any Transfer of the type described in the first sentence of this Section 17.D. (but, in the case of an Transfer upon the death of an Owner, within 30 days after the date of such death). Within 60 days of its receipt of the notification, GMAC Real Estate shall notify Strategic-Partner or transferee of its consent or refusal to consent to the proposed Transfer.

**E. Definition of a Transfer.** For purposes of Sections 17.B. and 17.D., the term "Transfer" shall mean any sale, lease, assignment, conveyance or other transfer including: (i) those occurring involuntarily or by operation of law, including those resulting from death, marriage, incompetency or similar events; (ii) those occurring through merger, acquisition, consolidation, dissolution, bankruptcy, execution or foreclosure sale or similar events or those occurring between/among the spouse and/or children of an Owner; and (iii) those occurring through any other voluntary act.

**F. Effect of Unauthorized Transfer.** In the event of a Transfer for which consent was required pursuant to this Section 17, but such consent was not obtained, both Strategic-Partner and the transferee shall be required to comply with the provisions of this Agreement and shall be obligated to GMAC Real Estate to do so. A failure to comply with the provisions of this Section 17 shall constitute an Event of Default under this Agreement.

**G. Right of First Refusal.** As to any Transfer referenced in 17.B. or 17.D. above (except a Transfer of ownership interests between/among the spouse and/or children of an Owner or between/among Owners), GMAC Real Estate shall have the right, at its option, to purchase (or otherwise have transferred to it) the stock and/or assets of Strategic-Partner, under substantially the same conditions as a proposed Transfer to a third-party (the "**Right of First Refusal**"). Prior to an Transfer to a third-party, Strategic-Partner shall serve upon GMAC Real Estate a copy of the term sheet, letter of intent or contract (the "**Offer Document**") whereby Strategic-Partner has agreed with a third-party to an Transfer, together with a certification from the transferor(s) that the Offer Document accurately and fully represents all the terms and conditions of the proposed Transfer and a copy of all due diligence materials furnished by Strategic-Partner to the third-party upon which the third-party based its offer as provided in the Offer Document. If, within 10

days of receipt by GMAC Real Estate of the above documentation (the "10-day Notice Period"), GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected to exercise its Right of First Refusal, GMAC Real Estate and Strategic-Partner shall be deemed to have entered into a contract based on the same terms set forth in the Offer Document and, thereafter, each party shall be bound by its terms, provided the Offer Document provides (and, shall be deemed to so provide, if it does not), that: (i) GMAC Real Estate shall have the right to substitute cash for any other form of payment provided in the Offer Document; and (ii) the date of closing or settlement shall be not less than 60 days from the date of service by GMAC Real Estate upon Strategic-Partner of the notice that it has elected to exercise its Right of First Refusal; and (iii) Strategic-Partner makes the customary warranties and representations given by the seller of the assets of, or ownership interests in, an entity operating a real estate brokerage business, including, but not limited to, those related to title, the operating condition of the assets, the validity of contracts and the extent of liabilities. If, within the 10-day Notice Period, GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected not to exercise its Right of First Refusal or if no notice is so served by GMAC Real Estate, GMAC Real Estate shall be deemed to have waived its Right of First Refusal for a period of 180 days from the beginning of the 10-day Notice Period (the "180-day Waiver Period"). If, within the 180-day Waiver Period, Strategic-Partner effectuates the Transfer in accordance with the terms and conditions of the Offer Document, the Right of First Refusal shall be considered terminated. If, within the 180-day Waiver Period, the Transfer is not effectuated in accordance with the terms and conditions of the Offer Document or any material term or condition of the Offer Document is changed, the Right of First Refusal shall be considered reinstated and the procedures set forth above shall be followed with respect to any proposed Transfer (including a proposed Transfer which was the subject of a Offer Document that was changed during any 180-day Waiver Period).

## 18. TERMINATION; DEFAULT; CROSS-DEFAULT.

This Agreement may be terminated upon any one of the following conditions (in addition to the conditions specifically mentioned elsewhere in this Agreement and unless otherwise provided by the law of the state in which Strategic-Partner is located). Prior to the effective date of termination, Strategic-Partner shall pay all monies due, or to become due pursuant to this Agreement, to GMAC Real Estate and shall furnish GMAC Real Estate with all required reports and records. After termination, GMAC Real Estate shall have no further obligations to Strategic-Partner.

A. **By Strategic-Partner.** If GMAC Real Estate is in Default (as defined in Section D, below) of this Agreement, Strategic-Partner may terminate this Agreement, effective upon service upon GMAC Real Estate of a written notice of termination (the "Strategic-Partner's Termination Notice"), provided, prior to the service of Strategic-Partner's Termination Notice, Strategic-Partner had served upon GMAC Real Estate a written notice of such Default (the "Strategic-Partner's Default Notice") which specified the nature and extent of the Default, including identification of the specific provision of this Agreement which GMAC Real Estate is in Default of, and GMAC Real Estate failed to cure such Default within 30 days after receipt of Strategic-Partner's Default Notice or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, GMAC Real Estate failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by

GMAC Real Estate within 90 days of the service of the Strategic-Partner's Default Notice, despite the diligent efforts of GMAC Real Estate to do so, Strategic-Partner shall have the right to serve Strategic-Partner's Termination Notice at any time thereafter, until the Default is cured).

The service of Strategic-Partner's Termination Notice by Strategic-Partner shall: (1) be deemed to be an irrevocable waiver by Strategic-Partner of the exclusivity of the Licensed Site and GMAC Real Estate shall be free to license other parties to use the Marks at the Licensed Site, and (2) relieve other strategic-partners of the Franchise of any obligations regarding the placement of referrals with Strategic-Partner.

B. **By GMAC Real Estate (Automatic).** Each of the following shall constitute an Event of Default, which, among other things, shall result in an automatic termination of this Agreement (unless GMAC Real Estate, in its sole discretion, notifies Strategic-Partner, in writing to the contrary), effective immediately, without notice to Strategic-Partner:

(1)     Strategic-Partner becomes insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy (or similar proceeding) is filed by Strategic-Partner or is filed against Strategic-Partner and is not opposed by Strategic-Partner; or if a final judgment in an amount of $25,000 or more is entered against Strategic-Partner and is not covered by a policy of insurance remains unsatisfied for a period of 60 days; or, if Strategic-Partner is an individual and except as otherwise provided in this Agreement, Strategic-Partner dies, or, if Strategic-Partner is an entity, Strategic-Partner ceases to exist; or if execution is levied against Strategic-Partner or Strategic-Partner's business, assets, ownership interest or property.

(2)     Strategic-Partner ceases to operate its real estate brokerage business, which shall include failing to keep its offices open and staffed during all regular business hours, properly equipped for the transaction of real estate brokerage activities; provided, however, that if Strategic-Partner's business premises are damaged or destroyed, Strategic-Partner shall have 30 days after such event in which to apply for approval from GMAC Real Estate to relocate or reconstruct the premises, which approval shall not be unreasonably withheld, delayed or conditioned. Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any cessation of its real estate brokerage business or the closure of any of its offices;

(3)     The real estate brokerage license of Strategic-Partner, of Strategic-Partner's broker of record (or the equivalent) or of any Owner is suspended, revoked or not renewed, or Strategic-Partner's right to do business in the jurisdiction in which any of Strategic-Partner's Licensed Sites is located. Strategic-Partner shall notify GMAC Real Estate, in writing, immediately upon the occurrence of any of the above events;

(4)     Strategic-Partner or any Owner conducts its real estate brokerage operations in such a fashion as to reflect unfavorably on GMAC Real Estate, its name, goodwill or reputation, or on the Marks, including, but not limited to, the employment of or other association with any individuals who have been convicted of a crime; or Strategic-Partner acts or fails to act in such a manner as to be in violation of any law or regulation. Without limiting the generality of the foregoing, any breach of the

representations or warranties set forth in Section 20.C. hereof shall result in automatic termination of this Agreement.  Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any of the above events;

(5)    Strategic-Partner or any Owner purports to Transfer any rights or obligations under this Agreement or any interest in Strategic-Partner to a third party without GMAC Real Estate's prior written consent, contrary to the provisions of this Agreement;

(6)    Strategic-Partner or any Owner makes any material misrepresentation or omission in its application or Business and Financial History Form or Strategic-Partner maintains false books or records or makes any false reports or statements to GMAC Real Estate; or

(7)    Strategic-Partner or any Owner is in Default of any provision of this Agreement and was served with a GMAC Real Estate Default Notice (as defined below) in the preceding 12-month period.

**C.  By GMAC Real Estate.(Right To Cure).**  If Strategic-Partner or any Owner is in Default of this Agreement based on acts or omissions not referenced in Section 18.B., above, GMAC Real Estate, in addition to all other remedies available to it, may terminate this Agreement, effective upon service upon Strategic-Partner of a written notice of termination (the **"GMAC Real Estate Termination Notice"**), provided, prior to the service of the GMAC Real Estate Termination Notice, GMAC Real Estate had served upon Strategic-Partner a written notice of such Default (the **"GMAC Real Estate Default Notice"**) which specified the nature and extent of the Default and Strategic-Partner failed to cure such Default within 30 days after receipt of the GMAC Real Estate Default Notice, or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, Strategic-Partner failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by Strategic-Partner within 90 days of the service of the GMAC Real Estate Default Notice, despite the diligent efforts of Strategic-Partner to do so, GMAC Real Estate shall have the right to serve a GMAC Real Estate Termination Notice at any time thereafter, until the Default is cured).

**D.  Default and Event of Default.**  The term **"Default"**, as used throughout this Agreement, shall mean a material failure to comply with a provision of this Agreement.  The term **"Event of Default"**, as used throughout this Agreement, shall mean a Default for which this Agreement provides no period to cure or for which the period to cure has expired.

**E.  Additional Remedies upon an Event of Default.**  Should Strategic-Partner commit an Event of Default, GMAC Real Estate, without terminating this Agreement, may, at its option, (and in addition to any other remedies available to it under this Agreement), suspend services to Strategic-Partner, remove Strategic-Partner from any GMAC Real Estate websites and other directories, eliminate Strategic-Partner's exclusive territory (if any) under this Agreement, suspend further referrals to Strategic-Partner and remove Strategic-Partner from the authorized referral directory, or take other action deemed appropriate.

F. **Cross-Default.** Notwithstanding any contrary provision of this Agreement or any other Franchise Agreement between Strategic-Partner (and/or its Owners or affiliates) and GMAC Real Estate (each such other Franchise Agreement being a "**Sister Agreement**"), any occurrence of Strategic-Partner's Default and/or Event of Default under this Agreement shall constitute a Default and/or Event of Default under each Sister Agreement, and any occurrence of Strategic-Partner's Default and/or Event of Default under any Sister Agreement shall constitute a Default and/or Event of Default under this Agreement.

## 19. OBLIGATIONS UPON TERMINATION.

A. Upon termination of this Agreement, for whatever reason, Strategic-Partner shall:

(1) within 10 days of such termination, discontinue use of all Marks, including the words "GMAC Real Estate", or any derivation of those words, and refrain from holding itself out to the public in a manner that would suggest that it is a licensee or former licensee of GMAC Real Estate. Strategic-Partner agrees that GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of the Marks. In addition, if Strategic-Partner has used the words "GMAC Real Estate" as part of its internet domain name and such use has not terminated within 10 days of termination of this Agreement, Strategic-Partner will be deemed to have assigned its rights in such domain name to GMAC Real Estate, and GMAC Real Estate may take whatever actions it deems appropriate to terminate such domain name and Strategic-Partner's right to use the same;

(2) on the date of such termination, pay to GMAC Real Estate all fees, charges and other amounts due to GMAC Real Estate, together with the following additional fees:

(a) Royalty Fees and Advertising Fees, computed as set forth on Exhibit A, on GCI attributable to transactions in process on the termination date and to transactions under contract on the date of termination that settle or close within 30 days after termination; and

(b) Referral Fees, computed as set forth above, on referrals sent or received prior to the termination date;

(3) Surrender to GMAC Real Estate or, at the option of GMAC Real Estate, destroy all signs and documentation bearing the Marks, including yard signs, letterheads, advertising and marketing materials, business cards, manuals, training materials, client promotion materials and the like. GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of materials or programs which are part of the Franchise;

(4) Take immediate steps to cancel all advertising, including advertising in the Yellow Pages of the telephone directory, which carries the Marks; and

(5) Execute any documents necessary to effectuate its obligations under this Agreement and take such action as GMAC Real Estate deems reasonably necessary to

evidence the fact that Strategic-Partner has ceased using the Marks and has no further right to use the Marks.

B.  Upon termination of this Agreement pursuant to Section 18.B. or 18.C. above, in addition to the obligations set forth in Section 19.A. above:

(1)   Strategic-Partner shall:

(a)    pay to GMAC Real Estate all financial losses sustained by GMAC Real Estate as the result of the early termination (if the amount of such losses cannot be calculated exactly, they shall be estimated); and

(b)    remain obligated with respect to the provisions of Section 8 of this Agreement; and

(2)   Owners shall be personally liable to GMAC Real Estate for all financial obligations of Strategic-Partner to GMAC Real Estate, but limited to those obligations incurred prior to the date of termination and those based on losses attributable to the one-year period after the date of termination.

For purposes of section 19 b.(2), "losses attributable to the one-year period after the date of termination" shall mean the Total Fee Amounts (defined as Royalty Fees, Advertising Fees and Referral Office Fees) which would have been due from Strategic-Partner under the Agreement had Strategic-Partner performed under the Agreement for the one-year period following the termination date.  For purposes of calculating the Total Fee Amounts for such period, the monthly average of the Royalty Fees and Advertising Fees due from Strategic-Partner, as provided in Exhibit A of this Agreement, for the twenty-four (24) month period preceding the date of termination will be multiplied by twelve, and will be added to the actual Referral Office Fees due for the one-year period following the date of termination.  If the date of termination occurs prior to year three of this Agreement, the Royalty and Advertising Fees portion of the Total Fee Amounts will be based on the amount of such fees due to GMAC Real Estate for the twelve-month period preceding the date of termination.

C.  If, after termination of this Agreement, Strategic-Partner fails to comply with its obligations under this Section, in addition to any other payments required to be made by Strategic-Partner to GMAC Real Estate, Strategic-Partner shall reimburse GMAC Real Estate for all its costs related to its attempt to enforce its rights, including the payment of reasonable collection agency's fees, attorney's fees and costs.

## 20. REPRESENTATIONS AND WARRANTIES.

A.  Strategic-Partner represents that it is either an individual or an entity (properly formed and authorized to do business in the state in which the Licensed Site is located) licensed to sell real estate in the state in which the Licensed Site is located.

B.  Strategic-Partner acknowledges that GMAC Real Estate has delivered to Strategic-Partner, not less than 10 business days prior to the signing of this Agreement, a copy of the

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4                          20

Offering Circular concerning this franchise for the state in which the Licensed Site is located and in which Strategic-Partner intends to do business, which Strategic-Partner has had an opportunity to review. Strategic-Partner further acknowledges that GMAC Real Estate has not, either orally or in writing, represented that Strategic-Partner will achieve in the licensed business any specified level of sales or profit, nor represented the sales or profit level of any other licensee, but has referred Strategic-Partner to the Offering Circular which provides Strategic-Partner with the names, addresses and telephone numbers of other licensees of GMAC Real Estate, so that Strategic-Partner can make its own inquiry. Strategic-Partner further acknowledges that any additional inquiry pertaining to the nature of this franchise which Strategic-Partner has made to GMAC Real Estate, in writing, has been answered, in writing, to the satisfaction of Strategic-Partner.

C. Strategic-Partner acknowledges that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the "Anti-Terrorism Measures"). GMAC Real Estate therefore requires certain representations and warranties that the parties with whom it deals are not directly or indirectly involved in terrorism. Therefore, Strategic-Partner hereby represents and warrants that neither it nor any of its employees, agents, representatives or, as applicable, its principals, members, officers or directors, nor any other person or entity associated with Strategic-Partner (each, individually, a "Strategic-Partner Party" and collectively, the "Strategic-Partner Parties") is:

(i)    a person or entity listed in the Annex to the Executive Order; or

(ii)    a person or entity otherwise determined pursuant to the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism (such a person or entity and those persons and entities listed in the Annex to the Executive Order are referred to herein as "Terrorists"); or

(iii)    a person or entity who assists, sponsors or who supports Terrorists or acts of terrorism ("Sponsors of Terrorism"); or

(iv)    owned or controlled by Terrorists or Sponsors of Terrorism.

Furthermore, Strategic-Partner represents and warrants that neither it nor any Strategic-Partner Party will, during the term of this Agreement, become a person or entity described in clauses (i) – (iv) above.

## 21. ENTIRE AGREEMENT.

This Agreement is the entire agreement of the parties and supersedes any and all prior oral or written agreements or understandings between the parties relating to the subject matter of this Agreement.

## 22. INDEMNIFICATION AND INSURANCE.

Strategic-Partner shall defend, indemnify and hold harmless GMAC Real Estate, its shareholder, agents and employees, from and against any claims for damages, losses and expenses (including attorney's fees) resulting in any way from the conduct of Strategic-Partner's real estate brokerage business. This indemnification obligation shall survive the expiration or earlier termination of this Agreement.

In addition to, and not in substitution for, the above indemnification, Strategic-Partner shall, at its own expense, purchase and maintain: (a) comprehensive general liability insurance, including contractual, products/completed operations and personal injury coverage; (b) comprehensive automobile liability coverage, including owned, non-owned and hired automobiles used in Strategic-Partner's real estate brokerage operations; (c) errors and omissions insurance, with respect to Strategic-Partner's real estate brokerage operations. For the insurance referenced under clauses (a) and (b) above, the minimum limits required shall be $1,000,000 per occurrence for bodily injury and $500,000 per occurrence for property damage, with a maximum deduction of $5,000; for the insurance referenced in clause (c) above, the minimum limits shall be $1,000,000 per annum, with a maximum deduction of $5,000. GMAC Real Estate shall be named as an additional insured on each such policy. Workers Compensation insurance, to the extent required by the law of the state in which the Licensed Site is located, shall be purchased and maintained by Strategic-Partner on each employee and sales associate. All losses resulting from Strategic-Partner's failure to obtain insurance shall be borne by Strategic-Partner, only. In the event of cancellation, non-renewal or material change in Strategic-Partner's required insurance policies, Strategic-Partner shall serve upon GMAC Real Estate a notice of such action at least 30 days prior to the effective date of such action. Strategic-Partner shall deliver to GMAC Real Estate a copy of its insurance binder before the Effective Date and, thereafter, shall serve upon GMAC Real Estate continuous certificates of such coverages (which certificates shall provide that the applicable policies shall not be cancelled without serving upon GMAC Real Estate at least 30-days prior notification of such intended cancellation).

## 23. CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS.

A. **Choice of Law.** Except as expressly provided otherwise, this Agreement shall be construed in accordance with the laws of the state in which the Licensed Site is located. However, no law regulating the offer or sale of franchises, business opportunities or similar interests or governing the relationship between GMAC Real Estate and Strategic-Partner will apply unless its jurisdictional requirements are met independently without reference to this Section. All disputes regarding the validity of the arbitration agreement set forth in Section 23.B shall be governed by the laws of the State of Illinois, without regard for its conflict of laws principles.

B. **Arbitration.** GMAC Real Estate and Strategic-Partner agree that, except for controversies, disputes or claims (together or separately, "Claims") related to the improper use of the Marks, all Claims between GMAC Real Estate and its affiliates (and their respective shareholders, officers, directors, agents, and/or employees)(together, the "GMAC Real Estate

Parties"), and Strategic-Partner (and/or Strategic-Partner's Owners, guarantors, affiliates, and/or employees)(together, the "**Strategic-Partner Parties**") arising out of or related to:

    (1)    this Agreement or any other agreement between Strategic-Partner and GMAC Real Estate;

    (2)    GMAC Real Estate's relationship with Strategic-Partner; or

    (3)    any policy or standard relating to the Franchise or the franchised business;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association ("AAA"). The arbitration proceedings will be conducted by one arbitrator and, except as this section otherwise provides, according to the then current commercial arbitration rules of the American Arbitration Association. All proceedings will be conducted at a suitable location chosen by the arbitrator in the Chicago Metropolitan Area of the State of Illinois and will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

The arbitrator may not declare any Mark generic or otherwise invalid or, except as expressly provided by federal statute, award any punitive or exemplary damages against either party (GMAC Real Estate and Strategic-Partner waive, to the fullest extent permitted by law, except as expressly provided by federal statute, any right to, or claim for, punitive or exemplary damages against the other). The arbitrator shall be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. Each party shall be required to submit all Claims against the other or those Claims shall be forever waived. The arbitrator may not consider any settlement discussions that might have been made by either Strategic-Partner or GMAC Real Estate.

GMAC Real Estate and Strategic-Partner agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between any of the GMAC Real Estate Parties and any of the Strategic-Partner Parties may not be consolidated with any other arbitration proceeding between GMAC Real Estate and any other person or between Strategic-Partner and any other person.

Despite GMAC Real Estate's and Strategic-Partner's agreement to arbitrate, GMAC Real Estate and Strategic-Partner each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that GMAC Real Estate and Strategic-Partner must contemporaneously submit the dispute for arbitration on the merits as provided in this Section.

The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

C. **Waiver of Jury Trial.** To the extent permitted by law, **Strategic-Partner and GMAC Real Estate each waives its right to a trial by jury in any litigation or arbitration proceeding arising from this Agreement or from actions taken pursuant to this Agreement or from the relationship between the parties resulting from this Agreement.**

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

23

D. **Time Limitations for Claims.** Any claim by Strategic-Partner against GMAC Real Estate shall be barred unless, within one year from the date that Strategic-Partner knew, or should have known, of the facts upon which the claim is based, Strategic-Partner filed a formal request for arbitration against GMAC Real Estate, as set forth above.

## 24. MODIFICATION OF AGREEMENT.

Subject to GMAC Real Estate's right to modify its standards and specifications for use of the Marks and other aspects of the operation of a GMAC Real Estate business, no changes may be made in this Agreement unless in writing and signed by all parties.

## 25. SEVERABILITY.

Each Section and provision of this Agreement is severable and, if one portion is invalid, the remaining portions shall nevertheless remain in full force and effect.

## 26. NON-WAIVER.

No failure by GMAC Real Estate to take action on any Default or Event of Default of Strategic-Partner, whether it is a single instance or a series of instances, shall constitute a waiver of such Default or Event of Default or of the performance required of Strategic-Partner. No express waiver by GMAC Real Estate of any performance or Default or Event of Default of Strategic-Partner shall be construed as a waiver of any other or any future obligation or Default or Event of Default.

## 27. NOTICES; FACSIMILE AND ELECTRONIC MAIL.

A. Any notice provided for in this Agreement shall be in writing, addressed to GMAC Real Estate or Strategic-Partner at the respective addresses set forth at the beginning of this Agreement, and shall be served: (a) by personal delivery (which shall be effective upon such personal delivery) or (b) by certified mail, return receipt requested, properly addressed, postage prepaid (which shall be effective on the earlier of the date of delivery as indicated on the return receipt card or 3 days after deposit into the United States mails, or (c) by a nationally recognized overnight delivery service, properly addressed, delivery charges prepaid (which shall be effective on the earlier of the date of delivery as indicated on the carrier's receipt records or 2 days after delivery to the carrier).

B. Although not effective for purposes of giving notice pursuant to Section 27.A. above, each party consents to the other party forwarding facsimile and electronic mail transmissions to the consenting party as follows:

GMAC Real Estate:

To: Contract Administration @ 908-542-5526 (fax) and
susan_daniel@gmacrs.com (e-mail)

Strategic Partner:

To: Ruben Coulanges @ 508-583-6901(fax) and r_coulanges@hotmail.com (e-mail)

Such consent will continue in effect until modified or terminated by written notice to the other party sent in accordance with subparagraph 27.a. above.

## 28. TERM AND RENEWAL.

The term of this Agreement shall be seven (7) years from the Effective Date (as later defined) (the "Term").

At the expiration of the Term, Strategic-Partner shall have the right to enter into a new, ten-year agreement with GMAC Real Estate, subject to the following conditions: (a) Strategic-Partner has provided GMAC Real Estate with written notice of its intent to execute a new agreement at least 180 days prior to the expiration of the Term, and (b) Strategic-Partner is not then and has not been in Default of this Agreement. The new agreement will be in the form then being offered by GMAC Real Estate. The new agreement may contain materially different terms than this Agreement, including those which relate to fees, payment of fees, performance standards, renewal terms and the Marks.

Subject to any contrary applicable state law, if Strategic-Partner continues to use the Marks after the end of the Term, but fails to execute a new agreement, Strategic-Partner will be deemed to be operating under the terms and conditions of the agreement then being offered by GMAC Real Estate, except that the term shall be deemed to be 180 days from the date that GMAC Real Estate is served with a notice of termination by Strategic-Partner (at its option, GMAC Real Estate shall have the right to shorten the term by the service upon Strategic-Partner of a notice fixing a shorter term) and, at the option of GMAC Real Estate but without notice being required, the Royalty Fees shall be increased to an amount equal to 10% of Strategic-Partner's monthly GCI, payable within 48 hours of the completion of each settlement and closing from which Strategic-Partner is entitled to be paid a commission.

## 29. EFFECTIVE DATE.

The parties intend that this Agreement be effective as of February 1, 2005 (the "Effective Date") conditioned upon:

1.) Strategic-Partner having submitted to GMAC Real Estate a copy of the Company's active real estate brokerage license issued by the appropriate regulatory agency of the Commonwealth of Massachusetts; and

2.) Receipt, review and acceptance by GMAC Real Estate of a completed Agent Verification Checklist, including copies of the active real estate brokerage sales agents' licenses for agents associated with Strategic-Partner and verifiable data, acceptable to GMAC Real Estate, documenting the GCI indicated in Strategic-Partner's franchise application; and

3.) Receipt by GMAC Real Estate of the declaration pages for all insurance policies secured by Company as required under Section 22 of the Franchise Agreement. GMAC Real Estate must be named as an additional insured under all of the insurance policies; and

Upon satisfaction of all of the foregoing conditions, or waiver thereof by GMAC Real Estate, GMAC Real Estate will provide Strategic-Partner with written confirmation of the same. If, however, the foregoing conditions are not satisfied by the Effective Date, GMAC Real Estate, at its sole option, may agree to amend the Effective Date to a later date or may terminate this Agreement by sending written notice of termination to Strategic-Partner.

## 30. LIMITATION OF DAMAGES.

Except for Strategic-Partner's obligation to indemnify GMAC Real Estate, as provided by common law or in the Section of this Agreement entitled "Indemnification and Insurance", neither party shall be liable to the other for consequential, punitive or exemplary damages.

## 31. CONFIDENTIALITY OF AGREEMENT.

Except as may be required by law, Strategic-Partner agrees not to publicize or disclose to any third party, without the prior written consent of GMAC Real Estate, the terms of this Agreement.

**[The remainder of this page has been intentionally left blank.]**

IN WITNESS WHEREOF, the parties have executed this Agreement.

GMAC REAL ESTATE, LLC

By: _____

Print Name: Judith O'Brien

Title: Vice President _____

Date: _1-31-05_____

SOUTH SHORE REALTY GROUP, INC.

By: _____

Print Name: Ruben Coulanges_____

Title: President _____

Date: ____1-19-05_____

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

27

## ENDORSEMENT OF PRINCIPALS / OWNERSHIP INTEREST HOLDERS

Each of the Owners identified in Section 17.B. is executing this Agreement for the limited purpose of being personally bound by the provisions of Sections 3 (The Marks), 4 (Materials), 7 (Certain Activities Not Precluded; Rights Reserved; Provision of Other Settlement Services), 8 (No Conflicting License/Interest), 13 (Verification Rights), 17 (Assignment; Ownership; Transfers; Right of First Refusal), 18.F. (Cross-Default), 19.B. (Financial Obligations after Default) of this Agreement and 23 (Choice of Law and Forum; Arbitration; Waiver of Jury Trial; Time Limitation for Claims).

_____     Date: ___1 - 19 - 05___

Ruben Coulanges

## Exhibit A to the Franchise Agreement
## Royalty and Advertising Fees

**a.    Royalty Fees.**

Strategic-Partner shall pay to GMAC Real Estate, Royalty Fees, in accordance with the following:

(1)    <u>Amount</u>. Upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid Gross Commission Income ("GCI"), a Royalty Fee, in an amount equal to five percent (5%) of the GCI to which Strategic-Partner is entitled. In addition, if at the end of each twelve-month period following the Effective Date, the total amount of Royalty Fees paid by Strategic-Partner during such twelve-month period is less than $10,000 (the "Annual Royalty Fee Minimum"), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the Annual Royalty Fee Minimum and the total amount of Royalty Fees actually paid.

If this Agreement is the first contract between GMAC Real Estate and Strategic-Partner, Strategic-Partner shall not be required to pay the Royalty Fees which are based on GCI earned with respect to transactions under contract or in escrow on the Effective Date, provided, however, that such transactions are closed or settled within thirty (30) days after the Effective Date. As to transactions under contract or in escrow on the date of the termination of this Agreement, Strategic-Partner shall be required to pay those Royalty Fees which are based on GCI earned with respect to such transactions, if such transactions close or are settled within thirty (30) days of the termination date.

(2)    <u>Awards</u>. Within 105 days of the end of each calendar-year after the Effective Date, GMAC Real Estate shall pay to Strategic-Partner an award amount ("Award") equal to the following percentage of Strategic-Partner's past calendar-year's GCI:

### AWARD CHART

| Award Level | Gross Commission Income Range From | Gross Commission Income Range To | Maximum Range Amount | Award Multiplier Rate | Maximum Award For Range | Cumulative Maximum Award |
|---|---|---|---|---|---|---|
| 1 | 0 | $1,150,000 | $1,150,000 | N/A | $-0- | $-0- |
| 2 | 1,150,001 | 1,725,000 | 574,999 | N/A | 2,500 | 2,500 |
| 3 | 1,725,001 | 2,300,000 | 574,999 | 1.00 % | 5,750 | 8,250 |
| 4 | 2,300,001 | 4,025,000 | 1,724,999 | 1.25 % | 21,562 | 29,812 |
| 5 | 4,025,001 | 5,750,000 | 1,724,999 | 1.50 % | 25,875 | 55,687 |
| 6 | 5,750,001 | 7,500,000 | 1,749,999 | 1.75 % | 30,625 | 86,312 |
| 7 | 7,500,001 | 9,250,000 | 1,749,999 | 2.00 % | 35,000 | 121,312 |
| 8 | 9,250,001 | 10,950,000 | 1,699,999 | 2.25 % | 38,250 | 159,562 |
| 9 | 10,950,001 | 12,725,000 | 1,774,999 | 2.50 % | 44,375 | 203,937 |
| 10 | 12,725,001 | 15,025,000 | 2,299,999 | 2.75 % | 63,250 | 267,187 |
| 11 | 15,025,001 | 17,350,000 | 2,324,999 | 3.00 % | 69,750 | 336,937 |
| 12 | 17,350,001 | 20,825,000 | 3,474,999 | 3.25 % | 112,937 | 449,874 |
| 13 | 20,825,001 | 24,300,000 | 3,474,999 | 3.50 % | 121,625 | 571,499 |
| 14 | 24,300,001 | 56,600,000 | 32,299,999 | 3.75 % | 1,211,250 | 1,782,749 |
| 15 | 56,600,001 | and higher | as determined | 4.00 % | as calculated | as calculated |

(3)    _Conditions of Awards_.    (a) Notwithstanding the above, Strategic-Partner shall be entitled to no Award in the event that: (i) at any time during the calendar-year for which the Award is applicable or on the date that the Award is to be given, an Event of Default existed or exists, as applicable, regarding this Agreement or any other contract with GMAC Real Estate or any Affiliate; or (ii) during the calendar-year for which the Award is applicable, Strategic-Partner had been more than 30 days in arrears of any payments required to be made by Strategic-Partner to GMAC Real Estate under this Agreement or under any other contract with GMAC Real Estate or any Affiliate; or (iii) on the date that Strategic-Partner would otherwise have been entitled to payment of an Award, this Agreement had been terminated and no new franchise agreement had been entered into between Strategic-Partner and GMAC Real Estate; and

(b)    For the purpose of calculating GCI with respect to Awards under this Section, Strategic-Partner's Licensed Sites contributing to the GCI shall include the Licensed Site listed in Section 6 as well as those other licensed sites (the "Sister Sites") subject to a Sister Agreement (as defined in Section 18.F), _provided_ (i) each of those Sister Sites is owned by the same persons listed in Section 17.B. as Owners, in the same percentages listed in Section 17.B., and (ii) each of those Sister Sites is located within the same local market area. Strategic-Partner and GMAC Real Estate agree that GCI from the following Sister Sites will be considered together with the Licensed Site for purposes of determining any Award due Strategic-Partner:        N/A

(c)    The Gross Commission Income Range figures included in the Award Chart may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the figures in any year be greater than 5%). The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

b.    **Advertising Fees.**

Upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid GCI, Strategic-Partner shall pay to GMAC Real Estate an Advertising Fee, in an amount equal to 2% of the GCI to which Strategic-Partner is entitled, provided, however, the amount of the Advertising Fee in any calendar-month: (i) shall not exceed $870 for that calendar-month; and (ii) shall not be lower than $240 for that calendar-month regardless of transaction count (if this minimum amount has not been received by GMAC Real Estate during any month through payments based on a percentage of GCI for that calendar-month, the difference between this minimum amount and the payments actually received by GMAC Real Estate shall be paid by Strategic-Partner on the first business day after the last day of each calendar-month).

GCI generated by a sales agent shall be attributed to the office location (and/or Licensed Site) at which the sales agent's license is held or registered or, if the applicable state's licensing regulations do not provide for the holding or registration of sales agents' licenses at particular office locations, at the office location (and/or Licensed Site) from which the sales agent principally operates.

Minimum and maximum Advertising Fees may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the Advertising Fees in any year be greater than 5%). The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United

States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

A-3

3/2004 Reg. Fran. Agmt
CHOO1/30423577.4

A-1

## RECEIPT OF FRANCHISE-RELATED DOCUMENTS

The undersigned, personally and/or as an officer or ownership interest holder of the proposed franchisee, does hereby acknowledge receipt of the following documents, in form for execution, relating to the franchise of GMAC Real Estate, LLC:

| [X] | (1) | Franchise Agreement |
| [ ] | (2) | State Rider for the State of _____ |
| [ ] | (3) | Franchise Development Costs Note |
| [ ] | (4) | The Personal Guaranty of Note |
| [ ] | (5) | The Loan and Security Agreement |
| [ ] | (6) | The Pledge Agreement |
| [ ] | (7) | The Subordination Agreement |
| [ ] | (8) | The Term Loan Note |
| [ ] | (9) | Other (specify): _____ |

(Proposed franchisee must initial the box adjacent to the applicable documents)

I further acknowledge my understanding that it is my responsibility, individually and/or as an officer or ownership interest holder of the proposed franchisee, to review all such documents, so that I am fully familiar with the transaction contemplated thereby prior to signing the documents.

DATED: _____1 - 11 - 05_____

A FEDERAL TRADE COMMISSION RULE REQUIRES THAT WE PROVIDE YOU WITH THE FRANCHISE-RELATED DOCUMENTS NOTED ABOVE AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO THE DATE THEY ARE TO BE EXECUTED. PLEASE DO NOT SIGN OR RETURN THESE DOCUMENTS UNTIL FIVE (5) BUSINESS DAYS HAVE ELAPSED FROM THE DATE OF THIS RECEIPT.

_____ individually

and/or as an officer or ownership interest holder of

_____

(a __Massachusetts__ corporation)

(a _____ partnership)

(a _____ limited liability company)

# EXHIBIT C

# AMERICAN ARBITRATION ASSOCIATION

## COMMERCIAL ARBITRATION TRIBUNAL

In the Matter of the Arbitration between

Re:    51 115 01284 07
        GMAC REAL ESTATE, LLC
        and
        South Shore Realty Group, Inc. d/b/a South Shore GMAC Real Estate
        and
        Ruben S. Coulanges
        - Chicago, Illinois
        Claim: $155,673.43

Case Manager: Gilbert A. Camarena

## AWARD OF ARBITRATOR

    I, Paul Bernstein, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the parties on or about January 19, 2005, and the undersigned having been duly sworn, and the oral, face-to-face hearing having been held at the offices of the American Arbitration Association at 225 N. Michigan Ave., Suite # 1840, Chicago, IL 60601 on April 3, 2008, counsel for the Claimant appearing and a witness for Claimant only appearing and having offered sworn testimony based upon which several documents were admitted into evidence, and after the final argument of the attorney for the Claimant, the hearings being declared closed as of April 7, 2008 to allow counsel for Claimant to submit a more detailed time and billing statement for the most current billing period, and the undersigned, having fully reviewed the testimony of the witness and considered the written documents submitted to me and introduced into evidence by Claimant, no one appearing at the hearing on behalf of either Respondent, and having also considered the detailed time and billing information provided by Claimant in regard to Claimant's demands for attorney's fees against Respondents, I hereby, **AWARD**, as follows:

    South Shore Realty Group, Inc., a corporation, d/b/a South Shore GMAC Real Estate organized under the laws of the State of Massachusetts("South Shore"), Respondent, shall pay to GMAC REAL ESTATE, LLC ("GMAC") the sum of One-Hundred-Fifty-Five Thousand, Six-Hundred Seventy-Three-Dollars and Forty-Three cents ($155,673.43) for GMAC'S damages as to claims made in this arbitration proceeding plus Eleven-Thousand, Four Hundred Dollars and no cents ($11,400.00) as and for the attorney's fees of Claimant, or the total sum of One-Hundred-Sixty-Seven Thousand, Seventy-Three-Dollars and Forty-Three cents ($167,073.43), not including arbitration filing and other fees and costs of the American Arbitration Association and not including the charges of the arbitrator.



EXHIBIT

C

Ruben S. Coulanges, personally and individually ("Coulanges"), Respondent, shall pay to GMAC REAL ESTATE, LLC ("GMAC") the sum of Fifty-Nine Thousand, Four-Hundred Sixty-Four-Dollars and Forty-Three cents ($59,464.43) for GMAC'S damages as to claims made in this proceedings plus Eleven-Thousand, Four-Hundred Dollars and no cents ($11,400.00) as and for the attorney's fees of Claimant, or the total sum of Seventy-Thousand Eight-Hundred Sixty-Four-Dollars and forty-three cents ($70,864.43), not including arbitration filing and other fees and costs of the American Arbitration Association and not including the charges of the arbitrator.

The award herein made for One-Hundred-Sixty-Seven Thousand, Seventy-Three-Dollars and Forty-Three cents ($167,073.43) is the full amount of the award in favor of GMAC and is against South Shore. The award made herein against Coulanges for Seventy-Thousand Eight-Hundred Sixty-Four-Dollars and forty-three cents ($70,864.43) is that part of the award in favor of GMAC against South Shore that reflects the contractual, personal guaranty and responsibility of Mr. Coulanges, Mr. Coulanges not being personally liable or responsible for the difference between One-Hundred-Sixty-Seven Thousand, Seventy-Three-Dollars and Forty-Three cents ($167,073.43) and Seventy-Thousand Eight-Hundred Sixty-Four-Dollars and forty-three cents ($70,864.43).

The administrative filing and case service fees of the American Arbitration Association, totaling $4,200.00, and the fees and expenses of the arbitrator, totaling $1,800.00 shall be borne entirely by South Shore and Coulanges jointly and severally.

Therefore, South Shore and Coulanges shall be liable jointly and severally to reimburse GMAC the sum of $6,000.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by GMAC.

Interest will accrue at the rate of interest provided by the laws of the State of Massachusetts until judgment is entered on this award from and after the date of this award and thereafter as provided by said State's applicable laws or rules in regard to the payment of interest on judgments.

The above sums are to be paid on or before ten days from the date of this Award.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are, hereby denied.

Signed: _____          DATED: April 9, 2008

Paul Bernstein, Esq. Arbitrator